**ORAL ARGUMENT NOT YET SCHEDULED**

No. 26-1176

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————————

**LIVEVIDEO.AI CORP.,**

Petitioner,

v.

**FEDERAL COMMUNICATIONS COMMISSION and**
**UNITED STATES OF AMERICA,**

Respondents.

———————————————

**ON PETITION FOR REVIEW OF AN ORDER OF THE**
**FEDERAL COMMUNICATIONS COMMISSION**

———————————————

**BRIEF FOR PETITIONER LIVEVIDEO.AI CORP.**

———————————————

Alfred C. Constants III, Esq.

Constants Law Offices, LLC

115 Forest Avenue, Unit 331

Locust Valley, NY 11560

(516) 200-9660

1

constantslaw49@gmail.com

Counsel for Petitioner LiveVideo.AI Corp.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioner certifies as follows:

(A) Parties and Amici. Petitioner is LiveVideo.AI Corp. Respondents are the Federal Communications Commission and the United States of America. Participants in the underlying proceeding, MB Docket No. 24-275, whose interests may be affected include Skydance Media, LLC; Paramount Skydance Corporation; Paramount Global; National Amusements, Inc.; Warner Bros. Discovery, Inc.; Center for American Rights; FUSE Media; the Gabelli Entities; One Ministries, Inc.; and Mack Toys, Inc. No amici have appeared.

(B) Rulings Under Review. The ruling under review is the Commission's Memorandum Opinion and Order, FCC 25-43, MB Docket No. 24-275 (released July 24, 2025) (JA__). Also at issue is the Commission's failure to act on Petitioner's timely Application for Review (Aug. 1, 2025) and related post-order filings (JA__).

(C) Related Cases. This case has not previously been before this Court. Counsel is aware of LiveVideo.AI Corp. v. Redstone, No. 24-CV-6290 (DEH) (BCM) (S.D.N.Y.), and No. 25-2954 (2d Cir.), and of the Commission's pending foreign-ownership proceeding, MB Docket No. 26-93.

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioner LiveVideo.AI Corp. states that it is a privately held corporation; it has no parent corporation, and no publicly held corporation owns 10% or more of its stock. Its general nature and purpose is that of a technology and media company engaged in video streaming, content discovery and distribution; it appears here as a shareholder of, and competing bidder for, Paramount.

**TABLE OF CONTENTS**

GLOSSARY.................................................................................................9

JURISDICTIONAL STATEMENT....................................................................10

STATEMENT OF THE ISSUES.......................................................................10

STATUTES AND REGULATIONS...................................................................12

STATEMENT OF THE CASE.........................................................................12

    A.  LiveVideo's Participation and the Suppression of Its Competing Bid......12

    B.  The Order, and the Questions It Did Not Answer....................................13

    C.  The Operator Predicate Collapses...........................................................13

    D.  The Integrated UFC Transaction and the Falsified Representations.........14

    E.  Defiance of Congress While Lobbying the Commission...........................14

    F.  The Successive Transaction, the Foreign-Ownership Request, and the Commission's Announced Posture...........................................................15

    G.  Docketed Integrity Allegations, Disclosure Failures, and the Appearance of Conflict.............................................................................................15

    H.  Independent Corroboration: A Dissenting Commissioner, a State Investigation, and a Twelve-State Antitrust Suit......................................16

SUMMARY OF ARGUMENT.........................................................................18

STANDARD OF REVIEW..............................................................................20

ARGUMENT...............................................................................................21

    I.  The Order Is Not Yet Final, the Time to Seek Review Has Not Begun, and the Commission's Refusal to Decide Is Agency Action Unreasonably Withheld................................................................................................21

        A.  A Bureau action is not a final Commission order until the Commission acts on a timely application for review........................21

        B.  The Commission's year of silence is unreasonable under every TRAC factor...................................................................................22

    II.  The Order Is Arbitrary and Capricious and Was Issued Without Observance of Procedure Required by Law............................................23

        A.  The Order's operator-fitness predicate has collapsed, and the Commission has never confronted it.................................................23

        B.  The Order is silent on the docketed evidence, the Congressional warnings, and the ex parte questions...............................................24

    C. The contested questions of candor and character required a hearing 26

    D. To the extent the Order rested approval on promises to alter news content, it credited a consideration Section 326 places beyond the Commission's power ........................................................................ 26

    E. The Order's sole engagement with LiveVideo's evidence—a footnote relaying the applicants' character attack on a timeline that could not support it—confirms the silence rather than curing it ..................... 28

    F. The Commission never addressed the Applicants' own contemporaneous SEC disclosure discrepancy about the same litigation ................................................................................................ 31

III. The Commission Reviewed a Fraction of the Transaction and Relied on Representations That Events Have Falsified ........................................... 32

IV. The Commission Ignored Evidence of Undisclosed Pre-Approval Control and the Applicants' Defiance of Congressional Oversight ...................... 33

V. The Commission Left Unresolved Docketed Allegations of Bribery, Obstruction, and Backdating, and an Appearance of Disqualifying Conflict .................................................................................................... 34

    A. The integrity allegations were docketed, specific, and unanswered. 34

    B. The appearance of a disqualifying conflict required resolution, not avoidance ........................................................................................ 35

    C. The applicants' and the Commission's unexplained silence warrants an adverse inference, and the applicants' litigation-driven disclosure confirms a want of candor .................................................................. 39

VI. The Foreign-Ownership Relief Exceeds Section 310(b)(4) and the Commission's Own Rules, Which Must Be Set Aside as Applied .......... 40

VII. Neither Harmless Error nor the Breadth of the Public-Interest Standard Can Save the Order .............................................................................. 45

VIII. The Court Should Vacate and Remand with Instructions and Bar Closing Pending Review ......................................................................... 46

CONCLUSION .................................................................................................. 49

CERTIFICATE OF COMPLIANCE .................................................................. 50

CERTIFICATE OF SERVICE ........................................................................... 51

ADDENDUM — PERTINENT STATUTES AND REGULATIONS ................. 52

# TABLE OF AUTHORITIES

*Authorities upon which Petitioner chiefly relies are marked with an asterisk (*).*

**CASES**

*Allied-Signal, Inc. v. NRC, 988 F.2d 146 (D.C. Cir. 1993)*...................................46

*Am. Radio Relay League, Inc. v. FCC, 524 F.3d 227 (D.C. Cir. 2008)*.................24

*Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009)*.......................................35

*Cinderella Career & Finishing Schs., Inc. v. FTC, 425 F.2d 583 (D.C. Cir. 1970)*
............................................................................................35, 37, 41, 45

*\*Citizens for Jazz on WRVR, Inc. v. FCC, 775 F.2d 392 (D.C. Cir. 1985)*............26

*Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971)*...........24, 26

*City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114 (2d Cir. 2011)*........31

*Encino Motorcars, LLC v. Navarro, 579 U.S. 211 (2016)*................................23, 45

*\*FCC v. Fox Television Stations, Inc., 556 U.S. 502 (2009)*................23, 32, 44, 45

*FCC v. League of Women Voters of Cal., 468 U.S. 364 (1984)*..............................27

*FCC v. WOKO, Inc., 329 U.S. 223 (1946)*......................................................26, 40

*FTC v. Dean Foods Co., 384 U.S. 597 (1966)*.......................................................47

*\*Functional Music, Inc. v. FCC, 274 F.2d 543 (D.C. Cir. 1958)*.....................41, 48

*Gencom, Inc. v. FCC, 832 F.2d 171 (D.C. Cir. 1987)*...........................................26

*Gibson v. Berryhill, 411 U.S. 564 (1973)*.............................................................35

*Home Box Office, Inc. v. FCC, 567 F.2d 9 (D.C. Cir. 1977)*.................................24

*In re Core Commc'ns, Inc., 531 F.3d 849 (D.C. Cir. 2008)*..................................22

*\*Int'l Union, UAW v. NLRB, 459 F.2d 1329 (D.C. Cir. 1972)*..............................39

*Judulang v. Holder, 565 U.S. 42 (2011)*..............................................................46

*McGrain v. Daugherty, 273 U.S. 135 (1927)*........................................................34

*\*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983)*
............................................................................................26, 30, 32, 38, 46

*Passalacqua Builders, Inc. v. Resnick Devs. S., Inc., 933 F.2d 131 (2d Cir. 1991)*
............................................................................................30

*Reuters Ltd. v. FCC, 781 F.2d 946 (D.C. Cir. 1986)*.............................................24

*Sangamon Valley Television Corp. v. United States, 269 F.2d 221 (D.C. Cir. 1959)*
............................................................................................24

*Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4 (1942)*........................................47

*SEC v. Chenery Corp., 332 U.S. 194 (1947)..................................24, 30, 34, 39, 46

Taxpayers Watchdog, Inc. v. Stanley, 819 F.2d 294 (D.C. Cir. 1987)....................47

*Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70 (D.C. Cir. 1984).......................................................................................................22

Trump v. Slaughter, 609 U.S. ___ (2026)...............................................................36

Tumey v. Ohio, 273 U.S. 510 (1927)......................................................................35

Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622 (1994)...........................................27

## STATUTES, RULES & REGULATIONS

*5 U.S.C. § 706(1), (2)(A), (C), (D).......................................................20, 25, 27, 41

18 U.S.C. §§ 201, 208, 1505........................................................16, 34, 35, 36

28 U.S.C. §§ 1651, 2342(1), 2344.........................................................10, 21

*47 U.S.C. §§ 155(c)(7), 405................................................................10, 21, 48

47 U.S.C. §§ 309(a), 309(e), 310(d), 326, 402(a)…10, 11, 19, 21, 26, 27, 33, 40, 47

*47 U.S.C. § 310(b)(4)..................................................11, 16, 20, 40, 41, 43, 47

5 C.F.R. §§ 2635.202, 2635.502...............................................................36, 37, 38

47 C.F.R. §§ 1.17, 1.65, 1.115, 1.1202(a), 1.1206, 1.1208(b), 1.1214, 1.1216,....10, 13, 16, 21, 24, 25, 35, 39, 41, 42, 43, 44, 48

1.5000(d), 1.5001(k), 1.5002, 1.5003, 1.5004(f)

# GLOSSARY

APA — Administrative Procedure Act

Application for Review — LiveVideo's Aug. 1, 2025 Application for Review under 47 C.F.R. § 1.115

Commission / FCC — Federal Communications Commission

Committee — Committee for the Assessment of Foreign Participation in the U.S. Telecommunications Services Sector

ECFS — Electronic Comment Filing System

JA — Joint (Deferred) Appendix

OGE — U.S. Office of Government Ethics (Form 278e financial disclosure)

Order — Memorandum Opinion and Order, FCC 25-43 (July 24, 2025)

WBD — Warner Bros. Discovery, Inc.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. §§ 2342(1) and 2344 and 47 U.S.C. § 402(a) to review final orders of the Commission, and under the All Writs Act, 28 U.S.C. § 1651, to compel agency action unlawfully withheld. Venue lies here under 28 U.S.C. § 2343.

The Order issued as a Media Bureau action on delegated authority. LiveVideo filed a timely Application for Review on August 1, 2025, together with successive petitions for reconsideration (Ex. G; JA__). The Commission has never acted on them. Under 47 U.S.C. §§ 155(c)(7) and 405 and 47 C.F.R. § 1.115, a Bureau action does not become a final, judicially reviewable order of the Commission until the Commission itself acts on a timely application for review. The 60-day period of 28 U.S.C. § 2344 has therefore not begun to run, and this petition is not untimely. Should the Court conclude that the Order is not yet final, LiveVideo seeks in the alternative a writ of mandamus directing the Commission to decide. LiveVideo—a Paramount shareholder, a competing bidder, and an active participant below—is a party aggrieved with Article III and statutory standing.

## STATEMENT OF THE ISSUES

1.  Whether the Bureau's Order is a final, reviewable order of the Commission while LiveVideo's timely Application for Review remains

undecided, and whether the Commission's year-long refusal to decide is agency action unreasonably withheld warranting mandamus.

2. Whether the Order is arbitrary and capricious, and was issued without observance of procedure required by law, where the Commission left unaddressed the docketed evidence, the Congressional correspondence, the ex parte questions, and the collapse of the operator-fitness predicate on which its public-interest finding rested.

3. Whether the Commission arbitrarily reviewed the license transfer in isolation from the integrated $7.7 billion UFC transaction, and relied on public-interest representations that post-closing events falsified.

4. Whether the Commission was required to resolve, rather than ignore, the docketed allegations of undisclosed pre-approval control, bribery, obstruction, backdated amendments, and an appearance of disqualifying conflict, and whether those questions required a hearing under 47 U.S.C. § 309(e).

5. Whether the foreign-ownership relief now sought exceeds 47 U.S.C. § 310(b)(4) and the Commission's own rules; whether the Commission may make the required public-interest finding on an ownership record that was amended after the Executive Branch certified it complete and still does not identify the holders of ninety-nine percent of the sponsor's equity; and

11

whether the Commission's January 2026 foreign-ownership orders must be set aside as applied.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the Addendum.

## STATEMENT OF THE CASE

### A. LiveVideo's Participation and the Suppression of Its Competing Bid.

MB Docket No. 24-275 concerned the transfer of Paramount's broadcast licenses to Skydance Media. LiveVideo—a Paramount shareholder and a competing bidder—participated from the outset, filing a petition to deny, motions for production and to supplement, authenticated evidence, a petition for decision on an incomplete record, and, after the Order, an Application for Review and successive petitions for reconsideration (Ex. B; JA__).[1] The record reflects a particularized pattern: after LiveVideo sought inclusion in the sale process, Paramount's General Counsel was terminated on June 29, 2024 with a $9.8 million severance; LiveVideo's July 5, 2024 written offer—materially superior for public shareholders —was concealed from the Board; and the Skydance agreement was executed 48 hours later (Ex. B; JA__).

_____

[1] LiveVideo ECFS Submission, Undisclosed Meetings with Political Figures (June 2024), ECFS No. 121748636152; Ex Parte Notice: Ellison/Trump UFC Meeting Allegations, ECFS No. 12172715422979 (June 4, 2025); Congressional Correspondence, ECFS No. 10723133656643 (July 23, 2025).

This was not a lone-objector proceeding. One Ministries, Sean Kiggins, a labor coalition led by Teamsters Local 399, the Gabelli Entities, Center for American Rights, FUSE Media, and Mack Toys all appeared (Ex. B; JA__). The Commission itself identified four timely second-cycle pleadings, LiveVideo's among them.

**B. The Order, and the Questions It Did Not Answer.**

On July 24, 2025, the Bureau approved the transfer (Ex. A; JA__). The Order made no findings on the authenticated evidence LiveVideo had docketed on June 16, 2025; none on the Congressional correspondence docketed June 4 and July 23, 2025; none on whether the applicants' July 2025 ex parte notices were complete under 47 C.F.R. § 1.1206; and none on LiveVideo's unrebutted motions for production and to enlarge the issues (Exs. B–F; JA__). It rested instead on the premise that the post-merger enterprise would be operated in the public interest by a qualified operator.

**C. The Operator Predicate Collapses.**

Within months, that operator—Jeffrey Shell—was forced from leadership amid allegations, pressed in litigation and in public reporting, that he disclosed material nonpublic information concerning Paramount's $7.7 billion UFC rights deal and its then-undisclosed plan to bid for Warner Bros. Discovery.[2] The lost

---

[2] First Amended Complaint, Cipriani v. Shell, No. 26SMCV01156 (L.A. Super. Ct. Mar. 2026); B. Manfredi, With Paramount, Jeff Shell Plunges Yet Another Media Company Into a PR Crisis, MSN (Apr. 2026).

operating experience has not been replaced. The Commission has made no finding about any of it.

**D. The Integrated UFC Transaction and the Falsified Representations.**

By the applicants' own account, the $7.7 billion UFC rights deal was part of the Paramount–Skydance transaction; the Commission evaluated the transfer in isolation. Shell's own cross-complaint asserts he "did not become the President of Paramount until August 2025"—an admission that he exercised de facto commercial authority over Paramount's largest pending transaction before holding office.[3] After closing, the applicants' local-journalism representations were contradicted by reported mass layoffs, and $7.7 billion was wired to TKO—whose executives participated in the undisclosed June 7, 2025 interaction—four days after closing, for rights analysts described as above market (Exs. I, J; JA__).

**E. Defiance of Congress While Lobbying the Commission.**

United States Senators wrote on May 19, 2025 seeking documents by June 2; the applicants produced nothing. They instead pressed an ex parte campaign before the Commission—notices of July 17, 21, 22, and 23, 2025—that omitted the pending Congressional inquiries (Ex. B; JA__). LiveVideo docketed the Senate

---

[3] Cross-Complaint, Cipriani v. Shell, supra (message attributed to Shell: "We are buying ALL of the UFC rights for the next 7 years for Paramount … $7 billion + … Very hush hush until we sign"); MLex (June 17, 2025).

correspondence on July 23, 2025, one day before the vote (Ex. F; JA__).[4] The Order never mentions it.

**F. The Successive Transaction, the Foreign-Ownership Request, and the Commission's Announced Posture.**

The enterprise then moved to acquire Warner Bros. Discovery for $110.9 billion, financed by roughly $24 billion from the sovereign-wealth funds of Saudi Arabia, Qatar, and Abu Dhabi. On April 24, 2026, Paramount petitioned for a declaratory ruling (MB Docket No. 26-93) disclosing approximately 49.5% foreign ownership and seeking advance approval that could reach 100%. The Commission revised its foreign-ownership framework on January 29, 2026; weeks later the Chairman publicly called the deal "cleaner," predicted approval "pretty quickly," called the agency's role "minimal," and described the foreign-ownership review as warranting only a "very quick, almost pro forma review."[5] Senators objected on March 23, May 20, and June 18, 2026 (Ex. J; JA__).[6]

**G. Docketed Integrity Allegations, Disclosure Failures, and the Appearance of Conflict.**

---

[4] Congressional Correspondence, ECFS No. 10723133656643 (July 23, 2025) (Ex. F; JA__).

[5] Sawdah Bhaimiya, FCC Chief Tells CNBC WBD-Paramount Merger Deal Is "Cleaner" than Netflix's, Will Be Approved "Quickly," CNBC (Mar. 3, 2026); Jon Brodkin, FCC Chair Calls Paramount/WBD Merger "A Lot Cleaner" than Defunct Netflix Deal, Ars Technica (Mar. 3, 2026).

[6] Letter from U.S. Senators to FCC Chairman Brendan Carr (June 18, 2026) (citing Paramount Global, Petition for Declaratory Ruling, MB Docket No. 26-93 (Apr. 24, 2026)); Letters of Mar. 23 and May 20, 2026.

Senators invoked 18 U.S.C. § 201 in docketed correspondence; the applicants missed the June 2, 2025 deadline and produced only partial materials, conduct LiveVideo contends obstructed a congressional proceeding, 18 U.S.C. § 1505; and the docket appears to reflect amendments treated as effective as of dates earlier than their actual filing, 47 C.F.R. § 1.65 (Exs. B, F, J; JA__).

In related litigation, National Amusements—the entity whose ownership is the entire subject of this transfer—repeatedly declined to disclose who owns it: it withheld its Rule 7.1 corporate-disclosure statement in the Southern District of New York until the day it moved for sanctions, and it has not filed the FRAP 26.1 statement required in the Second Circuit (No. 25-2954). That is the same reticence about ownership that recurs in the unnamed holders at the center of the § 310(b)(4) request. And the Chairman's spouse serves as head of global policy at Palantir Technologies, in which the President took disclosed positions while promoting it, even as he expressed support for this transaction (Ex. J; JA__). The Commission addressed none of it.

**H. Independent Corroboration: A Dissenting Commissioner, a State Investigation, and a Twelve-State Antitrust Suit.**

The concerns LiveVideo pressed below are no longer its alone. FCC 25-43 did not issue on a unanimous Commission; Commissioner Gomez dissented, characterizing the approval as a "cowardly capitulation." A state law-enforcement

office separately investigated the same category of undisclosed influence LiveVideo alleged—an effort internally styled "Project Warrior," the applicants' own name for their campaign to secure federal-official support, including a favorable Department of Justice statement—and in that investigation the applicants declined service, delayed for weeks, and objected the day production was due. A sitting state Attorney General publicly called the federal approval a "rubber stamp."

When that state withdrew its discovery motion, the matter did not end: its findings were folded, days later, into a multistate complaint, led by the California Attorney General and joined by a coalition of States and the Writers Guild of America, to block the transaction under Section 7 of the Clayton Act. The district court entered a temporary restraining order against consummation on July 20, 2026, later extended to August 17, 2026, and on July 24, 2026 the parties stipulated that the transaction will not close until the earlier of five days after a merits determination or June 1, 2027—a contingent deferral, not a firm floor, that could lift on short notice. Stipulation and [Proposed] Order Not to Close, Dkt. Nos. 169–170, No. 4:26-cv-07116-AMO (N.D. Cal.) (filed July 24, 2026).

Corroboration comes from a further independent direction: a Paramount stockholder has sued Ellison family principals and the Paramount board in a derivative action alleging that the same principals promised improper benefits to secure favorable federal treatment for this transaction. Robbins v. Ellison, C.A. No.

2026-0928 (Del. Ch., filed July 14, 2026). Petitioner offers that filing only for the fact that an independent shareholder, in a different forum, has advanced a substantially similar concern—not for the truth of its allegations. That an approval LiveVideo calls unlawful is independently condemned by a dissenting Commissioner, a state investigation, a state Attorney General, a multistate coalition, and a shareholder-derivative plaintiff is not cumulative detail. It is convergence, from institutions and litigants with different incentives, on the same conclusion. (Exs. P–R; JA__).

## SUMMARY OF ARGUMENT

Three grounds independently warrant relief: the Commission's year-long refusal to decide LiveVideo's pending filings; its failure to enforce its own ex parte rules on a record it left unaddressed; and a foreign-ownership request that exceeds the Commission's own rules on their face. The pattern of more than fifteen unanswered filings supplies the backdrop against which all three are assessed.

An agency may not immunize its work from judicial review by never finishing it. LiveVideo filed a timely Application for Review on August 1, 2025. Nearly a year later, the Commission has not decided it—or any of the more than fifteen filings LiveVideo placed before it. That failure has two consequences. The Bureau's Order is not yet a final, reviewable order of the Commission, and the 60-day clock of § 2344 has not begun; LiveVideo is not late, the Commission is. And the same silence

is agency action unreasonably withheld, which this Court remedies by mandamus. Part I.

On the merits, the Order cannot survive arbitrary-and-capricious review. It rested on a fit-operator premise that collapsed within months, and the Commission has never confronted the collapse. It is silent on the authenticated evidence, the docketed Congressional warnings, and its own ex parte rules. It resolved by omission contested questions of candor and character that § 309(e) commits to a hearing. And to the extent it credited the applicants' promises to alter news content, it rested on a consideration 47 U.S.C. § 326 forbids. Part II.

The Commission also reviewed a fraction of the transaction—excluding the integrated $7.7 billion UFC deal the applicants themselves treated as part of it—and rested on public-interest representations that post-closing layoffs and an above-market payout to an ex parte counterparty falsified. Part III. It ignored evidence of undisclosed pre-approval control and the applicants' defiance of Congress. Part IV. And it left unresolved docketed allegations of bribery, obstruction, and backdating, and an unaddressed appearance of disqualifying conflict, drawing no response from the applicants or the Commission to any of it. Those failures warrant adverse inferences and are independently corroborated by a dissenting Commissioner and a twelve-state antitrust suit. Part V.

Finally, the foreign-ownership relief now sought exceeds both § 310(b)(4) and the Commission's own January 2026 rules, which cap advance approval for non-controlling investors at 49.99%—not 100%. Those rules may be attacked as applied. And the Commission cannot in any event make the required public-interest finding on an ownership record that was amended after the Executive Branch certified it complete and that still does not identify the holders of ninety-nine percent of the sponsor's equity. Part VI. Neither harmless error nor the breadth of the public-interest standard can save the Order. Part VII. The Court should vacate and remand with instructions, bar closing before review is complete, or, at minimum, issue the writ. Part VIII.

## STANDARD OF REVIEW

The Court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D). It must "compel agency action unlawfully withheld or unreasonably delayed." Id. § 706(1). Reasoned decisionmaking requires the agency to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made"; an agency acts arbitrarily when it "entirely fail[s] to consider an important aspect of the problem." Motor Vehicle Mfrs. Ass'n v. State

Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Questions of jurisdiction, finality, and statutory authority are reviewed de novo.

**ARGUMENT**

## I. THE ORDER IS NOT YET FINAL, THE TIME TO SEEK REVIEW HAS NOT BEGUN, AND THE COMMISSION'S REFUSAL TO DECIDE IS AGENCY ACTION UNREASONABLY WITHHELD.

An agency may not insulate a decision from judicial review by never finishing it. That is what has happened here.

### A. A Bureau action is not a final Commission order until the Commission acts on a timely application for review.

The Communications Act permits delegation, but conditions it on a right of Commission-level review. 47 U.S.C. § 155(c)(7); see id. § 405; 47 C.F.R. § 1.115. Until the Commission acts on a timely application for review, the delegated action is not the Commission's final word—and it is the Commission's final word that § 402(a) and § 2342(1) make reviewable. LiveVideo filed its Application for Review on August 1, 2025 (Ex. G; JA__). It has never been decided. The Order is therefore not final, and the 60-day period of 28 U.S.C. § 2344 has not begun to run.

The Commission cannot answer that this petition is at once premature and untimely, nor treat its Order as final enough to permit a multi-billion-dollar

consolidation yet too tentative to review. If the Order is not final, the remedy is mandamus, not dismissal; the Commission may not manufacture unreviewability. If it is final, the petition is timely, because the clock never started while Commission review remained pending. Either way, this Court has a case before it.

**B. The Commission's year of silence is unreasonable under every TRAC factor.**

The Commission has neither granted nor denied more than fifteen filings—an Application for Review, petitions for reconsideration, a petition for declaratory ruling, motions to supplement and to compel, authenticated evidence, and docketed Congressional correspondence (Ex. B; JA__). The time an agency takes "must be governed by a 'rule of reason.'" Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70, 80 (D.C. Cir. 1984). No rule of reason tolerates a year of total silence on a record raising integrity questions about the Nation's largest broadcast transaction, while a $110.9 billion successor transaction races toward closing. The interests prejudiced are weighty—a competing bidder's rights, the integrity of a major ownership decision, and the public's. And no competing priority has been offered, because none has been articulated at all. This Court has issued the writ on far less. In re Core Commc'ns, Inc., 531 F.3d 849, 855–62 (D.C. Cir. 2008).

The Commission's own records establish the silence. Its Proceeding 24-275 History Report reflects a single Bureau merits action in the docket—the July 24,

2025 Order—and discloses no order, ruling, or disposition of any kind thereafter, through the report's generation on July 16, 2026: eleven months and three weeks in which not one of LiveVideo's post-Order filings was decided (Ex. O; JA__). Fed. R. Evid. 201(b)(2). Delay of that magnitude, on a record of this consequence, is unreasonable as a matter of law. The Court should either review the Order as final or direct the Commission to decide LiveVideo's pending filings within a date certain.

## II. THE ORDER IS ARBITRARY AND CAPRICIOUS AND WAS ISSUED WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW.

The Commission approved the transfer of one of the Nation's most consequential broadcast portfolios without answering a single question LiveVideo placed before it.

### A. The Order's operator-fitness predicate has collapsed, and the Commission has never confronted it.

The Order's public-interest finding presupposed competent, candid operation. Within months the enterprise's only seasoned operator was forced out amid securities-disclosure allegations, and the lost experience was never replaced. An agency that has relied on a factual predicate must reckon with its negation; it may not rest on a rationale the facts have overtaken. FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009); see Encino Motorcars, LLC v. Navarro, 579 U.S. 211,

221–22 (2016). The Commission has said nothing—not that the change is immaterial, not that the operator was replaced, not that the public interest is unaffected. Silence is not an explanation, and this Court cannot supply one the agency never gave. SEC v. Chenery Corp., 332 U.S. 194, 196 (1947).

**B. The Order is silent on the docketed evidence, the Congressional warnings, and the ex parte questions.**

Judicial review proceeds on "the full administrative record that was before the [agency] at the time [it] made [its] decision." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971). That record contained authenticated video of an undisclosed, outcome-oriented contact; Senate correspondence warning of improper consideration; and unrebutted motions for production. The Order addresses none of them, and makes no finding whether the applicants' July 2025 ex parte notices were complete under 47 C.F.R. § 1.1206. That is not a housekeeping lapse. The permit-but-disclose bargain is what makes off-the-record advocacy compatible with reasoned review; absent enforcement, "the elaborate public discussion in the dockets … may be a sham and a fiction." Home Box Office, Inc. v. FCC, 567 F.2d 9, 54 (D.C. Cir. 1977); see Sangamon Valley Television Corp. v. United States, 269 F.2d 221, 224 (D.C. Cir. 1959); Am. Radio Relay League, Inc. v. FCC, 524 F.3d 227, 237 (D.C. Cir. 2008) (rejecting a "hide and seek" approach to materials the agency relied on); Reuters Ltd. v. FCC, 781 F.2d 946, 952 (D.C. Cir. 1986). An order leaving such

allegations wholly unaddressed was "issued without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

LiveVideo did not raise these concerns in the abstract. On June 20, 2025—more than a month before the vote—it filed a Petition for Declaratory Ruling invoking the ex parte rules by section: 47 C.F.R. §§ 1.1202(a), 1.1206(a)(1), 1.1208(b), and 1.1216 (Ex. E; JA__). The petition asked the Commission to declare the applicants' undisclosed contacts a violation, to order complete ex parte notices, and to dismiss the application. The Commission granted the transfer without ruling on that petition or on the June 16 evidentiary submission supporting it. An agency that grants the very application a docketed, rule-specific petition asked it to dismiss —without a word of explanation—has not engaged in reasoned decisionmaking.

The procedural gap is confirmed on the face of the record. LiveVideo lodged ex parte-violation complaints with the Commission's Office of General Counsel and, on August 11, 2025, petitioned the Commission to release the Office's determinations and to explain their omission from the Order (Ex. H; JA__). See 47 C.F.R. §§ 1.1214, 1.1216. The Commission neither released any determination nor acknowledged the request. An order resolving a transfer while the agency's own ex parte-enforcement process remains unopened, its determinations unpublished, and a docketed petition to disclose them unanswered, was not the product of the procedure the rules require. 5 U.S.C. § 706(2)(D).

A related defect appears on the face of the Order. Its treatment of the parent's voting control rests on a purported July 16, 2025 amendment that the applicants' own disclosures do not mention and that does not independently appear in the docket —even though the Bureau elsewhere deemed a change in that same voting control a "major amendment" warranting a fresh pleading cycle. FCC 25-43 ¶ 3. An order whose factual predicate cannot be reconciled with the record it cites cannot survive review. Overton Park, 401 U.S. at 419–20; State Farm, 463 U.S. at 43.

**C. The contested questions of candor and character required a hearing.**

Where the record raises a substantial and material question about an applicant's qualifications, § 309(e) commits the question to a hearing; it is not optional. A hearing is required where "the totality of the evidence arouses a sufficient doubt" whether a grant serves the public interest. Citizens for Jazz on WRVR, Inc. v. FCC, 775 F.2d 392, 395 (D.C. Cir. 1985); accord Gencom, Inc. v. FCC, 832 F.2d 171, 180–81 (D.C. Cir. 1987). And candor is dispositive of fitness, because "[t]he fact of concealment may be more significant than the facts concealed." FCC v. WOKO, Inc., 329 U.S. 223, 227 (1946). The Commission resolved these questions by not asking them.

**D. To the extent the Order rested approval on promises to alter news content, it credited a consideration Section 326 places beyond the Commission's power.**

Congress has withheld from the Commission any "power of censorship" over broadcast content and forbidden it to impose any regulation or condition "which shall interfere with the right of free speech by means of radio communication." 47 U.S.C. § 326. The Commission may not condition, reward, or withhold a license on the viewpoint or perceived "bias" of a broadcaster's journalism. See FCC v. League of Women Voters of Cal., 468 U.S. 364, 378–80 (1984); Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 641 (1994). Yet the record—including a Member of Congress's docketed August 18, 2025 letter and the applicants' own public representations—reflects that the transaction was accompanied by commitments to address perceived "bias" in CBS's news programming, commitments Commissioner Gomez's dissent decried as "never-before-seen controls over newsroom decisions and editorial judgment, in direct violation of the First Amendment and the law." To the extent the Order credited those content-directed commitments as part of its public-interest rationale, it rested on a factor § 326 forbids it to weigh and acted "in excess of statutory … authority, or limitations." 5 U.S.C. § 706(2)(C). Petitioner does not ask this Court to vindicate the licensee's editorial rights. It asks the Court to hold, as a matter of the Commission's own jurisdiction, that an approval resting on government-extracted editorial concessions cannot stand.

**E. The Order's sole engagement with LiveVideo's evidence—a footnote relaying the applicants' character attack on a timeline that could not support it—confirms the silence rather than curing it.**

The Order's closest approach to LiveVideo's evidence proves the point. Discussing the applicants' Opposition, the Order states that "the Applicants state that LVA's unfounded allegations of bid-rigging and sexual misconduct are devoid of any credible factual evidence and remain unadjudicated, such that the Commission should not consider them." FCC 25-43 ¶ 14 & n.60. The attribution is the whole of it: the Commission does not find the allegations unfounded; it reports that the Applicants said so. The footnote then relays the Applicants' further submission that LiveVideo's principal is "a serial litigant who is known to abuse judicial process to air personal grievances and harass perceived enemies … sanctioned by a federal court that found him to be a 'vexatious litigant,'" sourced to an order in an unrelated, decade-old corporate dispute with no connection to this transaction, this docket, or the conduct at issue. See Order Granting Motion to Declare Plaintiff a Vexatious Litigant, Greenspan v. IAC/InterActiveCorp., No. 5:14-cv-04187-RMW (N.D. Cal. Sept. 30, 2016), quoted in FCC 25-43 ¶ 14 n.60.

The passage is a verbatim transplant of the regulated party's litigation position. The Applicants' January 2, 2025 Consolidated Opposition told the Commission, in materially the same words the Order later adopted, that the SDNY

litigation "appears driven by LVA's CEO, a serial litigant … sanctioned by a federal court that found him to be a 'vexatious litigant,'" citing only the same 2016 Greenspan order. Consolidated Opposition to Petitions and Response to Comments at 3 & n.12, MB Docket No. 24-275 (filed Jan. 2, 2025) (Ex. C; JA__). Yet as of that date no court had found LiveVideo's CEO a vexatious litigant in that litigation at all; the Opposition's own footnote conceded only a "warning that LVA could face sanctions for pursuing frivolous claims," not an adjudicated sanction. Nor was the source disinterested: Ropes & Gray, which publicly identifies its litigation and enforcement partners as having "advised National Amusements Inc. in the sale" to the Skydance affiliates, conducted the very SDNY case from which the characterization was drawn. Ropes & Gray, Ropes & Gray Advised National Amusements in Sale to Skydance Media Affiliates to Complete Paramount-Skydance Merger (Aug. 7, 2025) (Ex. K; JA__).

The timeline is dispositive standing alone. The magistrate judge was not referred authority over case-dispositive motions in the SDNY action until July 7, 2025 (Dkt. 152); the Report and Recommendation containing any sanctions findings did not issue until August 12, 2025—nineteen days after the Order; and the district court did not adopt it until September 30, 2025 (Ex. T; JA__). When FCC 25-43 was signed on July 24, 2025, no SDNY sanctions ruling of any kind existed for the footnote's characterization to rest on, beyond the unrelated 2016 order and the

Applicants' own say-so. Events since have confirmed rather than cured the defect: LiveVideo's fully briefed appeal from the September 30 judgment presses that the Greenspan order is void for want of jurisdiction (it issued while the underlying case was on appeal to the Ninth Circuit); that the SDNY court made no alter-ego finding under Passalacqua Builders, Inc. v. Resnick Devs. S., Inc., 933 F.2d 131, 138–39 (2d Cir. 1991), before attributing Greenspan's history to LiveVideo's CEO; and that the sanctions sequence was retaliation for LiveVideo's protected reporting to the FCC and Congress. LiveVideo.AI Corp. v. Redstone, No. 25-2594 (2d Cir.) (Ex. L; JA__).

An agency does not discharge its obligation to engage a petitioner's evidence by relaying, unexamined, the regulated party's character attack on the petitioner's principal—least of all one that predates any sanctions ruling in the case it purports to summarize and rests on an unrelated order now under direct attack as void. The footnote adjudicates nothing about bid-rigging, disclosure, or candor; it substitutes an interested party's characterization for the Commission's own reasoning on the one occasion the Order comes within reach of LiveVideo's central submissions. If the Commission invokes footnote 60 on review to show that LiveVideo's evidence was considered and rejected, the footnote's own text and timeline foreclose that reading: it is the Applicants' assertion, restated before it could have been true. State Farm, 463 U.S. at 43; Chenery, 332 U.S. at 196.

**F. The Commission never addressed the Applicants' own contemporaneous SEC disclosure discrepancy about the same litigation.**

LiveVideo's January 13, 2025 Reply placed a further, unrebutted fact before the Commission—one bearing directly on which side's candor warranted scrutiny. Paramount Global's Form S-4 (filed Dec. 16, 2024, and signed by National Amusements, Inc.'s Chairperson) represented to the SEC and to Paramount's shareholders that, in the SDNY litigation, "the defendants have not been served." Reply to Consolidated Opposition in Support of Petition to Deny at 5–6, MB Docket No. 24-275 (filed Jan. 13, 2025) (Ex. D; JA__). One week earlier, on December 9, 2024, the Clerk of the SDNY court had entered a default against National Amusements following service on its registered agent on November 6, 2024 (Dkt. 63); National Amusements' own December 18, 2024 letter motion sought to vacate that default (Ex. S; JA__). A defaulted party has necessarily been served. See City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011) (default admits well-pleaded factual allegations).

The Commission never addressed the discrepancy, though LiveVideo placed it squarely in the record two weeks before the characterization the Order would later adopt in footnote 60. A misstatement to the SEC and to public shareholders about the status of the very litigation the Applicants simultaneously asked the Commission to discount as the work of a "vexatious litigant" is precisely the candor question §

31

309(e) commits to hearing. An agency cannot adopt one party's credibility attack on its adversary while remaining silent on that same party's documented misstatement about the very facts underlying the attack. State Farm, 463 U.S. at 43.

## III. THE COMMISSION REVIEWED A FRACTION OF THE TRANSACTION AND RELIED ON REPRESENTATIONS THAT EVENTS HAVE FALSIFIED.

An agency must consider the transaction actually before it, not a curated slice of it. State Farm, 463 U.S. at 43. The applicants themselves treated the $7.7 billion UFC rights deal as part of the Paramount–Skydance transaction. The Commission nonetheless assessed the license transfer in isolation and never weighed the UFC deal in the public-interest calculus. That omission is not academic: it excluded from review the single largest item of consideration moving in the same window.

The public-interest predicate fared no better. The Commission credited the applicants' commitments to invest in local journalism. Within months those commitments were contradicted by reported mass layoffs, and $7.7 billion was wired to TKO—an entity whose executives participated in the undisclosed UFC 316 interaction—four days after closing, for rights analysts described as above market. When the premises of an order are falsified that quickly and that publicly, the agency must confront the contradiction rather than cling to a rationale the facts have overtaken. Fox, 556 U.S. at 515. Approval on a journalism-investment rationale,

32

followed by layoffs and a massive payout to a party whose principals had undisclosed contacts, both undermines the finding and corroborates what LiveVideo alleged before the vote.

## IV. THE COMMISSION IGNORED EVIDENCE OF UNDISCLOSED PRE-APPROVAL CONTROL AND THE APPLICANTS' DEFIANCE OF CONGRESSIONAL OVERSIGHT.

Who actually controlled this licensee, and with what candor that was disclosed, is the core of §§ 309(e) and 310(d). The Commission never reached it. LiveVideo's April 14, 2026 supplement marshaled four interlocking arcs: undisclosed ringside contacts between the transaction's controlling principal and the President at UFC 314 and UFC 316; the pre-closing treatment of the $7.7 billion deal as concluded; the post-approval build-out of event infrastructure; and the Cipriani allegations (Ex. I; JA__).[7] Shell's own cross-complaint supplies the admission: he "did not become the President of Paramount until August 2025." That defense to one claim is a concession on another—it establishes that he exercised de facto commercial authority over Paramount's largest pending transaction before holding any office.

The applicants' treatment of Congress compounds the problem. After Senators requested documents by June 2, 2025, the applicants produced nothing—

---

[7] LiveVideo Supplement (Apr. 14, 2026) (Ex. I; JA__).

then pressed an ex parte campaign before the Commission in the days before the vote, omitting the pending inquiries from their notices (Ex. B; JA__). LiveVideo does not contend the applicants were legally obliged to answer the letters as though they were subpoenas. The point is narrower and dispositive: a party that stonewalls a coordinate branch while privately lobbying the agency, and conceals the former from the latter, has raised a candor question the Commission was obliged to weigh. Congress's power to inform itself is broad and constitutionally rooted, McGrain v. Daugherty, 273 U.S. 135, 174–75 (1927), and the Commission's refusal even to acknowledge the docketed Senate correspondence—in 2025, and again as the same Senators pressed foreign-ownership concerns in 2026—is arbitrary. The Order did worse than ignore that correspondence: it represented that no congressional correspondence had been filed in MB Docket No. 24-275 when two letters had been, one docketed the day before the vote. A misdescription of the record cannot be squared with reasoned decisionmaking. Chenery, 332 U.S. at 196.

## V. THE COMMISSION LEFT UNRESOLVED DOCKETED ALLEGATIONS OF BRIBERY, OBSTRUCTION, AND BACKDATING, AND AN APPEARANCE OF DISQUALIFYING CONFLICT.

### A. The integrity allegations were docketed, specific, and unanswered.

Senators expressly invoked the federal bribery statute, 18 U.S.C. § 201, in correspondence docketed in MB 24-275. LiveVideo's June 4, 2025 ex parte notice

34

documented a June 7, 2025 ringside settlement of the CBS litigation—$16 million in cash plus $15–20 million in public-service-announcement inventory—described as given "in exchange for regulatory forbearance and support before the FCC" (Ex. J; JA__). The applicants then missed the Senators' production deadline and produced only partial materials, conduct LiveVideo contends obstructed a congressional proceeding, 18 U.S.C. § 1505. The docket further appears to reflect amendments accepted or treated as effective as of dates earlier than their actual filing—backdating that, if confirmed, corrupts the record and the operation of 47 C.F.R. § 1.65. Whatever their ultimate merit, these are not allegations an agency may pass over in silence.

**B. The appearance of a disqualifying conflict required resolution, not avoidance.**

Due process and settled administrative law require a decisionmaker free of any "direct, personal, substantial, pecuniary interest," Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 876 (2009) (quoting Tumey v. Ohio, 273 U.S. 510, 523 (1927)), free of circumstances posing a "serious risk of actual bias," id. at 884, and free of the appearance of prejudgment, Cinderella Career & Finishing Schs., Inc. v. FTC, 425 F.2d 583, 591 (D.C. Cir. 1970); see Gibson v. Berryhill, 411 U.S. 564, 578–79 (1973). A federal officer may not participate in a matter in which, to his knowledge,

his spouse has a financial interest; the spouse's interest is imputed by statute. 18 U.S.C. § 208(a); 5 C.F.R. § 2635.502.

That framework poses a dilemma the Commission cannot avoid. If the Chairman knew—through his spouse's senior policy role at Palantir—of the President's positions in and promotion of that company, the interest is imputed and recusal analysis was required. If the Commission was unaware of the President's positions in Palantir, Oracle, Warner Bros. Discovery, and Netflix, it cannot credit the President's expressed support for this transaction without first inquiring into his financial stake, because an adjudicator may not weigh an interested principal's preferences while remaining ignorant of the interest. Either branch demanded a reasoned, on-the-record response. The Commission gave neither.

Two intervening public records sharpen the problem. On June 29, 2026, the Supreme Court held that the President may remove the heads of the independent commissions, including this one, at will. Trump v. Slaughter, 609 U.S. ___ (2026). The Chairman has himself publicly stated that the Commission is not "an independent agency, formally speaking," removing any doubt that the decisionmaker regards himself as subject to presidential direction. The same day, the President certified his annual financial disclosure, reporting that the large majority of his foreign licensing income derives from Saudi Arabia, the United Arab Emirates, and Qatar—the same three governments whose sovereign funds seek

equity in the parent of these licenses—and separately reporting the $16 million settlement of his lawsuit against CBS, paid to his presidential-library foundation. OGE Form 278e (certified June 29, 2026) (Ex. M; JA__). LiveVideo does not allege, and need not allege, that any sovereign-fund money reaches the President. The narrower point suffices: a public-interest adjudication into roughly 38.5 percent foreign ownership by three governments, conducted by a Chairman who serves at the pleasure of a President with disclosed financial interests in those same governments and in CBS itself, presents a question of impartiality—and of its appearance—that the Commission was obliged to confront rather than pass over. See Cinderella, 425 F.2d at 591; 5 C.F.R. § 2635.502.

The appearance problem reaches the deciding commissioners directly. Public ethics-disclosure records, reported in July 2026, show that the two Commissioners who approved this transaction accepted valuable gifts from the regulated enterprise. The Commissioner who cast a decisive approval vote accepted Kennedy Center gala tickets from Paramount worth more than $12,000; the Chairman accepted such tickets from CBS or Paramount at least seven times since 2017, totaling more than $63,000, and in December 2025 sat in a private skybox with the applicants' chief executive as Paramount pursued the Warner Bros. Discovery transaction now before the agency. Federal ethics rules forbid an employee from accepting a gift from a person whose interests may be substantially affected by the performance of the

37

employee's official duties. 5 C.F.R. § 2635.202. Four government-ethics authorities —including a former Director of the Office of Government Ethics—concluded that these acceptances compromised the agency's impartiality and required recusal. Once these facts entered the public record, the Commission had a duty to inquire, to insulate the decision by recusal, firewall, or screen, and to disclose what it had done. It has identified no such measure, and has never explained how an approval rendered by gift-recipient decisionmakers can be reconciled with the appearance-of-impartiality standard its own regulations impose. That was an important aspect of the problem the agency was bound to address, and did not. State Farm, 463 U.S. at 43.

Two further reported conflicts, if confirmed, compound the problem and independently required disclosure. LiveVideo's submissions identify a former Chief of Staff to the Chairman, since placed in a senior FCC media-enforcement role, as having participated in the July 2025 ex parte meetings whose completeness is at issue in Part II.B—an official positioned to review the lawfulness of contacts in which he took part. Separately, LiveVideo's submissions identify the applicants' lead outside counsel as having previously represented UFC, the counterparty to the $7.7 billion rights deal addressed in Parts III–IV. Neither matter has been confirmed on this record or addressed by the Commission; LiveVideo raises them as further instances of the same pattern—undisclosed relationships bearing on the impartiality

38

of the process—and does not ask the Court to resolve their truth in the first instance. On remand, the Commission should be directed to confirm or dispel both.

**C. The applicants' and the Commission's unexplained silence warrants an adverse inference, and the applicants' litigation-driven disclosure confirms a want of candor.**

Two evidentiary presumptions reinforce the foregoing. First, where a party with relevant evidence within its control fails to produce it, "that failure gives rise to an inference that the evidence is unfavorable to him." Int'l Union, UAW v. NLRB, 459 F.2d 1329, 1336 (D.C. Cir. 1972). The applicants left LiveVideo's motions— for production, to reopen, for decision on an incomplete record, for summary decision, and to compel—wholly unrebutted, and resisted producing the very lobbying materials a state investigation sought; the Court should infer the withheld evidence would not have aided them. The Commission's parallel silence permits the inference that no adequate explanation exists for its inaction. Chenery, 332 U.S. at 196.

Second, the applicants' own disclosure conduct betrays their knowledge. Applicants bear a continuing duty to keep their applications accurate and to amend "as promptly as possible." 47 C.F.R. § 1.65. Yet they did not file their corrective foreign-ownership amendment until June 23, 2026—five days after the June 18, 2026 Senate letter identified precisely those disclosure failures. A correction that

comes only under public exposure is not prompt; it is reactive, and it confirms that the earlier disclosure was known to be deficient. "The fact of concealment may be more significant than the facts concealed." WOKO, 329 U.S. at 227. On remand, the Commission should be directed to treat the late, litigation-driven amendment as bearing on candor and character and to designate the question for hearing under § 309(e).

## VI. THE FOREIGN-OWNERSHIP RELIEF EXCEEDS SECTION 310(b)(4) AND THE COMMISSION'S OWN RULES, WHICH MUST BE SET ASIDE AS APPLIED.

For nearly a century Congress has insisted that American broadcasting remain ultimately in American hands. Section 310(b)(4) bars foreign ownership above 25% absent an affirmative, reasoned public-interest finding. Paramount now seeks approximately 49.5%—and, by advance approval, up to 100%. That request exceeds not only the statute but the Commission's own January 29, 2026 Report and Order, which permits advance approval for investors lacking actual control only up to "a non-controlling 49.99 percent, not up to 100 percent." As United States Senators concluded:

> "Their advance approval request for up to 100 percent aggregate foreign ownership … exceeds what the Commission's January 2026 rules permit. The Commission should reject that request out of hand."

Letter (June 18, 2026) (Ex. J; JA__); see Report & Order, GN Docket No. 25-149, FCC 26-3 (Jan. 29, 2026) (Ex. U; JA__); 47 C.F.R. § 1.5001(k). Against that, the Chairman's public prediction—before any record was developed—that approval would be "almost pro forma" and would come "pretty quickly" is not merely unreasoned; it permits "a disinterested observer [to] conclude that [the agency] has in some measure adjudged the facts … in advance of hearing." Cinderella, 425 F.2d at 591.

Nor is the Commission's framework insulated from challenge. Although the period for direct review of the January 2026 orders has run, a party may attack a rule's validity when the agency applies it—here, in MB Docket No. 26-93—where the ground of attack is that the rule exceeds statutory authority. Functional Music, Inc. v. FCC, 274 F.2d 543, 546 (D.C. Cir. 1958). As applied to authorize foreign equity beyond what § 310(b)(4) and the agency's own rules permit, the framework is "in excess of statutory … authority, or limitations," 5 U.S.C. § 706(2)(C), and must be set aside.

The deeper problem is that the Commission cannot make the affirmative finding § 310(b)(4) demands on a record that does not disclose who the owners are. On June 16, 2026, the Executive Branch's Committee for the Assessment of Foreign Participation certified the applicants' responses "complete" (Ex. V; JA__). Seven days later—and five days after Senators asked the Commission to compel disclosure

41

of the foreign investors' agreements—the applicants supplemented the ownership structure, disclosing for the first time, in either docket, that ninety-nine percent of the direct equity of the sponsor's management company (RedBird Capital Partners L.P.) is held by limited partners the Petition does not name (Ex. N; JA__). An applicant may not tender factual statements "rendered misleading by the omission of material information," 47 C.F.R. § 1.17(a)(2), and the Commission may not rest a public-interest finding on a record it is still amending and that still will not say who owns the sponsor. When these same applicants earlier reallocated the voting control of the parent, the Bureau itself deemed the change a "major amendment" requiring a fresh pleading cycle. FCC 25-43 ¶ 3. A revision that first reveals where voting and economic control actually sit within the parent's largest foreign-adjacent investor is no less consequential—yet it drew neither re-notice nor an opportunity to comment.

Nor may the Commission borrow another agency's clearance as a substitute for its own. The Department of Justice closed its antitrust review on June 12, 2026 on competition grounds alone, expressly observing that broadcast television "presents no competitive overlap." That statement addressed neither foreign ownership nor national security. The stakes of that separate inquiry are not academic: public reporting during the pendency of this Petition has raised distinct national-security questions about the same Gulf states now seeking equity in these licenses, including whether contemporaneous nuclear-cooperation arrangements

complicate other United States security objectives in the region. The Commission's § 310(b)(4) review is the only federal review reaching the broadcast licenses at issue; it cannot be discharged as the "very quick, almost pro forma" formality the Chairman promised.

The tempo of the Commission's own rulemaking compounds the point. The Commission finalized the Subpart T framework weeks before the Petition, let it take effect after the Petition, corrected it after that, and has moved in parallel to repeal the 39-percent National Television Multiple Ownership cap, 47 C.F.R. § 73.3555(e), on an August 6, 2026 vote. A framework revised, corrected, and supplemented around a pending adjudication invites the appearance that the petition is not being decided so much as overtaken.

Those changes did not merely liberalize the framework in the abstract; they benefit specifically identifiable parties, and the record does not show the Commission weighed that fact. Under the revised advance-approval provisions, 47 C.F.R. § 1.5001(h)–(k), the applicants gain a materially clearer path to approval of the sovereign-linked investors' interests than existed before; without that change, the same request would confront a messier insulation analysis and the flat 25 percent ceiling of § 310(b)(4). Under the revised private-remedial provisions, id. § 1.5004(f)(3)–(4), an inadvertent breach of the foreign-ownership limits by the RedBird chain —whose general partner holds substantially all of the voting interest while unnamed

limited partners hold the bulk of the economics—now qualifies for a notice-and-cure period rather than immediate enforcement exposure. And the contemporaneous repeal of the 39-percent audience-reach cap (MB Docket No. 17-318, vote scheduled Aug. 6, 2026) principally benefits the domestic broadcasters closest to that line rather than this transaction, yet its timing alongside the Subpart T revisions reflects a Commission loosening every adjacent guardrail on media consolidation while this record sat undecided. An agency that reshapes the rules governing a pending transaction, in the specific respects that transaction needs reshaped, must at least acknowledge whom the change benefits and explain why. The Order and the rulemaking orders do neither. Fox, 556 U.S. at 515–16.

The applicants' repeated characterization of the sovereign-wealth investors as "non-controlling" is, moreover, an assertion, not a record-based finding. The Commission's own rule defines control to include "actual working control in whatever manner exercised," "not limited to majority stock ownership." 47 C.F.R. § 1.5000(d). Whether these investors in fact lack control turns on the operative instruments—equity-commitment letters, subscription agreements, side letters, information-rights and consent provisions—that Senators asked the Commission to require and that the June 23 supplement did not supply. Until the Commission obtains and examines those documents, it cannot certify "non-controlling" as a finding. And the Chairman's public dismissal of the parallel, twelve-State antitrust

challenge to the same combination as "not a legitimate antitrust case" only deepens the concern that the outcome has been prejudged before any record was made. Cf. Cinderella, 425 F.2d at 591.

The framework the applicants invoke reflects, finally, an unexplained reversal. As recently as 2020, the Commission adopted a rigorous, structured executive-branch review of foreign-ownership petitions. On a single day—January 29, 2026—it changed course, broadening the "controlling U.S. parent" definition, expanding advance approval of deemed-voting interests held by limited partners and LLCs, and easing trust and residency requirements, on a rulemaking record of only a handful of comments. Those are precisely the liberalizations the Paramount petition now invokes. An agency that departs from a settled prior policy must at least display awareness that it is doing so and give good reasons for the change. Fox, 556 U.S. at 515–16; Encino Motorcars, 579 U.S. at 221–22. The Commission has never explained why the safeguards it deemed necessary in 2020 became dispensable in 2026—just as the applicants' need for foreign capital crystallized.

## VII. NEITHER HARMLESS ERROR NOR THE BREADTH OF THE PUBLIC-INTEREST STANDARD CAN SAVE THE ORDER.

The Commission cannot invoke harmless error where it never confronted the dispositive questions. An order's propriety is judged "solely by the grounds invoked by the agency," and a reviewing court may not supply a reasoned basis the agency

never gave. Chenery, 332 U.S. at 196. Nor does the breadth of the public-interest standard excuse reasoned decisionmaking: agency action "is lawful only if it rests 'on a consideration of the relevant factors.'" Judulang v. Holder, 565 U.S. 42, 53 (2011) (quoting State Farm, 463 U.S. at 43). The more consequential the decision— here, control of the Nation's leading broadcast and news properties—the greater the obligation to engage the objections before it.

## VIII. THE COURT SHOULD VACATE AND REMAND WITH INSTRUCTIONS AND BAR CLOSING PENDING REVIEW.

Vacatur turns on the seriousness of the deficiency and the disruptive consequences of vacating. Allied-Signal, Inc. v. NRC, 988 F.2d 146, 150–51 (D.C. Cir. 1993). The deficiencies here go to the integrity of the decisional process itself —an unexplained collapse of the Order's premise, unenforced disclosure rules, and unresolved questions of candor and control. This Court cannot say the Commission would reach the same result on a proper record, because the Commission has never engaged the record at all. And whatever disruption vacatur entails, the applicants assumed it: they proceeded with full notice of LiveVideo's objections, the docketed Congressional concerns, and the operator crisis.

On remand, the Court should direct the Commission to compile and certify the complete record; adjudicate LiveVideo's pending Application for Review and related filings within a date certain; make express findings on operator fitness, ex

parte compliance, and candor; evaluate the transaction as the integrated whole the applicants describe; make the affirmative § 310(b)(4) finding only on a developed record that identifies the actual foreign and domestic owners of the sponsor—including the holders of the ninety-nine percent equity interest the applicants have not named—before any foreign-financed control vests; resolve the appearance-of-conflict question, including the entanglements disclosed after the Order; and designate remaining material disputes for hearing under § 309(e). Pending that remand, the Court should bar the Commission from authorizing, facilitating, or permitting the Paramount–Warner Bros. Discovery transaction to close.

The relief LiveVideo seeks is prospective. The Skydance–Paramount transaction closed in August 2025, and LiveVideo does not ask this Court to unwind it. It asks the Court to set aside the unexplained Order and to ensure that no further § 310(b)(4) approval of the same license chain takes effect—and that the Warner Bros. Discovery combination does not close—before the Commission completes the review it has withheld. This Court has long possessed the authority to preserve the status quo so that its eventual judgment is not rendered an empty formality by a transaction permitted to harden in the interim. FTC v. Dean Foods Co., 384 U.S. 597, 603–04 (1966); Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 9–10 (1942).

Two of these questions are purely legal and ripe for summary resolution now. See Taxpayers Watchdog, Inc. v. Stanley, 819 F.2d 294, 297–98 (D.C. Cir. 1987).

The finality question follows directly from §§ 155(c)(7) and 405 and § 1.115; and advance approval of up to 100 percent aggregate foreign ownership plainly exceeds the Commission's own rules, 47 C.F.R. § 1.5001(k). The Court can resolve both in Petitioner's favor as a matter of law and set aside the rules' contrary application. Functional Music, 274 F.2d at 546.

Changed circumstances only strengthen the case for interim relief, though their terms should be stated accurately. On July 24, 2026, the parties to the parallel antitrust litigation stipulated that the transaction will not close until the earlier of five days after a merits determination in that litigation or June 1, 2027. Stipulation and [Proposed] Order Not to Close ¶ 1, Dkt. No. 170, California v. Paramount Skydance Corp., No. 4:26-cv-07116-AMO (N.D. Cal.) (filed July 24, 2026). That deferral is contingent, not a firm multi-year floor: it may lift on five days' notice upon any merits determination, at a time outside this Court's or the Commission's control. It therefore cannot substitute for the independent protection only this Court and the Commission can provide, and its contingency makes that protection more urgent, not less. To the extent the stipulation does hold the transaction open, it confirms that an order directing the Commission not to approve or facilitate the transaction before completing its review imposes no incremental burden during that interval, while preventing the Commission from converting the statutory review into a post-hoc ratification whenever the private stipulation happens to lift.

## CONCLUSION

The petition should be granted, the Order vacated, and the matter remanded with the instructions set forth above; in the alternative, the Court should issue a writ of mandamus directing the Commission to decide LiveVideo's pending filings within a date certain.

Dated: July 27, 2026

Respectfully submitted,
/s/ Alfred C. Constants III
Alfred C. Constants III, Esq.
Constants Law Offices, LLC
115 Forest Avenue, Unit 331
Locust Valley, NY 11560
(516) 200-9660
Counsel for Petitioner LiveVideo.AI Corp.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 8,764 words, excluding the parts exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1). It complies with Fed. R. App. P. 32(a)(5)–(6) because it was prepared in a proportionally spaced typeface (Times New Roman, 14-point) using Microsoft Word.

/s/ Alfred C. Constants III
July 27, 2026

## CERTIFICATE OF SERVICE

I certify that on July 27, 2026, I electronically filed the foregoing with the Clerk using CM/ECF, which will serve all registered counsel of record.

/s/ Alfred C. Constants III

# ADDENDUM — PERTINENT STATUTES AND REGULATIONS

- 5 U.S.C. § 706
- 47 U.S.C. § 155(c)
- 47 U.S.C. § 309(a), (e)
- 47 U.S.C. § 310(b)(4), (d)
- 47 U.S.C. § 326
- 47 U.S.C. §§ 402(a), 405
- 28 U.S.C. §§ 1651, 2342(1), 2344
- 47 C.F.R. §§ 1.17, 1.65, 1.115, 1.1202(a), 1.1206, 1.1208(b), 1.1214, 1.1216, 1.5000(d), 1.5001(k), 1.5004(f)
- 18 U.S.C. §§ 201, 208, 1505
- 5 C.F.R. §§ 2635.202, 2635.502