No. 26-1176

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

LIVEVIDEO.AI CORP.,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

On Petition for Review of an Order of
the Federal Communications Commission

**RESPONDENT FEDERAL COMMUNICATIONS COMMISSION'S OPPOSITION TO PETITIONER'S MOTION TO RELATE AND FOR COORDINATED CASE MANAGEMENT**

## INTRODUCTION

Petitioner LiveVideo.AI Corp. asks this Court "to relate and coordinate case management between this petition for review" and *State of California et al. v. Paramount Skydance Corp.*, No. 4:26-cv-07116 (N.D. Cal.), in which several states are seeking to block a merger between Paramount Skydance and Warner Bros. under federal antitrust law. But as explained in the Commission's opposition to LiveVideo's motion for

emergency relief, this case and the agency proceedings from which it arises are wholly unrelated to Paramount Skydance's proposed merger with Warner Bros. LiveVideo's motion to relate is baseless and should be denied.

## BACKGROUND

The statutory, regulatory, and procedural background to this case are comprehensively laid out in the Commission's opposition to LiveVideo's motion for emergency relief. *See* ECF No. 2182487. We here repeat those portions directly relevant to LiveVideo's motion to relate.

### A. Statutory And Regulatory Background

"The Federal Communications Commission possesses broad statutory authority to regulate broadcast media 'as public convenience, interest, or necessity requires.'" *FCC v. Prometheus Radio Project*, 592 U.S. 414, 418 (2021) (quoting 47 U.S.C. § 303). That authority includes the power to approve the transfer of broadcast licenses to operate radio and television stations, subject to a number of statutory requirements. *See* 47 U.S.C. §§ 301, 303, 307–310.

Two statutory restrictions on FCC broadcast licenses are relevant here. First, "[n]o * * * station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or

involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby." 47 U.S.C. § 310(d).

Second, "[n]o broadcast * * * license shall be granted to or held by * * * any corporation directly or indirectly controlled by any other corporation of which more than one-fourth of the capital stock is owned of record or voted by aliens, their representatives, or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country, if the Commission finds that the public interest will be served by the refusal or revocation of such license." 47 U.S.C. § 310(b)(4).

Under the Commission's implementing rules, "[a] broadcast * * * licensee * * * shall file a petition for declaratory ruling to obtain Commission approval under section 310(b)(4) of the Act, and obtain such approval, before the aggregate foreign ownership of any controlling U.S. parent exceeds, directly and/or indirectly, 25 percent of the controlling U.S. parent's equity interests and/or 25 percent of its voting interests." 47 C.F.R. § 1.5000(a)(1).

### B. Factual and Procedural Background

#### 1. The Paramount-Skydance Transfer Application Proceeding

On September 6, 2024, the FCC received applications proposing to transfer control of Paramount Global, an FCC license holder, from its then majority shareholder, National Amusements, Inc., to certain investors in Skydance Media, LLC, as part of a broader merger between Paramount and Skydance. *See* Public Notice, 39 FCC Rcd. 9766 (Media Bur. Sept. 6, 2024). As Paramount owned, directly or indirectly, 28 local CBS TV stations (as well as one Class A and two low-power television stations), FCC consent to the transfer was required under 47 U.S.C. § 310(d). Because the transfer did not propose any aggregate foreign ownership exceeding 25 percent of equity or voting interests, the Commission's foreign ownership rules did not play any role in the proceeding. *See In re Applications for Consent to the Transfer of Control of Paramount Glob.*, MB Docket No. 24-275, ¶ 36, 2025 WL 3526328, at *12 (July 24, 2025) (Skydance Order) (MA 23–24) (noting that the

Skydance applications did not trigger the Commission's foreign ownership rules).[1]

LiveVideo.AI Corp.—which claimed to be "a former business partner of Paramount and a competitor to Skydance and Paramount," Skydance Order ¶10 (MA 11)—opposed the Paramount-Skydance transfer application.

On July 24, 2025, the FCC granted consent to the Paramount-Skydance license transfer. *See* Skydance Order ¶ 60 (MA 33). After "thorough analysis of the potential harms and benefits of the Transaction," as well as consideration of the record and comments, the Commission concluded that "grant of the Applications will result in public interest benefits and serve the public interest, convenience, and necessity." Skydance Order ¶ 60 (MA 33).

With the FCC's approval of the license transfer in hand, Paramount and Skydance closed their merger on August 7, 2025. *See* Wyatte Grantham-Philips, *Paramount and Skydance close their $8 billion*

[1] The Motion Appendix (MA) refers to the appendix filed with LiveVideo's motion for emergency relief. ECF No. 2180914-2. Because that appendix is not separately paginated, this response uses the docket entry page numbers appearing at the top of each page.

*merger, kicking off reign of new entertainment giant*, ASSOCIATED PRESS (Aug. 7, 2025).[2]

### 2. The Paramount Foreign Ownership Declaratory Ruling Proceeding

On February 27, 2026, Paramount Skydance and Warner Bros. Discovery, Inc. entered a preliminary merger agreement under which Paramount Skydance would acquire Warner Bros. subject to sufficient financing, shareholder approval, and various regulatory hurdles. Alex Weprin, *It's a Deal: Paramount and Warner Bros. Discovery Unveil $111 Billion Megamerger*, THE HOLLYWOOD REPORTER (February 27, 2026).[3]

Warner Bros. does not hold FCC television station broadcast licenses subject to Section 310(d)'s transfer restrictions, and its planned acquisition by Paramount has not been submitted for FCC approval. However, as part of its efforts to secure financing for the transaction, Paramount on April 27, 2026, filed a petition for declaratory ruling requesting that the Commission "find that it would serve the public

---

[2] https://apnews.com/article/paramount-skydance-media-cbs-trump-merger-a030c4f2c1903ed0e7f927782a64fcc0.

[3] https://www.hollywoodreporter.com/business/business-news/paramount-warner-bros-discovery-mega-deal-official-1236517004/.

interest to allow Paramount * * * to accept indirect foreign equity and voting interests in excess of the 25% benchmarks set forth in section 310(b)(4) of the [Communications] Act." *Paramount Glob. Seeks Foreign Ownership Declaratory Ruling Pursuant to Section 310(b)(4) of the Commc'ns Act of 1934*, As Amended Pleading Cycle Established, No. DA 26-411, 2026 WL 1284539, at *1 (Apr. 27, 2026). Paramount's request for foreign ownership approval is "not a condition of closing" the Warner Bros. merger. Emergency Motion 8; *id*. Exh G.

"Pursuant to Commission practice," the FCC referred Paramount's petition "to relevant Executive Branch agencies for their views on any national security, law enforcement, foreign policy, or trade policy concerns related to the foreign ownership of Paramount." *Id.* at *3 (citing *Process Reform for Executive Branch Review of Certain FCC Applications and Petitions Involving Foreign Ownership*, IB Docket 16-155, Report and Order, 35 FCC Rcd. 10927 (2020)). On April 29, 2026, the Justice Department notified the FCC by letter that the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector (Team Telecom) was assessing Paramount's petition for national security purposes. *Letter from Jessica Campbell, Foreign Investment Review Section, National Security Division*

*U.S. Department of Justice* (April 29, 2026).[4] And on June 16, DOJ informed the Commission that it was beginning a 120-day initial review period for the transaction. *Letter from Jessica Campbell, Foreign Investment Review Section, National Security Division U.S. Department of Justice* (June 16, 2026).[5]

As of this filing, the declaratory ruling proceeding regarding foreign ownership in Paramount awaits Team Telecom review.

### 3. The Paramount-Warner Bros. Antitrust Litigation

On July 13, 2026, twelve states filed suit in the Northern District of California, alleging federal antitrust violations under the Clayton Act and seeking to enjoin the proposed merger between Paramount Skydance and Warner Bros. *See State of California et al. v. Paramount Skydance Corp.*, No. 4:26-cv-07116 (N.D. Cal.). *See also Writers Guild of America, West, Inc. v. Paramount Skydance Corp.*, No. 26-07212 (N.D. Cal.). After the court granted and extended a temporary restraining order enjoining the proposed merger, *see id.* ECF No. 141, 166, the parties stipulated that the merger would not close "until the earlier of (1) five days after [a]

[4] https://www.fcc.gov/ecfs/document/10429060883440/1.

[5] https://www.fcc.gov/ecfs/document/26109834743/1.

merits determination … or (2) June 1, 2027," ECF 170. Trial is currently scheduled to begin March 2, 2027. ECF No. 197.

## ARGUMENT

LiveVideo bases its extraordinary request to "relate and coordinate case management" in two different suits—between different parties in different jurisdictions bringing different claims—on the following assertion: "The two proceedings arise from the same corporate transaction and the same applicant, Paramount, and they turn on overlapping questions of federal antitrust law and the foreign-ownership limits of the Communications Act." Motion to Relate 2. That statement is wholly incorrect.

1. The two proceedings do not "arise from the same corporate transaction." Motion to Relate 2. In this case, LiveVideo seeks review of an FCC order approving the transfer of broadcast licenses from National Amusements, Inc. to certain investors in Skydance Media, LLC, as part of the now-completed merger between Paramount and Skydance. *See* Public Notice, 39 FCC Rcd. 9766 (Media Bur. Sept. 6, 2024). By contrast, *California et al. v. Paramount* involves a suit "to enjoin Paramount Skydance Corp. from acquiring Warner Bros. Discovery, Inc."—an entirely separate proposed merger that has not yet been consummated.

*See* Complaint, *State of California et al. v. Paramount Skydance Corp.*, No. 4:26-cv-07116, ECF No. 1 (N.D. Cal.).

The challenged license transfer approval also does not in any way relate to or address foreign investment in Paramount, which likewise is distinct from any proposed merger. As explained above and in the Commission's opposition to emergency relief, the license transfer applications at issue in the Paramount-Skydance transfer approval did not trigger the Commission's foreign ownership rules. *See* Skydance Order ¶ 36 (MA 23–24). To be sure, separate, ongoing Commission proceedings—not at issue in this case, and to which LiveVideo is not a party—concern foreign investment in Paramount Skydance, *see supra* pp. 6–7—but those proceedings do not address "the same corporate transaction" (Motion to Relate 2) at issue in *California et al. v. Paramount Skydance*—*i.e.*, a proposed merger between Paramount Skydance and Warner Bros. And as LiveVideo elsewhere seems to recognize (Emergency Motion 8; *id.* Exh G), Paramount's request for foreign ownership approval is "not a condition of closing" the Warner Bros. merger.

2. The two proceedings do not involve the same parties or "the same applicant." Motion to Relate 2. In this case, LiveVideo challenges

an FCC order through a petition for review naming the FCC and the United States as respondents. In *California et al. v. Paramount Skydance*, twelve states filed a federal antitrust suit against Paramount Skydance Corp. and Warner Bros. Discovery, Inc. Neither the FCC nor the United States is a party to the antitrust litigation, and Warner Bros. was never involved in the license transfer proceedings challenged here. While Paramount Global (now part of the post-merger Paramount Skydance) was party to the license transfer proceedings, it is not a party to this litigation. Nor is Paramount (or anyone else) an "applicant" in *California et al. v. Paramount Skydance*, which does not involve any application before the FCC or any other agency.

3. The two proceedings do not "turn on overlapping questions of federal antitrust law" or "the foreign-ownership limits of the Communications Act." Motion to Relate 2. The challenged license transfer approval turned on a pure question of Communications law: "Pursuant to section 310(d) of the [Communications] Act," that proceeding "determine[d] whether the proposed transfer of control to Skydance of licenses and authorizations held and controlled by wholly-owned subsidiaries of Paramount will serve the public interest, convenience, and necessity." Skydance Order ¶ 25 (MA 19). The

challenged order did not mention federal antitrust law (except in passing) or foreign ownership (except to note it was not at issue).

By contrast, *California et al. v. Paramount Skydance* turns on whether "Paramount's proposed acquisition of Warner Bros. will likely substantially harm competition in each of the relevant markets, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18." *See* Complaint, No. 4:26-cv-07116, ECF No. 1 at 30 (N.D. Cal.). The states' complaint nowhere mentions the Communications Act, license transfers, or the FCC's foreign ownership rules.

Attempting to square the circle, LiveVideo claims that it "asserts federal antitrust claims arising from the same transaction and the same anticompetitive conduct that the California Attorney General now challenges under the Clayton Act," and cites to "a motion for leave to supplement in the United States District Court for the Southern District of New York on October 14, 2025." Motion to Relate 6.[6] But that S.D.N.Y. litigation—terminated as baseless after LiveVideo was sanctioned for

[6] LiveVideo notes that its "motion was denied on procedural grounds," Motion to Relate 6, but omits the reason: the filing was stricken, and counsel found in contempt of court, for violating a court order to stop filing frivolous motions without leave. *See* Order, *LiveVideo.AI Corp. v. Redstone et al.*, 24-cv-6290 ECF No. 186 (S.D.N.Y.).

frivolous filings—has nothing to do with this case (or *California et al. v. Paramount Skydance* for that matter). LiveVideo cannot assert federal antitrust claims in this case by lodging a copy of a district court motion (that was ordered to be struck from the record) in an unrelated FCC license transfer docket. Motion to Relate 7.

4. LiveVideo's statement that "[t]his Court's Rule 47.5 recognizes the management of related cases" does not support its position. *Id.* at 10. That rule, entitled "Processing Direct Criminal Appeals," provides that "[a]bsent extraordinary circumstances, a direct criminal appeal will not be held in abeyance pending resolution of a postconviction proceeding in district court." Cir. R. 47.5. But this is not a direct criminal appeal, and *California et al. v. Paramount Skydance* is not a postconviction proceeding. Rule 47.5 has nothing to do with this case.

* * * * *

This Court undoubtedly possesses authority to efficiently manage its docket. Motion to Relate 10. But LiveVideo's requested relief would only hamper the efficient resolution of this litigation by needlessly ensnarling two wholly unrelated cases in two entirely different courts.

## CONCLUSION

The motion to relate and coordinate case management should be denied.

Dated: August 28, 2026

Respectfully submitted,

/s/ *Adam Sorensen*

Jacob M. Lewis
*Deputy General Counsel*

Adam L. Sorensen
*Counsel*

FEDERAL COMMUNICATIONS COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal Communications Commission*

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1):

   ☒ this document contains 2,314 words, *or*

   ☐ this document uses a monospaced typeface and contains ____ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☒ this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook, *or*

   ☐ this document has been prepared in a monospaced spaced typeface using _________________ with ____________________.

/s/ *Adam Sorensen*
Adam Sorensen
*Counsel for Respondent*
*Federal Communications Commission*