**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| LIVEVIDEO.AI CORP.,<br><br>Petitioner,<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION and<br>UNITED STATES OF AMERICA,<br><br>Respondents. | No. 26-1176 |

*On Petition for Review of an Order of the Federal Communications Commission, FCC 25-43, MB Docket No. 24-275*

# PETITIONER'S NOTICE OF MATERIAL DEVELOPMENTS BEARING ON ITS PENDING EMERGENCY MOTION (DOC. #2180914) AND MANDAMUS MOTION (DOC. #2186935)

Petitioner LiveVideo.AI Corp. gives notice of developments since its Notice of July 27, 2026 (Doc. #2185379) that bear on its pending Emergency Motion (Doc. #2180914) and Motion for a Writ of Mandamus (Doc. #2186935).

**1. The Section 310(b)(4) ruling issued.**

On September 17, 2026, the Media Bureau, acting on delegated authority, granted Paramount Global's petition in MB Docket No. 26-93. Declaratory Ruling, DA 26-1001 (Ex. A). The Ruling approves 38.5 percent equity for investment vehicles of Saudi Arabia, Abu Dhabi, and Qatar; gives each advance authority to 20 percent, or 60 percent combined; permits aggregate foreign ownership of up to 100 percent on the Commission's routine terms; and took effect on release. *Id.* ¶¶ 29–31, 35. That is the action LiveVideo's pending motions asked the Court to keep from taking effect before its filings were decided. Doc. #2180914; Doc. #2186935 at 18.

**2. The premises of the Commission's opposition have changed.**

The Commission opposed the Emergency Motion on the grounds that LiveVideo "has not participated in or commented on" MB Docket No. 26-93 "in any capacity," and that the Commission would "complete its statutory review before approving the transaction." Doc. #2182487 at 13, 19–20 (July 9, 2026). LiveVideo filed comments in that docket on July 13, 2026 (ECFS No. 26110014680), and the Ruling lists LiveVideo among the opposing parties and denies its opposition. Ruling ¶ 34 & App. A. The approval issued from the Bureau, not the Commission. LiveVideo's Application for Review and request for stay (filed Sept. 22, 2026; ECFS Nos. 26110077749, 26110077743) are undecided, as are its filings in MB Docket No. 24-275 and its disqualification request of July 31, 2026 (ECFS No. 26110069211), which the Ruling declined to resolve. Ruling n.16.

**3. The order barring closing has been dissolved.**

LiveVideo's July 27 Notice described the stipulated order in *California v. Paramount Skydance Corp.*, No. 4:26-cv-07116-AMO (N.D. Cal.), ECF 170, which barred closing until the earlier of five days after a merits determination or June 1, 2027. Candor requires an update. On September 21, 2026, the plaintiff States and the defendants lodged a proposed consent decree and jointly moved for its entry. ECF 243, 244. On September 30, 2026, the court granted the motion, finding that the decree "represents a reasonable factual and legal resolution of the dispute." ECF 266 at 2 (Ex. B). It ruled: "The Court DISSOLVES the parties' stipulation and the Court's Order Not to Close, Dkt. No. 170, effective upon entry of this Order," and entered the decree as a judgment. *Id.* at 4; ECF 267 (Ex. B). The decree does not address foreign ownership. *See* ECF 267. In a Form 8-K filed September 25, 2026, Paramount fixed October 5 as the record date for a distribution of warrants "contingent on the closing" of the merger, and announced that its Class B stock will

begin trading on the New York Stock Exchange on or about October 6. It stated then that the timing of closing, "if any, is not yet certain." Form 8-K, Items 3.01, 7.01 (filed Sept. 25, 2026) (Ex. C). Five days later, the district court removed the last judicial restraint on closing. Paramount's filings state that the investors' nonvoting shares will issue "[a]t closing of the WBD Merger." Form 10-Q at 10 (filed Aug. 4, 2026) (Ex. D). The June 1, 2027 date, and the March 2, 2027 trial date the Commission reported to this Court, Doc. #2190509 at 8–9 (Aug. 28, 2026), no longer stand between the parties and closing; nothing in the district court does.

**4. A related petition is pending.**

On September 28, 2026, LiveVideo petitioned for review of the Ruling, No. 26-1257, Doc. #2195519 (Ex. E), and it will file in that case, on or before October 1, 2026, an emergency motion for a stay of the Ruling pending review or, at a minimum, of the advance approvals in Ruling ¶ 31 and of aggregate foreign equity above 49.5 percent, with a request for an administrative stay of that limited scope. This Notice serves as notice of that motion to Respondents. Fed. R. App. P. 18(a)(2)(C). Consistent with its reply of September 4, 2026 (Doc. #2191700 at 2), LiveVideo does not ask the Court to review the Ruling in this case and does not seek consolidation. Because the Section 310(b)(4) component of Docs. #2180914 and #2186935 now concerns an issued order that is before the Court in No. 26-1257, LiveVideo respectfully requests that the Court consider that component together with any stay motion in that case. The remaining relief sought in those motions, including an order directing the Commission to decide LiveVideo's pending filings in MB Docket No. 24-275, is unaffected.

Dated: September 30, 2026

Respectfully submitted,


/s/ Alfred C. Constants III
Alfred C. Constants III
Constants Law Offices, LLC
115 Forest Avenue, Unit 331
Locust Valley, New York 11560
(516) 200-9660
constantslaw49@gmail.com
*Counsel for Petitioner LiveVideo.AI Corp.*

## CERTIFICATE OF COMPLIANCE

This notice contains 774 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). It was prepared in 14-point Times New Roman, a proportionally spaced typeface.

/s/ Alfred C. Constants III

## CERTIFICATE OF SERVICE

I certify that on September 30, 2026, I filed this notice, with its exhibits, through the Court's CM/ECF system, which will serve all counsel of record, including counsel for the Federal Communications Commission and the United States.

/s/ Alfred C. Constants III
Alfred C. Constants III

# INDEX OF EXHIBITS

LiveVideo.AI Corp. v. FCC, No. 26-1176 (D.C. Cir.) — Notice of Material Developments (Sept. 30, 2026)


Ex. A — Declaratory Ruling, Paramount Global, MB Docket No. 26-93, DA 26-1001 (Media Bur. rel. Sept. 17, 2026)

Ex. B — California v. Paramount Skydance Corp., No. 4:26-cv-07116-AMO (N.D. Cal.): ECF 266 (Order Granting Joint Motion to Enter Consent Decree and dissolving Order Not to Close, Sept. 30, 2026); ECF 267 (Consent Decree, entered Sept. 30, 2026)

Ex. C — Paramount Skydance Corp., Current Report on Form 8-K (filed Sept. 25, 2026) (Items 3.01, 7.01, and 9.01 and signature page; Exhibit 99 omitted)

Ex. D — Paramount Skydance Corp., Quarterly Report on Form 10-Q for the quarter ended June 30, 2026 (filed Aug. 4, 2026), excerpts (cover page and p. 10)

Ex. E — Petition for Review, LiveVideo.AI Corp. v. FCC, No. 26-1257, Doc. #2195519 (D.C. Cir. filed Sept. 28, 2026) (petition, disclosure statement, and certificate; the Ruling attached to the petition is Exhibit A above)

# EXHIBIT A

Declaratory Ruling, Paramount Global, MB Docket No. 26-93, DA 26-1001
(Media Bur. rel. Sept. 17, 2026)

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Paramount Global | ) | MB Docket No. 26-93 |
| | ) | |
| Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934, as Amended | ) ) ) | |

## DECLARATORY RULING

**Adopted: September 17, 2026** **Released: September 17, 2026**

By the Chief, Video Division, Media Bureau:

## I. INTRODUCTION

1. In this Declaratory Ruling (Declaratory Ruling), the Video Division, Media Bureau (Bureau), grants a petition for a declaratory ruling (Petition)[1] filed by Paramount Global (Paramount), on behalf of itself and its subsidiaries that operate broadcast television stations (Licensees).[2] The Petition asks the Commission to exercise its authority delegated to it by Congress to permit indirect foreign ownership in Paramount, the controlling U.S. parent of the Licensees, to exceed the 25% benchmarks established in section 310(b)(4) of the Communications Act of 1934, as amended (the Act),[3] and sections 1.5000 *et seq.* of the Commission's rules.[4] As discussed below, we grant Paramount's request for its

[1] Petition for Declaratory Ruling of Paramount Global (filed Apr. 24, 2026). Paramount filed a supplement (Supplement) on June 23, 2026, amending Exhibit B of the Petition to add the "direct equity and voting interests that each individual and entity will hold in the entity or entities immediately downstream" and include "clarifications in the accompanying notes regarding certain ownership interests." Supplement at 1.

[2] A complete list of Licensees is provided in the Attachment.

[3] Section 310(b)(4) of the Act states:

> No broadcast or common carrier or aeronautical en route or aeronautical fixed radio station license shall be granted to or held by . . . any corporation directly or indirectly controlled by any other corporation of which more than one-fourth of the capital stock is owned of record or voted by aliens, their representatives, or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country, if the Commission finds that the public interest will be served by the refusal or revocation of such license.

47 U.S.C. § 310(b)(4).

[4] 47 CFR § 1.5000 *et seq.* *See Review of Foreign Ownership Policies for Broadcast, Common Carrier and Aeronautical Radio Licensees under Section 310(b)(4) of the Communications Act of 1934, As Amended,* GN Docket No. 25-149, Report and Order, 41 FCC Rcd 831 (Jan. 30, 2026) (*2026 Foreign Ownership Order*) (codifying definitions, concepts, and practices underlying the foreign ownership rules to streamline the Commission's review processes); *Review of Foreign Ownership Policies for Broadcast, Common Carrier and Aeronautical Radio Licensees Under Section 310(b)(4) of the Communications Act of 1934, as Amended*, GN Docket No. 15-236, Report and Order, 31 FCC Rcd 11272 (2016) (*2016 Foreign Ownership Order*), *pet. for recon. dismissed*, 32 FCC Rcd 4780 (2017).

foreign investors, including certain prospective foreign investors (Foreign Investors),[5] to indirectly hold equity in excess of 25%, in the aggregate; specific approval[6] for the Foreign Investors to hold indirectly more than 5% each of the equity in Paramount through newly issued non-voting Class B shares;[7] and advance approval[8] for each of the Foreign Investors to hold up to 20% indirect equity in Paramount at some future time.[9] Further, as explained below, we conclude that in light of the commitments and undertakings set forth in the Letter of Agreement (LOA),[10] we do not grant the following requests made by Paramount, as they are now moot: foreign voting interests in excess of 25% in the aggregate; specific approval for each of the Foreign Investor's voting interests; and advance approval for each of the Foreign Investor's voting interests.[11]

2. Upon review of the Petition and consideration of the record of this proceeding, we find that the public interest would be served by granting the Petition, subject to compliance with the LOA's terms and the Commission's rules, as described below.[12] As discussed *infra*, Paramount must monitor foreign ownership to ensure continued compliance with the Commission's rules, including section 1.5004; Paramount must comply with the LOA, including, but not limited to, the commitment that "each of the Foreign Investor's interest in Paramount will consist entirely of non-voting stock without any governance or information rights, and the Foreign Investors will not have any influence, direction, or control over or provide any commentary or guidance on Paramount's content decisions, company management, or have any Access to Paramount's non-public U.S. Person Data" and "that in the event it proposes to change any voting, governance or information rights of the Foreign Investors, it will seek prior approval from the FCC through a new petition for declaratory ruling, and acknowledges that that [sic] such new petition

---

[5] The Foreign Investors include: (i) Public Investment Fund; (ii) L'Imad 1st SPV 2 Exempt RSC Ltd; (iii) L'imad 1st Holding 1 Exempt RSC Ltd; (4) L'imad 1st Capital Holding Ltd; (5) L'imad Holding Company – P.J.S.C; (6) QIA TMT Holding LLC; and (7) Qatar Investment Authority. *See infra* paras. 5-7.

[6] Under section 1.5001(i)(1) of the Commission's rules, petitions for a declaratory ruling are required to identify and seek specific approval for any foreign individual, entity, or group that holds or would hold, directly and/or indirectly, more than 5% of the equity and/or voting interests, or a controlling interest, in the licensee's controlling U.S. parent, subject to certain exemptions, including an exemption that increases the specific approval threshold to 10% for certain institutional investors. 47 CFR § 1.5001(i)(1), (i)(4).

[7] Petition; Reply Comments of Paramount Global at 1 (filed June 11, 2026) (Reply Comments).

[8] 47 CFR § 1.5001(k).

[9] Petition at 16-17. We note that after the Commission grants a declaratory ruling pursuant to section 310(b)(4) of the Act, petitioners have an affirmative duty under section 1.5004 to monitor and calculate their foreign equity and voting interests in a manner consistent with the principles enunciated by the Commission, including the standards and criteria set forth in sections 1.5002 and 1.5003 of the Commission's rules. 47 CFR §§ 1.5002-1.5004. *See infra* note 126. We also note that Paramount's specific approval, advance approval, and aggregate approval requests do not contemplate that actual voting interests will be held by any of the proposed Foreign Investors. *See infra* nn. 33 & 37.

[10] Letter of Agreement from Makan Delrahim, Chief Legal Officer of Paramount Skydance Corporation, Paramount Global to Chief, Foreign Investment Review Section (FIRS) and Deputy Chief, Compliance and Enforcement (FIRS), on behalf of the Assistant Attorney General for National Security, United States Department of Justice, National Security Division (dated Sept. 4, 2026) (LOA). As set forth in the LOA, "Foreign Investors" are "those foreign investors for which specific and advanced approval was requested in the Paramount Petition." *Id.* at 3 (citing Petition at 16-17). *See also* para. 1, note 5, *supra*.

[11] Under section 310(b)(4) of the Act, Commission approval is required only when the aggregate foreign ownership exceeds the statutory benchmarks. Accordingly, aggregate foreign equity and/or voting interests below the 25% benchmarks do not require a declaratory ruling from the Commission.

[12] For a discussion of the terms and conditions Paramount is subject to under this Declaratory Ruling, see *infra* para. 32.

could be subject to a referral to the Committee."[13] Paramount also must obtain Commission approval before its foreign ownership exceeds the terms and conditions of this Declaratory Ruling, including, but not limited to, seeking a new declaratory ruling if Paramount's foreign voting interests in the aggregate exceed 25%, or if it proposes to change the voting interests of any of the approved Foreign Investors under this Declaratory Ruling.

3. On April 27, 2026, the Bureau released a public notice[14] establishing a pleading cycle with comments due on May 27, 2026, and reply comments due on June 11, 2026, and designating the proceeding as "permit-but-disclose" in accordance with the Commission's *ex parte* rules.[15] We received several timely filed comments,[16] *ex parte* letters,[17] and other submissions to the Commission.[18] Also submitted into the record is a letter received from the National Telecommunications and Information Administration (NTIA) on behalf of the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector (Committee).[19] Consistent with the Committee's input, as discussed below, we find that it will serve the public interest to grant the Petition, subject to the conditions set forth in this Declaratory Ruling.

---

[13] LOA at 3-4.

[14] *Media Bureau Announces Filing of Petition for Declaratory Ruling by Paramount Global*, MB Docket No. 26-93, Public Notice, DA 26-411 (MB Apr. 27, 2026) (Public Notice).

[15] 47 CFR § 1.1206.

[16] *See, e.g.*, Comments of PRESSPAGE ENTERTAINMENT INC (filed Apr. 28, 2026) (PRESSPAGE Comments); Comments of Collin Hotchkiss (filed Apr. 28, 2026); Comments of Ron Beres (filed Apr. 29, 2026); Comments of Aidan Gordon (filed May 5, 2026); Comments of Patrick O. Ingle (filed May 7, 2026); Comments of W. Lee McVey, PE (Ret.) (filed May 7, 2026); Comments of Zachary Beaudoin (filed May 18, 2026); Comments of Chad Ray (filed May 20, 2026); Comments of Franklin Broadcasting LP (filed May 27, 2026) (Franklin Comments); Comments of Free Press (filed on May 27, 2026) (Free Press Comments). In addition, we received a number of late-filed comments. Between July 13 and July 14, 2026, LiveVideo.AI Corp. (LiveVideo.AI) submitted multiple filings, including a Motion for Leave to Accept Late-Filed Comments of LiveVideo.AI Corp. and Notice of Errata (together, LiveVideo.AI Comments); Written *Ex Parte* Presentation of LiveVideo.AI Corp. (LiveVideo.AI *Ex Parte*); and Exhibit; on July 31, 2026, LiveVideo.AI submitted a "Supplemental Petition to Disqualify Chairman Brendan Carr for Bias and Conflict of Interest." (LiveVideo.AI Supplement). We note that LiveVideo.AI raises claims such as alleged conflicts of interest, or submits documentation related to various pending litigations related to prior Commission transaction decisions. We decline to resolve LiveVideo.AI's conflict of interest claims because they fall outside the scope of this proceeding. The issue of whether the Commission's Chairman should disqualify himself, *see* LiveVideo.AI Supplement, is not properly raised at this stage of the proceeding because this Petition is being resolved under the Media Bureau's delegated authority. *See infra*, paras. 33-34 (citing 47 CFR §§ 0.61, 0.283). On July 22, 2026, Austin Olachea filed an Informal Objection and Supplemental Comments, both of which cite the incorrect docket number. On September 11, 2026, LiveVideo.AI filed an "Amended Petition to Deny, or in the Alternative Informal Objection; Motion for Leave to File Out of Time; Request for Targeted Supplementation; and Request to Withhold Action Pending a Complete Record)," which states that the filing supersedes its September 4, September 7, and September 8, 2026 submission filings.

[17] *See, e.g.*, *Ex Parte* Letter of PRESSPAGE ENTERTAINMENT INC (filed on May 5, 2026) (PRESSPAGE May 5, 2026 *Ex Parte* Letter); *Ex Parte* Letter of PRESSPAGE ENTERTAINMENT INC (filed on May 22, 2026) (PRESSPAGE May 22, 2026 *Ex Parte* Letter); and *Ex Parte* Letter of LiveVideo.AI Corp. (filed on July 14, 2026).

[18] A few congressional letters addressed to FCC Chairman Brendan Carr were filed in the docket. *See, e.g.*, Letter from Sen. Cory A. Booker, et al., United States Senate, to Hon. Brendan Carr, FCC (dated Mar. 23, 2026); Letter from Rep. Sam T. Liccardo, United States House of Representatives, to Hon. Brendan Carr, FCC (dated May 1, 2026); Letter from Sen. Maria Cantwell, et al., United States Senate, to Hon. Brendan Carr, FCC (dated May 20, 2026).

[19] Petition to Adopt Conditions to Authorization and License, NTIA, MB Docket No. 26-93 (filed Sept. 17, 2026) (Committee Petition); LOA.

## II. BACKGROUND

4. Paramount is a Delaware corporation that, through the Licensees (each a direct or indirect wholly owned subsidiary of Paramount), operates 28 broadcast television stations across the United States.[20] Paramount is a direct, wholly owned subsidiary of Paramount Skydance Corporation (Paramount Skydance), which, according to Paramount, is a "leading global media, streaming, and entertainment company that creates premium content and experiences for audiences worldwide."[21] Paramount Skydance has two classes of stock: Class A common stock, which has 100% of the voting interests in Paramount Skydance, and Class B common stock, which are non-voting shares.[22] The Ellison family indirectly holds 77.5% of the Class A shares as well as approximately 40% of the non-voting Class B shares; RedBird Capital Partners (RedBird) indirectly holds the remaining 22.5% of the Class A shares and approximately 9% of the non-voting Class B shares.[23]

### A. Proposed Investment

5. The Petition is filed in connection with a planned new investment (Proposed Investment) that would increase indirect foreign investment in Paramount.[24] As described in the Petition, in connection with the proposed merger of Paramount Skydance and Warner Bros. Discovery, Inc., on February 27, 2026, Lawrence Ellison, directly and indirectly, and a RedBird investment fund entered into subscription agreements to purchase up to approximately $47 billion of non-voting Paramount Skydance Class B shares.[25] Lawrence Ellison and RedBird then entered into agreements to assign those purchase rights to others, including, as is relevant here: (i) The Public Investment Fund, a sovereign wealth fund and instrumentality of Saudi Arabia (ii) L'Imad 1st SPV 2 Exempt RSC LTD, an investment vehicle of L'imad Holding, an Abu Dhabi government investment fund, and (iii) QIA TMT Holding LLC, an investment vehicle of the Qatar Investment Authority.[26]

6. As a result of the Proposed Investment, "the Ellison family and [RedBird Capital Partners] together will continue to hold the largest equity stake in Paramount Skydance and will continue to be the indirect owners of 100 percent of Paramount Skydance Class A Common Stock, representing 100 percent of the voting shares of, and thus control of, Paramount Skydance."[27] Paramount explains that the Proposed Investment will "not result in a transfer of control of Paramount" and that the "Ellison

---

[20] Petition at 3 (internal citations omitted).

[21] *Id*. Paramount Skydance's portfolio includes assets such as the "national CBS television network, Paramount Pictures, Nickelodeon, MTV, Comedy Central, and BET. The company also operates streaming platforms, including Paramount+ and Pluto TV." *Id*. Paramount Skydance also holds "extensive libraries of television and film titles, engages in content production and distribution, and provides advertising solutions." *Id*.

[22] *Id.* at 3.

[23] *Id.* at 3-5.

[24] *Id*. at 5-6.

[25] *Id*.

[26] *Id*.

[27] *Id*. The Petition notes that there are foreign investors in the RedBird funds. According to the Petition, however, "[t]he limited partners of RB Tentpole LP are insulated in accordance with Section 1.5003 of the Commission's rules. Therefore, the foreign insulated limited partners will be deemed to have voting interests in RB Tentpole LP equal to their equity interest." *Id*. at 15; *see also* 47 CFR § 1.5003 (providing insulation criteria for interests in limited partnerships) and 47 CFR § 1.5002(b)(2)(ii)(B) (explaining how to calculate indirect voting interests and stating that "[a] partner of a limited partnership (other than a general partner) or partner of a limited liability partnership that satisfies the insulation criteria specified in § 1.5003 shall be treated as an insulated partner and shall be deemed to hold a voting interest in the partnership that is equal to the partner's equity interest.")).

family will retain a majority of the voting interests and control of Paramount."[28] Therefore, Paramount notes that "no other application is being filed in connection with this Petition."[29] Paramount reiterates that "[a]ll voting rights and other decision-making functions in Paramount will be controlled by the Ellison family through U.S. entities."[30]

### B. Petition For Declaratory Ruling

7. To effectuate the purchases described above, pursuant to section 1.5001(h) of the Commission's rules,[31] Paramount requests approval for its foreign investors, including the Foreign Investors, to indirectly hold equity in excess of 25% in Paramount, the controlling U.S. parent of the Licensees.[32] Paramount also requests specific approval for certain foreign entities that individually will hold, indirectly, more than 5% of the equity[33] of Paramount.[34] In particular, Paramount makes the following requests for specific approval: (1) Public Investment Fund (15.1% equity) (Kingdom of Saudi Arabia); (2) L'Imad 1st SPV 2 Exempt RSC Ltd (12.8% equity) (United Arab Emirates); (3) L'imad 1st Holding 1 Exempt RSC Ltd (12.8% equity) (United Arab Emirates); (4) L'imad 1st Capital Holding Ltd (12.8% equity) (United Arab Emirates); (5) L'imad Holding Company – P.J.S.C (12.8% equity) (United Arab Emirates); (6) QIA TMT Holding LLC (10.6% equity) (Qatar); and (7) Qatar Investment Authority

[28] Petition at 2. According to the Petition, David Ellison, a U.S. citizen, "is the sole manager of Hikouki, LLC, Furaito, LLC, and Aozora, LLC, which are the holding companies that each respectively own 100 percent of the Pinnacle Media entities. Sayonara, LLC ('Sayonara') is the sole member of Hikouki, LLC, Furaito, LLC, and Aozora, LLC. Sayonara is owned and controlled by The Lawrence J. Ellison Revocable Trust u/a/d 1/22/88, as amended (the 'Trust'), which is controlled by Lawerence J. Ellison. David Ellison has granted to Sayonara a voting interest equal to approximately 35.5 percent in each of Hikouki, LLC, Furaito, LLC, and Aozora, LLC, and David Ellison retains an approximately 64.5 percent interest. In addition, by voting proxy, the Pinnacle Media entities have each granted David Ellison 64.5 percent of their respective voting interests in [Harbor Lights Entertainment, Inc. (Harbor Lights)] (and indirectly in Paramount Skydance) and have granted Sayonara the remaining 35.5 percent. David Ellison and Sayonara have the right to designate the Ellison family directors of Harbor Lights and Paramount Skydance, each in accordance with these voting percentages. David Ellison also serves as the Chairman and CEO of Paramount Skydance. Sayonara does not have any veto rights, or any special or outsized voting rights, in Harbor Lights or Paramount Skydance as a result of its minority voting interests." *Id*. at 4-5, 10. We note that Harbor Lights was formerly named National Amusements, Inc. *Id*. at 3, n.5.

[29] *Id*. at 2.

[30] *Id*. at 14, 21. Reply Comments at 7. Paramount further states that "[it] has repeatedly committed, and reaffirms here, that no foreign investor will have the ability to control Paramount or the Licensees." *Id*.

[31] 47 CFR § 1.5001(h).

[32] Reply Comments at 1; Petition at 2, 14-16. According to the Petition, "[t]he foreign-owned interests through Class B shares is expected to be approximately 49.5 percent in the aggregate after the Proposed Investment." Petition at 15. Paramount further states that "[a]lthough Paramount expects that existing and prospective foreign investors will indirectly hold slightly less than 50 percent of Paramount's equity interests after consummating the Proposed Investment described below, Paramount seeks approval for foreign investors in the aggregate to indirectly hold up to 100 percent of its equity and/or voting interests in light of routine fluctuations in publicly held equity interests and to account for potential future investments (subject to any specific approval requirements in Section 1.5004(a))." *Id*. at 2.

[33] Paramount states that the "voting interest of investors holding only Class B shares will be zero" but "[o]ut of an abundance of caution, to the extent that the Commission deems holders of non-voting equity in a corporation to have a 'deemed' voting interest equal to their equity interest[.]" *Id*. at 16. Paramount further states that "foreign investors' equity interests will consist entirely of passive, non-voting stock." Reply Comments at 7. Paramount also states that it "will return to the Commission in the event Paramount proposes to effectuate any changes in governance rights in the company that would result in an attributable interest or active governance role being held by any foreign investor in the future," and that any changes that would accord foreign investors increased rights would be reviewed independently of this order. *Id*. at 8.

[34] 47 CFR § 1.5001(i); Petition at 16-17.

(10.6% equity) (Qatar).[35] Pursuant to section 1.5001(k) of the Commission's rules,[36] Paramount also requests advance approval for each of the foregoing foreign entities seeking specific approval to increase its indirect equity interests in Paramount up to a non-controlling 20% at some future time.[37]

### C. Public Interest Showing

#### 1. Paramount's Public Interest Showing

8. Paramount asserts that grant of the Petition will serve the public interest, as it would "afford Paramount and, in turn, the Licensees, greater access to capital, including from foreign sources," which would enable Paramount to "compete more effectively in the provision of television broadcast services and in the broader video programming marketplace."[38] Specifically, Paramount provides that it recently has been making "strategic investments to improve the Licensees' newsgathering and reporting operations, both nationally and at a local level."[39] For example, Paramount notes that efforts are under way to rejuvenate "the Licensees' online presence, allowing them to meet viewers where they are and ensuring their continued relevance to the communities that they serve, in turn enhancing the availability of reliable, high-quality, non-paywalled local and national news across the country."[40]

9. To this end, Paramount explains that "[r]educing barriers to further investment in Paramount, including by allowing the company to pursue additional capital from non-U.S. investors, will enable it to allocate additional resources to preserve and enhance the legacy and broad reach of the Licensees' television broadcast operations."[41] The Petition further states that "[i]n turn, Paramount's ability to compete in the television broadcast and broader video marketplaces will improve, thereby promoting the strength of the industry overall."[42] Paramount provides that the "new equity investment" will better position the company to "weather continuing challenges facing broadcasters and operators of linear pay-television networks."[43]

10. Finally, Paramount notes that "grant of this Petition will not present any national security, law enforcement, foreign policy, or trade policy concerns."[44] Specifically, Paramount explains, the

---

[35] Petition at 16-17.

[36] 47 CFR § 1.5001(k).

[37] Petition at 16-17. Under the Commission's foreign ownership rules, a petitioner may request advance approval in its petition for a foreign individual and/or entity seeking specific approval to increase its equity and/or voting interests at some future time. 47 CFR § 1.5001(k). With regard to voting rights, Paramount states that the new Class B shares will have no voting rights and that it "will return to the Commission in the event Paramount proposes to effectuate any changes in governance rights in the company that would result in an attributable interest or active governance role being held by any foreign investor in the future." Reply Comments at 8.

[38] Petition at 19.

[39] *Id*. at 20.

[40] *Id*. at 20-21. In Reply Comments, Paramount also states that its "broadcast stations provide a critical link to local communities, delivering lifesaving information during emergency situations (like tornadoes, hurricanes, blizzards, and wildfires)." Reply Comments at 5. Further, Paramount provides that "at a time when local news operations across the country are contracting and communities are losing access to trusted sources of local journalism, investment that will bolster Paramount's capacity to maintain robust news operations across its station group should be welcomed. And indeed, granting the Petition will support continued investment in reporters, producers, and technical staff at the Licensees' stations, as well as in the digital platforms and tools necessary to reach audiences where they increasingly consume news content." Reply Comments at 5-6.

[41] Petition at 21.

[42] *Id.*

[43] *Id.*

[44] *Id.*

"Ellison family (which includes only U.S. persons) will retain a majority of the voting interests and control of Paramount, and each of the entities through which the Ellison family holds its interests in the company is a U.S. entity."[45]

### 2. Comments and *Ex Parte* Submissions

11. *Foreign Ownership Concerns*. A few commenters raise public interest considerations pursuant to section 310(b)(4) of the Act.[46] For example, Free Press asserts that Paramount fails to demonstrate that the Proposed Investment would serve the public interest.[47] First, Free Press questions Paramount's public interest rationale that the Proposed Investment would afford Paramount and its Licensees greater access to capital to allow it to compete more effectively in the marketplace, arguing that there has "never been a U.S. broadcasting company with as much 'access to capital' as Paramount currently can find from its controlling shareholder."[48] Free Press further argues that Paramount, "does not need to acquire WBD in order to continue profitably operating the CBS network and its local broadcast stations," as "[n]one of the 28 stations are 'failing' or 'failed'. . . ."[49] Second, Free Press asserts that Paramount's "[g]eneric rhetoric" about the public interest benefits of permitting "foreign governments to control up to 100 percent of one of the Big 4 U.S. broadcasting networks and station owners" does not satisfy the Commission's section 310(b)(4) standard.[50] Third, according to Free Press, "[Paramount] has not demonstrated that there are no other lawful methods of financing the transaction other than obtaining a waiver so that three foreign governments can hold up to 100 percent of the equity interests in these domestic broadcasting operations."[51] Finally, Free Press argues that "Paramount will begin its ownership of WBD with nearly $80 billion in debt, which will require deep cuts to Paramount's pre-merger holdings and existing operations" and that "[t]hese cuts will negatively impact the public interest, particularly at Paramount's broadcast units."[52] Franklin Broadcasting LP (Franklin), similarly argues that the "Commission should examine whether the proposed foreign sovereign wealth fund, foreign government-related or other substantial foreign capital participation identified in the record is necessary to consummate the transaction or preserve broadcast and news operations."[53]

*12.* *National Security.* Other commenters raise national security concerns associated with the Proposed Investment and propose that the Commission coordinate with Executive Branch agencies for their views on national security.[54] Specifically, according to PRESSPAGE, even "when structured as non-controlling or non-voting equity, ownership by foreign state-linked entities raises material national-

[45] *Id.*

[46] *See, e.g.*, PRESSPAGE Comments at 1-2; Franklin Comments at 3, 7; and Free Press Comments at 3-10.

[47] Free Press Comments at 6.

[48] *Id*. at 7.

[49] *Id*. at 8.

[50] *Id*.

[51] *Id*.; Free Press asserts that the appropriate standard for reviewing Paramount's request is as a "waiver" under the Commission's rules. Specifically, "[t]o receive a waiver under the Commission's rules, petitioners must demonstrate that 'the underlying purpose of the rule(s) would not be served or would be frustrated by application to the instant case, and that a grant of the requested waiver would be in the public interest.' Or demonstrate that 'in view of unique or unusual factual circumstances of the instant case, application of the rule(s) would be inequitable, unduly burdensome or contrary to the public interest, or the applicant has no reasonable alternative.'" *Id*. at 5. As discussed in more detail *infra* para. 24, we note that waiver is not the applicable standard in the Commission's foreign ownership review under section 310(b)(4) of the Act.

[52] Free Press Comments at 9.

[53] Franklin Comments at 3.

[54] *See, e.g.*, PRESSPAGE Comments at 1-2; Franklin Comments at 10; LiveVideo.AI *Ex Parte* at 1-2.

security considerations."[55] PRESSPAGE presses the Commission to coordinate closely with the Executive Branch agencies for their views on any national security concerns and opines that the Commission "should not act until that review is complete and its recommendations are incorporated into the record."[56] Franklin similarly requests that the Commission consider whether approval of the Petition should be conditioned on, or accompanied by, further inquiry into certain matters, including coordination with "Team Telecom and other relevant national-security reviewers concerning foreign sovereign wealth fund participation, foreign-government-related investment and any other substantial foreign interests identified in the record."[57]

13. To mitigate potential national security concerns, PRESSPAGE and Franklin urge the Commission to consider implementing various safeguards.[58] For example, PRESSPAGE states that, even if the Commission finds that foreign ownership above 25% is permissible, it should evaluate whether "additional safeguards are necessary to preserve these core public-interest values."[59] To that end, PRESSPAGE suggests that post-transaction structural separation can fully resolve national security concerns. Specifically, PRESSPAGE proposes that "all U.S. news and broadcast functions would be placed in a **wholly U.S.-owned and U.S.-controlled public entity**, while all studio and entertainment operations would be placed in a **separate public entity** that may permissibly receive foreign investment under §310(b)(4)."[60] Similarly, Franklin states that the Commission should "preserve and examine the availability of structural safeguards if the record shows that formal voting-control protections are insufficient to address practical foreign influence, national-security concerns, editorial independence, localism, public-service obligations or capital-structure pressure affecting sensitive broadcast, news, linear and advertising-supported assets."[61]

14. *Control and Influence.* Several commenters also assert that, in addition to its consideration of "formal voting control" as part of its section 310(b)(4) review of the Petition, the Commission should address the "practical influence" that the Foreign Investors may have over Paramount.[62] In particular, Franklin "recognizes that Section 310(b)(4) proceedings often focus on formal ownership, voting control and attributable interests,"[63] and that "foreign investors, directly or indirectly, may receive governance, contractual, financial, informational or economic rights that could create practical influence over the parent company or its sensitive communications assets,"[64] but it asserts that "[w]here substantial foreign equity may participate economically in the parent of major U.S. broadcast,

---

[55] PRESSPAGE Comments at 1.

[56] *Id*. at 2.

[57] Franklin Comments at 9-10.

[58] *See* PRESSPAGE May 5, 2026 *Ex Parte* Letter at 2-4, Franklin Comments at 5-8.

[59] PRESSPAGE Comments at 2.

[60] PRESSPAGE May 5, 2026 *Ex Parte* Letter at 2 (emphasis in the original).

[61] Franklin Comments at 1. Franklin also suggests that if the Commission examines a structural separation or similar safeguard, it should consider commitments addressing: (1) "local-news continuity;" (2) "national-news availability;" (3) "editorial-independence protocols;" (4) "independent governance for sensitive news assets;" (5) "public reporting on local-news and public-service obligations;" (6) "preservation or expansion of free over-the-air and free ad-supported news distribution;" (7) "emergency and public-affairs information distribution;" (8) children's educational and informational programming, where applicable;" (9) protection of newsroom decision-making from improper foreign, parent-company or creditor influence; and (10) "compliance reporting sufficient to allow the Commission to monitor performance." *Id*. at 7.

[62] *See, e.g.*, Franklin Comments at 2; PRESSPAGE May 5, 2026 *Ex Parte* Letter at 2; Free Press Comments at 9-10; LiveVideo.AI *Ex Parte* at 3.

[63] Franklin Comments at 4.

[64] *Id*. at 5.

local news and national news assets, the Commission should examine not only formal voting control, but also practical influence."[65] Similarly, PRESSPAGE states that "foreign equity—particularly when concentrated or accompanied by governance rights—can create channels for influence over editorial judgment, newsroom priorities, or the flow of information to the American public."[66] Free Press also asserts that while Paramount "goes to great lengths to provide assurances that the foreign governments financing this deal will have no control or say over CBS Network and Paramount's 28 FCC licensed full-power TV stations, foreign governments don't write checks for tens of billions of dollars in exchange for a share of a business with declining revenues."[67] Free Press goes on to state that "[c]ontrol over for-profit, commercial domestic news media by any government is an extraordinary situation that would surely strike most Americans as unseemly, precisely because of the utility of the news media as a propaganda tool for those governments."[68]

### 3. Paramount's Reply

15. In reply comments, Paramount asserts that the commenters ignore the substantial public interest benefits of the Proposed Investment.[69] Paramount further asserts that Free Press's comments "appear grounded in a presumption that foreign investment in broadcast stations is contrary to the public interest, but Commission precedent holds the opposite."[70] Accordingly, "[s]ection 310(b)(4) provides that foreign ownership of broadcast licenses should be barred *only* "if the Commission finds that the public interest will be served by the refusal or revocation of such license," but "[n]o such finding could be made on the record of this proceeding."[71] Indeed, Paramount argues that the commenters ignore the Proposed Investment's substantial public interest benefits and states that the "Proposed Investment will yield precisely the kinds of public interest benefits that the Commission has identified as supporting approval of foreign investment in other broadcast licensees under Section 310(b)(4), and no commenter has articulated a credible basis for concluding otherwise."[72] Further, Paramount argues that Free Press mischaracterizes the applicable legal standard for the Commission's foreign ownership approval process. Specifically, Paramount provides that "[i]gnoring the Commission's well-established foreign ownership approval process, as codified in clearly defined rules, Free Press mischaracterizes the applicable legal standard by suggesting that there is a very high bar for 'waiv[ing]' the 25 percent indirect foreign ownership benchmark."[73]

---

[65] *Id*. at 2.

[66] PRESSPAGE May 5, 2026 *Ex Parte* Letter at 2.

[67] Free Press Comments at 9.

[68] *Id*. at 10.

[69] Reply Comments at 4.

[70] *Id.* at 2. Paramount further states that "[i]ndeed, the Commission has determined that foreign investment in broadcast stations is not only appropriate but beneficial given the challenges confronting the industry, and ample precedent supports permitting foreign investment in Paramount of up to and including 100 percent. Since 2016, the Commission has applied the same streamlined standard to approve indirect foreign ownership of broadcast licensees above the 25 percent threshold, with the aim of 'facilitat[ing] investment from new sources of capital at a time of growing need for investment in" U.S. broadcasters, an important sector of our nation's economy.' In adopting this framework, the Commission emphasized that foreign investment has provided much-needed capital to U.S. broadcasters, allowing them to upgrade their facilities and technology, invest in programming, and maintain the quality of their service to the public." *Id.* at 2-3.

[71] *Id.* at 3.

[72] *Id.* at 4-6.

[73] *Id.* at 4. Paramount further states "no waiver of the Commission's rules is required to grant the Petition, and no heightened showing of the sort demanded by Free Press is necessary (especially not under Section 1.925 of the Commission's rules, which does not apply to television broadcast services)." *Id.* Paramount explains that

*16.* In response to concerns raised regarding national security and the Foreign Investors' influence and control, Paramount states that commenters' concerns are speculative and unsupported by facts.[74] Paramount asserts that, as its Petition makes clear, its "new foreign investors, which will receive only non-voting equity, will not have any ability to influence the company's editorial decision-making or news or entertainment content or to access its viewers' personal data."[75] The commenters, Paramount argues, overlook the fact that "none of the foreign investors will be able to wield any influence, let alone control, over Paramount's programming or the operations of the Licensees more broadly by acquiring non-voting stock in Paramount."[76] Further, the "Ellison family will retain control over Paramount" and that "no foreign investor will have the ability to control Paramount or the Licensees; to the contrary, Paramount will ensure that there will be no interference with the editorial or decision-making policies of its broadcast stations (or CBS News or any other facets of Paramount news and entertainment programming)."[77] Paramount maintains that commenters "fail to explain how passive, non-voting shareholders will achieve such influence, and they also ignore that these precise issues are under review by Team Telecom, providing a further backstop to ensure that the national security and law enforcement agencies are satisfied with the company's controls."[78] Regarding the commenters' concerns about potential changes that may give the Foreign Investors increased rights, Paramount states that it will "return to the Commission in the event Paramount proposes to effectuate any changes in governance rights in the company that would result in an attributable interest or active governance role being held by any foreign investor in the future. Accordingly, there is no need to speculate about potential changes that could accord the foreign investors increased rights as any such changes would be reviewed independently."[79]

### D. National Security, Law Enforcement, Foreign Policy and Trade Policy Review

17. Pursuant to Commission practice,[80] the Commission referred the Petition to the relevant Executive Branch agencies for their views on any national security, law enforcement, foreign policy, or trade policy concerns related to the proposed foreign ownership of Paramount, as the controlling U.S. parent of Licensees.[81] On April 29, 2026, the Committee notified the Commission that it was reviewing the Petition for any national security and law enforcement concerns that may be raised by foreign

"[i]nstead, the statute and the Commission's rules establish a clear process for seeking approval for foreign ownership exceeding 25 percent, including approval to allow up to and including 100 percent aggregate foreign ownership, subject to the traditional public interest standard rather than any heightened standard of review. The Commission has explained that Section 310(b)(4) does not establish a general prohibition against foreign investment but rather creates a process for the Commission to evaluate the public interest implications of such investment on a case-by-case basis." *Id.*

[74] *Id*. at 6.

[75] *Id*. at 6-7.

[76] *Id*. at 7.

[77] *Id*.

[78] *Id.* at 7-8. Paramount further states that "[t]he Commission routinely 'accords deference' to the expertise of these agencies, whose scrutiny of the Proposed Investment will ensure that any of the foreign investors will not have any ability to compromise editorial decision-making, access the data of U.S. persons, or otherwise harm the public interest." *Id*. at 8, citing *2016 Foreign Ownership Order*, 31 FCC Rcd at 11277, para. 6.

[79] Reply Comments at 8.

[80] Consistent with the Commission's rules under section 1.40001(b), "the Commission will consider any recommendations from the executive branch on pending . . . petition(s) for foreign ownership ruling(s) pursuant to §§ 1.5000 through 1.5004 . . . that may affect national security, law enforcement, foreign policy, and/or trade policy as part of its public interest analysis. The Commission will evaluate concerns raised by the executive branch and will make an independent decision concerning the pending matter." 47 CFR § 1.40001(b).

[81] Public Notice at 4-5.

participation in the United States telecommunications services sector and requested that the Commission defer action on the Petition.[82] Subsequently, on June 16, 2026, the Department of Justice notified the Commission that the Committee had initiated its 120-day initial review of the Petition.[83] On September 17, 2026, NTIA submitted its Committee Petition to the Commission in which the Committee advised the Commission that "it has no objection to the Commission approving the above-captioned Petition for Declaratory Ruling, provided that the Commission conditions its approval on the assurance of Paramount Global to abide by the commitments and undertakings" set forth in the LOA.[84]

## III. DISCUSSION

18. *Standard of Review*. We review the Petition under section 310(b)(4) of the Act, which states that "[n]o broadcast . . . license shall be granted to or held by . . . any corporation directly or indirectly controlled by any other corporation of which more than one-fourth of the capital stock is owned of record or voted by aliens, their representatives, or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country, if the Commission finds that the public interest will be served by the refusal or revocation of such license."[85] This section of the Act grants the Commission discretion to allow foreign investment in a licensee's controlling U.S. parent above 25% unless the Commission finds that the public interest would be served by refusing to permit such foreign investment.[86] In evaluating petitions relating to foreign ownership, the Commission affords appropriate deference to the expertise of the Executive Branch agencies on issues related to national security, law enforcement, foreign policy, and trade policy.[87]

19. In the *2016 Foreign Ownership Order*, the Commission modified the broadcast licensee foreign ownership review process by extending the streamlined rules and procedures developed for review of foreign ownership of common carrier and certain aeronautical licensees under section 310(b)(4) to the broadcast context, with certain limited exceptions.[88] The *2016 Foreign Ownership Order* expressly provides for processing of petitions requesting approval for up to and including 100% aggregate foreign voting and/or equity investment by unnamed and future foreign investors in the controlling U.S. parent of a broadcast licensee.[89] To exercise in a meaningful way the discretion conferred by statute, the Commission must receive detailed information from the applicant sufficient for the Commission to make the public interest finding the statute requires.[90]

20. *Section 310(b)(4) Determination and Public Interest Analysis*. Pursuant to section 310(b)(4) of the Act,[91] as well as sections 1.5001 through 1.5004 of the Commission's rules,[92] we find that the public interest is served by permitting indirect foreign equity ownership of Paramount in excess

---

[82] Letter from Jessica Campbell, Attorney Advisor, Foreign Investment Review Section, National Security Division, Department of Justice, DOJ, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 26-93 (filed Apr. 29, 2026).

[83] Letter from Jessica Campbell, Attorney Advisor, Foreign Investment Review Section, National Security Division, DOJ, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 26-93 (filed June 16, 2026).

[84] Committee Petition at 1; LOA.

[85] 47 U.S.C. § 310(b)(4).

[86] *See id.*; *2016 Foreign Ownership Order*, 31 FCC Rcd at 11276, para. 5.

[87] *2016 Foreign Ownership Order,* 31 FCC Rcd at 11277, para. 6.

[88] *See generally id.*

[89] *Id.* at 11282, para. 15.

[90] *See, e.g.*, *id*. at 11282, 11283-84, paras. 15, 20 (noting that the requirements adopted in the streamlined foreign ownership rules ensure that the Commission has the information necessary to evaluate and understand a licensee's ownership structure and to fulfill its obligations under section 310(b) of the Act).

[91] 47 U.S.C. § 310(b)(4).

[92] *See* 47 CFR § 1.5000 *et seq.*

of the 25% benchmark in section 310(b)(4) of the Act, and, consequently, we grant Paramount's request, as described and conditioned below. We further find that it is in the public interest to grant specific approval and advance approval for the percentages set out to the entities specified in Section IV below. As discussed further below, we conclude that grant of the Petition is in the public interest because it, among other things, provides the Licensees with greater access to capital and thereby contributes to the strengthening of the broadcast industry.[93]

21. First, we disagree with the commenters that argue that Paramount has failed to demonstrate that grant of the Petition is in the public interest. In the Commission's review of foreign ownership pursuant to section 310(b)(4) of the Act,[94] it has long recognized that foreign investment in U.S. companies and networks, including broadcast, fosters technical innovation, supports job creation, and strengthens the U.S. economy.[95] The Commission remains committed to encouraging such investment while maintaining its ability to conduct comprehensive reviews of foreign ownership in its licensees to safeguard the United States from new and evolving national security threats.[96] When reviewing foreign investment under section 310(b)(4), the Commission's decisions carefully balance the dual public interest objectives of prohibiting potentially harmful foreign investment and promoting non-harmful foreign investment.[97]

22. Upon review of the entire record, we find that Paramount has sufficiently demonstrated that the public interest would be served by granting the Petition.[98] Specifically, Paramount states that grant of the Petition would provide it with greater access to capital, improve the Licensees' newsgathering and reporting operations, and better position the company to "weather continuing challenges facing broadcasters and operators of linear pay-television networks."[99] The commenters have not rebutted these statements. We also agree with Paramount that the concerns raised in the record to the contrary are speculative and unsupported. Several commenters assert that the Commission, as part of its section 310(b)(4) review of the Petition, should consider the "practical influence" that the Foreign Investors may have over Paramount and its Licensees in addition to "formal voting control."[100] We find this argument unconvincing. The Proposed Investment is not a loan, which must be repaid, but a purchase of stock that has no voting rights. We are persuaded by Paramount's argument[101] that the Foreign Investors therefore will not be able to wield any influence, let alone control, over decisions involving the Licensees.

---

[93] *See* Petition at 19-22 (describing public interest benefits arising from approval of this declaratory ruling and the related Proposed Investment).

[94] 47 U.S.C. § 310(b)(4).

[95] *Review of Foreign Ownership Policies for Common Carrier and Aeronautical Radio Licenses Under Section 310(b)(4) of the Communications Act of 1934, as Amended,* IB Docket No. 11-133, Second Report and Order, 28 FCC Rcd 5741, 5744, para. 3 (2013) (*2013 Foreign Ownership Second Report and Order*) ("foreign investment has been and will continue to be an important source of financing for U.S. telecommunications companies, fostering technical innovation, economic growth, and job creation."); *see also 2016 Foreign Ownership Order*, 31 FCC Rcd at 11280, para. 12 (stating that "applying the foreign ownership rules for common carrier licensees to broadcast licensees in the context of Section 310(b)(4) petitions will help improve access to capital from foreign investors and promote regulatory flexibility, while also preserving the Commission's statutory obligation, in consultation with the relevant Executive Branch agencies, to ensure that foreign ownership above the 25 percent benchmark serves the public interest.").

[96] *2026 Foreign Ownership Order* at 832, para. 1.

[97] *Id*. at 851-52, para. 39.

[98] *See supra* paras. 8-10.

[99] Petition at 19-22.

[100] *See, e.g.*, Franklin Comments at 2; PRESSPAGE May 5, 2026 *Ex Parte* Letter at 2; Free Press Comments at 9-10; LiveVideo.AI *Ex Parte* at 3.

[101] Reply Comments at 6-7.

Paramount has further demonstrated that David Ellison will retain control over Paramount and that the Ellison family will continue to own a majority of the voting stock, and we credit Paramount's statement that "Paramount will ensure that there will be no interference with the editorial or decision-making policies of its broadcast stations (or CBS News or any other facets of Paramount news and entertainment programming)."[102] Finally, we are persuaded by the commitments Paramount made in its LOA with the Committee, which explicitly states that the "Foreign Investor's interest in Paramount will consist entirely of non-voting stock without any governance or information rights, and the Foreign Investors will not have any influence, direction, or control over or provide any commentary or guidance on Paramount's content decisions, company management, or have any Access to Paramount's non-public U.S. Person Data" and that Paramount "affirms that in the event it proposes to change any voting, governance or information rights of the Foreign Investors, it will seek prior approval from the FCC through a new petition for declaratory ruling, and acknowledges that that [sic] such new petition could be subject to referral to the Committee."[103] We condition our approval of the Petition on Paramount's returning to the Commission for approval before giving the Foreign Investors additional rights, including but not limited to, any voting rights.[104]

23. We find that the Commission's review process, the Committee's review process, Paramount's Petition certification,[105] the Commission's continuing compliance obligations,[106] and the commitments and undertakings set out in the LOA adequately ensure that the proposed foreign ownership serves the public interest, and that the commenters have not provided any persuasive reasons for us to find that the public interest would not be served by granting the Petition. We therefore conclude that grant of the Petition is consistent with the Commission's longstanding goal of promoting foreign investment, including in the broadcast industry, and that it would not serve the public interest to deny it.

24. Second, we reject the commenters' attempts to set an alternative standard for the Commission's foreign ownership review pursuant to section 310(b)(4) of the Act. At the outset, we find that Free Press mischaracterizes the applicable legal standard for the Commission's section 310(b)(4) review. Free Press asserts that the Commission's waiver rule is the applicable legal framework to petitions for declaratory ruling under section 310(b) of the Act.[107] That is incorrect. Instead, petitions for declaratory ruling filed pursuant to section 310(b)(4) of the Act are reviewed under sections 1.5000–1.5004 of the Commission's rules.[108] We also disagree with the commenters' assertions that Paramount must demonstrate that acquisition of WBD is necessary to promote the public interest,[109] that there are no other lawful methods of financing the transaction than through foreign investment,[110] or that "substantial foreign capital participation identified in the record is necessary to consummate the transaction or preserve broadcast and news operations."[111] We find that there is no affirmative burden on petitioners to make these showings. The question is whether it would be in the public interest to refuse to allow this foreign investment, not whether the investment is "necessary" or the only alternative.

---

[102] *Id.*

[103] LOA at 3-4.

[104] *See infra* para. 32 describing the terms and conditions to which Paramount is subject.

[105] *See* Petition at Certification.

[106] 47 CFR § 1.5004.

[107] 47 CFR § 1.925(b)(3)(i).

[108] 47 CFR §§ 1.5000-1.5004.

[109] Free Press Comments at 8.

[110] *Id.*

[111] Franklin Comments at 3.

25. *National Security*. When evaluating petitions for declaratory ruling under section 310(b)(4) of the Act, we also consider public interest issues related to national security, law enforcement, foreign policy, and trade policy concerns.[112] To exercise in a meaningful way the discretion conferred by statute, the Commission must receive detailed information from the applicant sufficient for the Commission to make the public interest finding the statute requires.[113] The Commission also coordinates as necessary and appropriate with the relevant Executive Branch agencies and accords deference to their expertise in identifying and interpreting issues of concern related to these matters.[114] When the Commission refers a petition to the Executive Branch agencies, it does not act on the petition until the Committee completes its review and provides the Commission its recommendation.

26. As stated above, pursuant to our standard practice, the Commission coordinated with the Executive Branch agencies and referred the Petition for their views on any national security, law enforcement, and foreign policy, or trade policy concerns related to the proposed foreign ownership of Paramount, the controlling U.S. parent of the Licensees.[115] Here, the Executive Branch agencies have reviewed the Petition and do not object to the Commission granting the Petition, provided that the Commission conditions its approval on Paramount's compliance with the LOA.[116] The Committee Petition further states that "[a]fter discussions with representative [sic] of Paramount Global in connection with the above-captioned application, the Committee has concluded that the additional commitments set forth in the LOA will help ensure that those agencies with responsibility for enforcing the law, protecting the national security, and preserving public safety can proceed appropriately to satisfy those responsibilities."[117]

27. In accordance with the request of the Committee, we grant the Committee Petition, and condition the grant of the Petition, on compliance by Paramount with the commitments and undertakings

---

[112] *See Process Reform for Executive Branch Review of Certain FCC Applications and Petitions Involving Foreign Ownership*, IB Docket 16-155, Report and Order, 35 FCC Rcd 10927 (2020) (setting rules and procedures for referring applications for Executive Branch review consistent with Executive Order No. 13913) (*Executive Branch Review Order*); *Foreign Participation Order*, 12 FCC Rcd at 23918-21, paras. 59-66 (in opening the U.S. telecommunications market to foreign entry in 1997, the Commission affirmed that it would consider national security, law enforcement, foreign policy, and trade policy concerns related to reportable foreign ownership as part of its overall public interest review of applications for international section 214 authority, submarine cable landing licenses, and declaratory rulings to exceed the foreign ownership benchmarks of section 310(b) of the Act). *See also Applications of T-Mobile US, Inc., and Sprint Corporation*, 34 FCC Rcd 10578, 10732-33, para. 349 (2019) (*T-Mobile/Sprint Order*); *2016 Foreign Ownership Order*, 31 FCC Rcd at 11277, para. 6; 47 CFR § 1.40001(a).

[113] *See, e.g.*, *2016 Foreign Ownership Order* at 11282, 11283-84, paras. 15, 20 (noting that the requirements adopted in the streamlined foreign ownership rules ensure that the Commission has the information necessary to evaluate and understand a licensee's ownership structure and to fulfill its obligations under section 310(b) of the Act).

[114] *Id*. at 11277, para. 6, citing to *2013 Foreign Ownership Second Report and Order*, 28 FCC Rcd at 5751, 5762, paras. 13, 34; *Rules and Policies on Foreign Participation in the U.S. Telecommunications Market: Market Entry and Regulation of Foreign-Affiliated Entities*, IB Docket Nos. 97-142 and 95-22, Report and Order and Order on Reconsideration, 12 FCC Rcd 23891, 23920, para. 63 (1997) (*Foreign Participation Order*), Order on Reconsideration, FCC 00-339, 15 FCC Rcd 18158 (2000). *See also Executive Branch Review of FCC Applications and Petitions with Foreign Ownership for National Security, Law Enforcement, Foreign Policy and Trade Policy Concerns*, IB Docket No. 16-155, Notice of Proposed Rulemaking, 31 FCC Rcd 7456 (2016) (*2016 Executive Branch Review NPRM*)).

[115] We thus dismiss as moot the concerns raised by commenters suggesting we coordinate closely with the Executive Branch agencies for their views on any national security concerns and not act until that review is complete as those steps already have been taken in the instant proceeding. *See* PRESSPAGE Comments at 1-2; Franklin Comments at 10; LiveVideo.AI *Ex Parte* at 1-2. *See also 2016 Foreign Ownership Order*, 31 FCC Rcd at 11282, para. 15; *Executive Branch Review Order*, 35 FCC Rcd at 10934-36, paras. 17, 24.

[116] *See* Committee Petition at 1; LOA.

[117] Committee Petition at 2.

set forth in the LOA. A failure to comply and/or remain in compliance with any of these conditions shall constitute a failure to meet a condition of this Declaratory Ruling, which may also result in monetary sanctions or other enforcement action by the Commission.

28. Given the Executive Branch agencies' determination, we decline to adopt the safeguards or commitments proposed in the record.[118] The Commission grants a petition for declaratory ruling on the condition that the petitioner complies with the Commission's routine terms and conditions, including any mitigation measures or agreements negotiated with the Committee. After carefully and thoroughly reviewing the record, we find that the commenters did not raise any persuasive basis for the Commission to depart from this established practice.

## IV. DECLARATORY RULING

29. Upon review of the Petition, and consideration of the record of this proceeding, pursuant to section 310(b)(4) of the Act and sections 1.5001 through 1.5004 of the Commission's rules, we find that the public interest would be served by permitting indirect foreign equity ownership of Paramount, the controlling U.S. parent of the Licensees, to exceed the 25% benchmark in section 310(b)(4) of the Act, as amended.[119] We also find that it is in the public interest to permit up to 100% indirect foreign equity interest of Paramount, in the aggregate, subject to the terms and conditions set forth in the Commission's rules including section 1.5004 of the Commission's rules, and the commitments and undertakings set forth in the LOA.[120]

30. Pursuant to section 1.5001(i) of the Commission's rules,[121] this Declaratory Ruling grants specific approval for the following entities to hold, indirectly, greater than 5% of the equity interests in Paramount:

- Public Investment Fund (15.1% equity) (Kingdom of Saudi Arabia);
- L'Imad 1st SPV 2 Exempt RSC Ltd (12.8% equity) (United Arab Emirates);
- L'imad 1st Holding 1 Exempt RSC Ltd (12.8% equity) (United Arab Emirates);
- L'imad 1st Capital Holding Ltd (12.8% equity) (United Arab Emirates);
- L'imad Holding Company – P.J.S.C (12.8% equity) (United Arab Emirates);
- QIA TMT Holding LLC (10.6% equity) (Qatar); and
- Qatar Investment Authority (10.6% equity) (Qatar).

---

[118] PRESSPAGE Comments at 2; Franklin Comments at 2-3.

[119] In its comments, Free Press characterizes the Petition as a request that requires the Commission to ignore the statutory limits on foreign ownership. *See* Free Press Comments at 6. We disagree. As discussed *infra*, consistent with our precedent, we find that our actions herein, including authorizing up to 100% indirect foreign equity interest of Paramount, in the aggregate, are consistent with both the Act and the Commission's rules and precedent when doing so serves the public interest, provided that petitioners comply with the routine terms and conditions of their declaratory ruling. *See, e.g.*, *Searchlight II HMT, L.P., Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934, as Amended*, MB Docket No. 23-2, Declaratory Ruling, 38 FCC Rcd 7412 (MB 2023) ("[w]e also find that it is in the public interest to permit up to an aggregate 100% indirect foreign ownership of [the broadcast licensees' controlling U.S. parent]"); *Univision Holdings II, Inc., Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934*, *as Amended*, MB Docket No. 21-321, Declaratory Ruling, 37 FCC Rcd 449 (MB 2022) ("it is in the public interest to grant Univision's request to permit foreign investors to own up to 100% in the aggregate of Univision's equity and voting interests.").

[120] For a discussion of the mootness of Paramount's requests in light of its LOA for its indirect aggregate foreign voting interests to exceed 25%, specific approval for its proposed Foreign Investors' voting interests, and advance approval for such Foreign Investors' voting interests, see *supra* paras. 1-2.

[121] 47 CFR § 1.5001(i).

31. Pursuant to section 1.5001(k) of the Commission's rules,[122] this Declaratory Ruling also grants advance approval for each of the foreign entities above, seeking specific approval to increase their indirect equity interests in Paramount up to a non-controlling 20% at some future time.[123]

32. *Terms and Conditions.* Under this Declaratory Ruling, Paramount has an affirmative duty to monitor its foreign equity and voting interests, calculate those interests consistent with the principles enunciated by the Commission, including the standards and criteria set forth in sections 1.5002 through 1.5003 of the Commission's rules,[124] and otherwise ensure continuing compliance with the provisions of section 310(b) of the Act.[125] Grant of this Declaratory Ruling is conditioned on the terms and conditions set forth in section 1.5004 of the Commission's rules, including the requirement to obtain Commission approval before foreign ownership of Paramount exceeds the terms and conditions of this Declaratory Ruling.[126] Grant of the Declaratory Ruling, is further conditioned on compliance with the LOA.[127] Paramount is further subject to the Commission's requirement to obtain approval for any new or additional foreign individual, entity, or group of such individuals or entities to hold, directly and/or indirectly, more than 5% (or more than 10% for certain investors that fall under the narrow exceptions in section 1.5001(i) of the Commission's rules[128]) of the equity and/or voting interests, or for any foreign individual, entity, or group to hold a controlling interest, in the company.[129] If, at any time, Paramount knows, or has reason to know, that it is no longer in compliance with this Declaratory Ruling, section 310(b) of the Act, or the Commission's foreign ownership rules, Paramount shall file a statement with the Commission explaining the circumstances within 30 days of the date that it knew, or had reason to know,

[122] 47 CFR § 1.5001(k).

[123] *See supra* para. 1. We note that in its comments, LiveVideo.AI states that Paramount's "advance-approval request appears to exceed the ceiling applicable to non-controlling foreign interests." *See, e.g.*, LiveVideo.AI Comments at 3. However, the Commission's foreign ownership rules permit non-controlling foreign investors that request specific approval to request advance approval to increase their equity and/or voting interests up to a non-controlling 49.99% at some future time. Here, in relevant part, Paramount requested advance approval for each of the foreign entities seeking specific approval to increase their indirect equity interests in Paramount up to a non-controlling 20%, which falls below the maximum permissible percentage of 49.99% for non-controlling interests. 47 CFR § 1.5001(k)(2).

[124] 47 CFR §§ 1.5002-1.5003.

[125] 47 CFR § 1.5004, note to paragraph (a).

[126] 47 CFR § 1.5004. Section 1.5004, *inter alia*, specifies that licensees have an ongoing, proactive obligation to monitor their foreign ownership compliance and to take preemptive action to remain in compliance with the Commission's foreign ownership rules and any declaratory ruling they have received. 47 CFR § 1.5004(a). While all of the terms and conditions set forth in section 1.5004 of the Commission's rules apply, we highlight the following provisions: (1) where a previously unapproved foreign-organized entity is inserted into the vertical ownership chain of a licensee, or its controlling U.S.-organized parent, without prior Commission approval, the licensee shall file a letter to the attention of the Chief, Media Bureau, within 30 days after the insertion of the new, foreign-organized entity; (2) a licensee that has received a foreign ownership ruling, including a U.S.-organized successor-in-interest to such licensee as part of reorganization, or any subsidiary or affiliate relying on such licensee's ruling, shall file a new petition for declaratory ruling under § 1.5000 to obtain Commission approval before its foreign ownership exceeds the routine terms and conditions of this section, and/or any specific terms of conditions of its rulings; and (3) if at any time the licensee, including any successor-in interest and any subsidiary or affiliate knows, or has reason to know, that it is no longer in compliance with its foreign ownership rulings or the Commission's rules relating to foreign ownership, it shall file a statement with the Commission explaining the circumstances within 30 days of the date it knew, or had reason to know, that it was no longer in compliance.

[127] LOA; *see supra* para. 2.

[128] *See* 47 CFR § 1.5001(i)(4).

[129] 47 CFR § 1.5004(a)(1).

that it was no longer in compliance.[130] A failure to meet a condition of this Declaratory Ruling may result in monetary sanctions or other enforcement action by the Commission for such non-compliance, including an order requiring divestiture of the foreign investment.[131]

## V. ORDERING CLAUSES

33. Accordingly, **IT IS ORDERED** that, pursuant to section 310(b)(4) of the Communications Act of 1934, as amended, 47 U.S.C. § 310(b)(4), and sections 1.5001 through 1.5004 of the Commission's rules, 47 CFR §§ 1.5001-04, and pursuant to authority delegated to the Media Bureau in sections 0.61 and 0.283 of the Commission's rules, 47 CFR §§ 0.61, 0.283, the Petition for Declaratory Ruling filed by Paramount Global **IS GRANTED** as specified and subject to the conditions specified herein.

34. **IT IS FURTHER ORDERED**, pursuant to sections 4(i) and (j), and 310(b)(4) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i)(j), 310(b)(4), and sections 1.5001 through 1.5004 of the Commission's rules, 47 CFR §§ 1.5001-04, and pursuant to authority delegated to the Media Bureau in sections 0.61 and 0.283 of the Commission's rules, that the opposing comments filed by the commenters listed in Appendix A, **ARE DENIED**.

35. **IT IS FURTHER ORDERED** that this Declaratory Ruling **SHALL BE EFFECTIVE** upon release.

FEDERAL COMMUNICATIONS COMMISSION

David Brown
Chief, Video Division
Media Bureau

[130] *See* 47 CFR § 1.5004(f)(1). If, for example, a foreign individual or entity should directly or indirectly invest in Paramount above the percentages approved herein without Commission approval, Paramount is obligated to follow the steps set out in 47 CFR § 1.5004(f). Subsequent actions taken by or on behalf of Paramount to remedy non-compliance shall not relieve it of the obligation to notify the Commission of the circumstances (including duration) of non-compliance.

[131] 47 CFR § 1.5004(f).

## Attachment

### Paramount Licensees

| Call Sign | Facility ID No. | Community of License | Licensee |
|---|---|---|---|
| WUPA | 6900 | Atlanta, GA | Atlanta Television Station WUPA Inc. |
| KCBS-TV | 9628 | Los Angeles, CA | CBS Broadcasting Inc. |
| KDKA-TV | 25454 | Pittsburgh, PA | CBS Broadcasting Inc. |
| KPIX-TV | 25452 | San Francisco, CA | CBS Broadcasting Inc. |
| KYW-TV | 25453 | Philadelphia, PA | CBS Broadcasting Inc. |
| WBBM-TV | 9617 | Chicago, IL | CBS Broadcasting Inc. |
| WCBS-TV | 9610 | New York, NY | CBS Broadcasting Inc. |
| WCCO-TV | 9629 | Minneapolis, MN | CBS Broadcasting Inc. |
| KCCW-TV | 9640 | Walker, MN | CBS Broadcasting Inc. |
| WWJ-TV | 72123 | Detroit, MI | CBS Broadcasting Inc. |
| WLNY-TV | 73206 | Riverhead, NY | CBS LITV LLC |
| WBXI-CD | 70416 | Indianapolis, IN | CBS Mass Media Corporation |
| WTOG | 74112 | St. Petersburg, FL | CBS Operations Investments Inc. |
| W26DP-D | 74116 | Inverness, FL | CBS Operations Investments Inc. |
| W36FJ-D | 74113 | Sebring, FL | CBS Operations Investments Inc. |
| KTVT | 23422 | Fort Worth, TX | CBS Stations Group of Texas LLC |
| WBZ-TV | 25456 | Boston, MA | CBS Television Licenses LLC |
| WJZ-TV | 25455 | Baltimore, MD | CBS Television Licenses LLC |
| WSBK-TV | 73982 | Boston, MA | CBS Television Licenses LLC |
| WFOR-TV | 47902 | Miami, FL | CBS Television Licenses LLC |
| KCNC-TV | 47903 | Denver, CO | CBS Television Stations Inc. |
| WKBD-TV | 51570 | Detroit, MI | Detroit Television Station WKBD Inc. |
| KCAL-TV | 21422 | Los Angeles, CA | Los Angeles Television Station KCAL LLC |
| WBFS-TV | 12497 | Miami, FL | Miami Television Station WBFS Inc. |
| WPSG | 12499 | Philadelphia, PA | Philadelphia Television Station WPSG, Inc. |

| Call Sign | Facility ID No. | Community of License | Licensee |
|---|---|---|---|
| WPKD-TV | 69880 | Jeannette, PA | Pittsburgh Television Station WPCW Inc. |
| KMAX-TV | 51499 | Sacramento, CA | Sacramento Television Stations, Inc. |
| KOVR | 56550 | Stockton, CA | Sacramento Television Stations, Inc. |
| KPYX | 69619 | San Francisco, CA | San Francisco Television Station KBCW Inc. |
| KTXA | 51517 | Fort Worth, TX | Television Station KTXA Inc. |
| KSTW | 23428 | Tacoma, WA | The CW Television Stations Inc. |

## APPENDIX A

**List of Commenters**

PRESSPAGE ENTERTAINMENT INC
Collin Hotchkiss
Ron Beres
Aidan Gordon
Patrick O. Ingle
W. Lee McVey, PE
Zachary Beaudoin
Chad Ray
Franklin Broadcasting LP
Free Press
LiveVideo.AI Corp.
Austin Olachea

# EXHIBIT B

California v. Paramount Skydance Corp., No. 4:26-cv-07116-AMO (N.D. Cal.): ECF 266 (Order Granting Joint Motion to Enter Consent Decree and dissolving Order Not to Close, Sept. 30, 2026); ECF 267 (Consent Decree, entered Sept. 30, 2026)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE STATE OF CALIFORNIA, et al.,

Plaintiffs,

v.

PARAMOUNT SKYDANCE CORPORATION, et al.,

Defendants.

Case No. 26-cv-07116-AMO

**ORDER GRANTING JOINT MOTION TO ENTER CONSENT DECREE**

Re: Dkt. No. 243

This Order assumes familiarity with the facts and procedural history of this antitrust case brought by twelve state Attorneys General challenging the proposed merger between two major media corporations. Before the Court is a joint motion to enter a consent decree. The motion additionally requests that the Court dissolve the stipulation and order not to close. The Court **GRANTS** the joint motion for the following reasons.

It is well-settled that the Court may approve a consent decree if it determines that "it is fair, reasonable and equitable and does not violate the law or public policy." *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 672 F.3d 1160, 1165 (9th Cir. 2012). The Court must independently scrutinize the proposed consent decree's terms, and "eschew any rubber stamp approval." *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 747 (9th Cir. 1995). Indeed, "a federal court is more than a recorder of contracts from whom parties can purchase injunctions; it is an organ of government constituted to make judicial decisions." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986). "However, a consent decree need not impose all the obligations authorized by law." *United States v. State of Oregon*, 913 F.2d 576, 581 (9th Cir. 1990) (citing *Local 93*, 478 U.S. at 522-23). "Rather, the court's approval is nothing more than an amalgam of delicate balancing, gross approximations and rough

justice. The court need only be satisfied that the decree represents a reasonable factual and legal determination." *Oregon*, 913 F.2d at 581 (internal quotation marks & citations omitted).

Here, the Court finds the proposed consent decree represents a reasonable factual and legal resolution of the dispute. The parties' proposed consent decree falls within the scope of the case made by the pleadings. Plaintiffs advance three U.S. markets for antitrust purposes: (1) distribution of wide-release theatrical films, (2) distribution of top-grossing theatrical films, and (3) licensing of basic cable channels to distributors. *See* Compl. ¶ 36. The parties' proposed production, distribution, and funding of films, including particular provisions for "tentpole" and "independent" films, ostensibly addresses potential harms to the first two markets by requiring certain minimum thresholds of investment and release of domestic films. And the parties' proposed requirements for continued, separate negotiations of distribution for the two entities' basic cable holdings addresses concerns related to the third market. The proposed consent decree imposes these requirements and includes important backstops requiring divestment of studios and/or cable channels in case of the combined entity's failure to comply with the proposed consent decree's terms. Further, the proposed consent decree imposes these requirements on film distribution and basic cable negotiations in the midst of a rapidly-changing marketplace. The Court therefore finds that the proposed consent decree reflects a settlement between the parties that is a fair, reasonable, and good faith approach to address the competitive harms alleged in the Complaint, and does not violate the law or public policy.[1]

Further, the Court finds the proposed settlement agreement reflects a procedurally sound resolution. The parties reached their agreement following highly contested, however brief, litigation, and they reached their agreement following what they report to have been several rounds of in-depth negotiations. Importantly, the participation of twelve state attorneys general

---

[1] Though amici aver that the "News Editorial Independence Board" risks violating the First Amendment by embroiling the Plaintiff States and/or the Court in enforcement of press standards, Dkt. Nos. 259 & 60, the Court disagrees. The proposed consent decree governs the News Editorial Independence Board's creation and structure, not its speech, which is substantively different than several of the cases regarding compelled speech cited by amici. *See* Dkt. No. 260 at 8 (citing *NRA of Am. v. Vullo*, 602 U.S. 175, 189 (2024); *Moody v. NetChoice, LLC*, 603 U.S. 707, 727 (2024)). Accordingly, the Court does not find that the News Editorial Independence Board provision renders the proposed consent decree contrary to law.

supports a finding of fairness. *See Moreno v. San Francisco Bay Area Rapid Transit Dist.*, Case No. 17-cv-02911-JSC, 2019 WL 343472, at *5 (N.D. Cal. Jan. 28, 2019) (recognizing that a government agency's participation in seeking a consent decree "weighs in favor of approving the settlement"); *S.E.C. v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984) ("[C]ourts should pay deference to the judgment of the government agency which has negotiated and submitted the proposed judgment."). Particularly recognizing that these government officials assent to the consent decree and recognizing, as Defendants have repeated throughout the case, that antitrust regulators across the globe have cleared the transaction before now, the Court concludes the proposed consent decree was the product of procedural fairness.

Amici express dismay at many of the proposed consent decree's provisions. *See* Dkt. Nos. 259 & 260.[2] However, a proposed consent decree like this one represents a negotiated settlement that does not fully remediate an alleged violation or even necessarily resolve the ultimate factual and legal issues of a case. As the Supreme Court has described,

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with litigation . . . . [T]he parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve.

*United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971); *see also Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982) (quoting same).

Here, the Court recognizes that this proposed consent decree reflects a compromise of the claims short of full adjudication – compromise that may leave some dissatisfaction for both sides and the public but a compromise that saves the risk, time, and expense of litigating through trial. The potential for greater investment in "documentaries and other nonfiction works, films by and

---

[2] The Court GRANTS the motion to amend/correct the amicus brief. Dkt. No. 261.

about Black and Latino communities, or other distinctive projects that might have been greenlit by one of two independently competing studios," Dkt. No. 259 at 5, and the concerns regarding news editorial independence, Dkt. No. 260 at 7-9, represent just some of the meaningful grounds for disappointment with the proposed consent decree. *See also* Dkt. No. 255 at 5 (letter from Sen. Cory A. Booker quoting a state Attorney General's statement that they were "deeply disappointed" they did not secure certain remedies in the proposed consent decree). But these hopes and desires for the proposed consent decree to reach farther – to achieve more – do not rise to the level of legal violations upon which the Court can reject the parties' negotiated resolution. "Unless a consent decree is unfair, inadequate, or unreasonable, it ought to be approved." *Randolph*, 736 F.2d at 529.

For the foregoing reasons, the Court **GRANTS** the parties' joint motion. The Court **DISSOLVES** the parties' stipulation and the Court's Order Not to Close, Dkt. No. 170, effective upon entry of this Order. In accordance with the parties' joint request, the Court will issue the consent decree as judgment and as a standalone docket entry.

**IT IS SO ORDERED.**

Dated: September 30, 2026

ARACELI MARTÍNEZ-OLGUÍN
**United States District Judge**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br>*Plaintiffs,*<br>v.<br>PARAMOUNT SKYDANCE CORP., and WARNER BROS. DISCOVERY, INC.,<br>*Defendants.* | Case No.: 4:26-cv-07116-AMO<br>**[~~PROPOSED~~] CONSENT DECREE**<br>Judge: Honorable Araceli Martínez-Olguín |

This Consent Decree ("**Consent Decree**") is entered into by and between the State of California, the State of Arizona, the State of Colorado, the State of Connecticut, the Commonwealth of Massachusetts, the State of Minnesota, the State of Nevada, the State of New Jersey, the State of New Mexico, the State of New York, the State of Oregon, and the State of Washington, by and through their respective Attorneys General (collectively, "**Plaintiff States**"), on the one hand, and Paramount Skydance Corporation ("**Paramount**"), Warner Bros. Discovery, Inc. ("**Warner Bros**." or "**WBD**"), the Combined Entity (as defined below), and their respective affiliates, (collectively, the "**Defendants**" or the "**Companies**"), on the other. "**Parties**" refers collectively to the Companies and the States, and "Party" refers to any one of the Parties, as the context requires.

The Parties, by and through their respective counsel, in consideration for and subject to the promises, terms, and conditions contained in this Consent Decree, hereby warrant, represent, acknowledge, covenant, stipulate and agree, subject to Court approval pursuant to applicable federal and state law, as follows:

## I. RECITALS

A. **WHEREAS**, on February 27, 2026, the Companies announced that they had entered into an agreement and plan of merger, pursuant to which Paramount will acquire Warner Bros. upon closing of the Merger;

B. **WHEREAS**, on July 13, 2026, after conducting an investigation of the Companies' proposed Merger and its potential effects on competition under federal and state antitrust laws, the Plaintiff States filed a complaint in the Federal District Court for the Northern District of California alleging that the effect of the proposed Merger may be substantially to lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. §18, in three alleged markets, and on that basis the Plaintiff States sought an order to permanently enjoin the proposed Merger amongst other relief;

C. **WHEREAS**, the Defendants deny that the Merger violates any applicable law but recognize the Plaintiff States' legitimate interest in protecting competition and consumers, and the Defendants desire to resolve the Plaintiff States' Complaint without the further cost, delay, and uncertainty of litigation;

D. **WHEREAS**, the Parties have engaged in good-faith negotiations and have agreed to the terms and conditions set forth herein to address the Plaintiff States' concerns regarding the competitive effects of the Merger alleged in the Complaint;

E. **WHEREAS**, this Consent Decree is for settlement purposes only and does not constitute an admission by the Companies that any law has been violated;

F. **NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth herein, the Parties agree as follows:

## II. DEFINITIONS

A. **"Consent Decree"** means this Consent Decree, including any amendments or modifications made in accordance with Section VIII.A hereof.

B. **"Attorneys General"** means, collectively, the Attorneys General of the Plaintiff States and their respective authorized designees.

C. **"Closing" or "Close"** means the closing of the Merger.

D. "**CBS News**" means the CBS Network News division within Paramount.

E. "**CNN**" means the CNN Worldwide division within Warner Bros.

F. **"Combined Entity"** means Paramount Skydance Corporation, a Delaware corporation, together with its subsidiaries, controlled affiliates, successors, and assigns, after the Merger Closes.

**G.** "**Commitment Period**" means the period of time that commences on the Closing and concludes on the fifth (5th) calendar year that follows the Closing. (For illustration purposes only, if the Closing occurs on September 30, 2026, the Commitment Period would run from September 30, 2026, to December 31, 2031.)

**H.** "**Commitment Year**" means each of the five consecutive calendar years following the calendar year in which the Closing occurs. (For illustration purposes only, if the Closing occurs at any time during calendar year 2026, then the Commitment Years would be 2027, 2028, 2029, 2030 and 2031.)

**I.** **"Distributor"** means any U.S. multichannel video programming distributor, including any virtual multichannel video programming distributor excluding any virtual multichannel video programming distributor that (1) is not affiliated with an MVPD and has never offered traditional MVPD services; and (2) as of the Effective date has more than five million (5,000,000) subscribers.

**J.** "**Divestiture Channels**" means collectively, BET (Black Entertainment Television, including BET, BET Gospel, BET Her, BET Hip-Hop, BET Jams, and BET Soul), VH1, Comedy Central, Smithsonian, Destination America, and Science, including all tangible and intangible assets reasonably necessary for a Divestiture Buyer to operate effectively, including the Divestiture Channels' copyrights, trademarks, other intellectual property rights, and licenses. For the avoidance of doubt, where a Divestiture Channel licenses content for distribution, the ownership rights of the underlying content remain the property of the license-granting entity and are not Distribution Channel assets to be divested, provided that the existing content license agreements with the Divestiture Channel will remain in place for the remainder of the license term.

**K.** "**Compliance Monitor**" has the meaning defined in Article VI.A of this Consent Decree.

**L.** **"Effective Date"** means the date on which this Consent Decree is entered by the Court.

**M.** "**Exhibitor**" means a person or legal entity that, as of the Effective Date, operates one or more theaters or cinemas in the United States for the primary purpose of publicly screening first-run Films for audiences.

**N.** **"Film"** means a feature-length motion picture (of at least seventy-five (75) minutes in running time) produced or distributed by the Combined Entity or its subsidiaries and intended for initial release in commercial movie theaters in the United States.

**O.** "**Independent Film**" means a Film that is either (i) based on an original screenplay or (ii) originated from Film producers outside of the Combined Entity, Disney, Universal, or Sony.

**P.** "**Lot**" means, with respect to Paramount, the studio lot Paramount operates at 5555 Melrose Avenue, in Los Angeles, California; and, with respect to Warner Bros., the

studio lot that Warner Bros. operates at 4000 Warner Boulevard in Burbank, California.

Q. **"Merger" or "Transaction"** means the Agreement and Plan of Merger entered into on February 27, 2026, between Paramount and Warner Bros., pursuant to which Paramount will acquire Warner Bros. upon Closing.

R. **"Miramax Studios"** means Miramax, LLC, and all of its subsidiaries, assets, and affiliated operations in which the Combined Entity holds a direct or indirect ownership interest.

S. **"Monitoring Trustee"** has the meaning defined in Article VI.B of this Consent Decree.

T. **"Motion Pictures & Television Fund"** means the Motion Picture & Television Fund, a California nonprofit corporation, or any successor organization.

U. "**National Association of Attorneys General Fund**" means a fund that is administered by the National Association of Attorneys General and that is designated for antitrust enforcement, as identified by the State Committee.

V. "**Paramount Basic Cable Channels**" means the basic cable channels owned by Paramount at the time of the Closing.

W. **"PVOD" or "Premium Video-on-Demand"** means access to audiovisual content for on-demand streaming via the internet or other digital distribution platforms immediately after Theatrical Release for a limited period of time for a one-off fee.

X. **"State"** means any one of the Plaintiff States, acting by and through its Attorney General, as the context requires.

Y. "**State Committee**" means a group of no more than five (5) Attorneys General offices appointed by the States, as modified from time to time. The State Committee will consult with and provide regular updates to the Plaintiff States.

Z. **"SVOD"** means subscription video-on-demand, being any service that provides access to audiovisual content on a subscription basis for on-demand streaming via the internet or other digital distribution platforms, including but not limited to Paramount+ and any successor service operated by the Combined Entity.

AA. **"Theatrical-Release Window"** means the period commencing on the date of a Film's initial public exhibition in commercial movie theaters in the United States (such exhibition, a "**Theatrical Release**") and during which such Film is made available exclusively through theatrical exhibition and is not to be made available on any SVOD or home entertainment platform.

BB. **"Warner Bros. Basic Cable Channels"** means the basic cable channels owned by Warner Bros. at the time of the Closing.

**CC.** "**Wide Release Film**" means a Film that is released on at least two thousand (2,000) screens.

## III. COMMITMENTS

**A. Theatrical Film Exhibition Commitments**

1. **Annual Film Release Commitment.** During each Commitment Year, the Combined Entity shall cause to be released for Theatrical Release in the United States a minimum of thirty (30) Films for the first and second Commitment Years and thirty-two (32) Films for the third, fourth, and fifth Commitment Years (the "**Annual Film Release Commitment**"). Of those Films:

   a. For the first and second Commitment Years, at least twenty (20) of the thirty (30) Films must be Wide Release Films;

   b. For the third, fourth, and fifth Commitment Years, at least twenty-one (21) of the thirty-two (32) Films must be Wide Release Films;

   c. For each of the Commitment Years, at least four (4) of the Films subject to this Section must be Independent Films; and

   d. For each of the Commitment Years, at least fifty percent (50%) of the Films subject to this section shall be produced or jointly produced by the Combined Entity.

2. **Theatrical-Release Window.** For each Film counted toward the Annual Film Release Commitment, the Combined Entity shall maintain a Theatrical-Release Window of not less than forty-five (45) days from the date of initial theatrical exhibition in the United States and shall not market or promote the Film as being available on any PVOD, SVOD, or other streaming platform prior to the thirtieth (30th) day of the Theatrical Release Window.

3. **SVOD Holdback Period.** For each Film counted toward the Annual Film Release Commitment, the Combined Entity shall not make such Film available on any SVOD platform, including Paramount+ or any successor service, for a period of not less than ninety (90) days from the date of the Film's initial theatrical exhibition in the United States.

4. **Marketing Budget Requirement.** The Combined Entity shall support each Film counted toward the Annual Film Release Commitment with a marketing spend consistent with typical practice for similar films and release patterns.

5. **Tentpole Films Requirement.** At least twenty percent (20%) of the Combined Entity's Films for each Commitment Year shall have aggregate

production and acquisition budgets of the equivalent of at least Fifty Million Dollars ($50 million) in September 2026, adjusted for inflation using the CPI-U based on the prior calendar year, and those Films must be released on a minimum of three thousand (3,000) domestic screens within the first four (4) weekends of initial release.

6. **Rental Rate Terms.** For the first three (3) Commitment Years of the Commitment Period, the Combined Entity shall maintain Film rental terms with Exhibitors for new Film releases that are consistent with the best practices followed by Paramount and Warner Bros. as of the Closing for such Exhibitor. For purposes of this paragraph, best practices include but are not limited to: (i) honoring Paramount's current terms and rental rates as of the Closing for current and planned Paramount Theatrical Releases; (ii) honoring Warner Bros.'s current terms and rental rates as of the Closing for current and planned Warner Bros. Theatrical Releases; and (iii) not offering any terms for Film Theatrical Releases that are less favorable than the higher of the rental rate schedule and associated terms offered by either Paramount or Warner Bros. to the same exhibitor as of the Closing.

7. **Film Catalogue Access.** During the Commitment Period, the Combined Entity will continue to make the film catalogues of both Paramount and Warner Bros. available for license by Exhibitors under similar Film rental terms as have been offered by each Company during the 2025 calendar year for similar grossing titles and situations. From time to time, certain Films may be taken out of release up to ninety (90) days before and up to thirty (30) days after a larger-scale re-issue, including but not limited to anniversary celebrations, so as not to cannibalize box office in close proximity to the larger theatrical release that will be supported by marketing efforts.

8. **United States Production Levels.** During the Commitment Years:

   a. The Combined Entity will spend at least Three Hundred Million Dollars ($300,000,000) more annually (totaling at least One Billion Five Hundred Million Dollars ($1,500,000,000) more across the Commitment Period) in production in the United States as compared to the level that the Companies spent on production in the United States in 2025.

   b. In the event that, during the Commitment Period, the United States enacts into law an uncapped federal film tax incentive of at least twenty percent (20%) (a "**Federal Film Tax Credit**"), then, for each remaining full calendar year within the Commitment Period for which the Federal Film Tax Credit applies, the Combined Entity's annual average production-day levels in the United States must be at least twenty percent (20%) of all Film production for the first and

second years, and must be at least thirty percent (30%) for the third, fourth, and fifth years.

c. In the event that, during the Commitment Period, the United States enacts into law a Federal Film Tax Credit as described in Section III.A.8.b, and either the State of California or the state of New York passes an uncapped state film tax incentive, inclusive of both above- and below-the-line expenses, of at least forty-three percent (43%), stackable with the Federal Film Tax Credit (a "**State Film Tax Credit**"), then, for each remaining full calendar year within the Commitment Period for which the State Film Tax Credit and Federal Film Tax Credit applies, the Combined Entity's annual average production-day levels in the United States must be at least forty percent (40%) of all Film production.

**9. Divestiture Remedy for Breach.** In the event that the Combined Entity fails to meet the Annual Film Release Commitment in any Commitment Year:

a. The Combined Entity shall have a cure period of six (6) months from the end of such Commitment Year (the "**Theatrical Cure Period**") in which to release a sufficient number of additional Films to bring the total to the required minimum of Films under the Annual Film Release Commitment for that Commitment Year. A Film may only be counted toward the Annual Film Release Commitment for one Commitment Year.

b. If, upon the expiration of the Theatrical Cure Period, the Combined Entity has failed to cure the shortfall, the Combined Entity shall divest its entire direct and indirect ownership interest in Miramax Studios ("**Miramax Divestiture Assets"**), on commercially reasonable terms, to a bona fide acquirer approved by the State Committee (such approval not to be unreasonably withheld or delayed) within twelve (12) months of the expiration of the Theatrical Cure Period (the "**Miramax Divestiture**").

c. The Combined Entity may not reacquire any part of or interest in the Miramax Divestiture Assets during the Commitment Period.

**10. Fund Contributions for Shortfalls.** In addition to and independent of the divestiture remedy set forth in Section A.9 of this Article, for each Film by which the Combined Entity falls below the Annual Film Release Commitment in any Commitment Year, the Combined Entity shall contribute thirty million dollars ($30,000,000), split fifty percent / forty percent / ten percent (50%/40%/10%) to (i) health care and retirement trust funds for the WGA, IATSE, DGA, International Brotherhood of Teamsters, and other unions that work on production of Films (as selected by the State

Committee), (ii) the Motion Pictures & Television Fund, and (iii) the National Association of Attorneys General Fund (collectively, the "**Contribution Funds**"), respectively. Such contributions shall be made within sixty (60) days of the end of the applicable Commitment Year (or the Theatrical Cure Period, whichever is later) and shall be non-refundable. The Contribution Fund obligations under this paragraph shall apply regardless of whether the Combined Entity subsequently cures the shortfall during the Theatrical Cure Period.

**11.** **Counting Methodology.** For purposes of this Article, a Film shall be counted toward the Annual Film Release Commitment for the Commitment Year in which its initial date of theatrical exhibition in the United States occurs, except that a Film released during the Cure Period shall be counted toward the Annual Film Release Commitment for the Commitment Year prior to its initial date of theatrical exhibition in the United States occurs. Films that receive a limited release (defined as fewer than six hundred (600) screens in the United States) shall not be counted toward the minimum unless they are subsequently expanded to one thousand (1,000) screens within thirty (30) days. For the avoidance of doubt, any re-releases of previously released films, commemorative editions, or otherwise repackaged versions of previously released intellectual property shall not count towards the Annual Film Release Commitment described in Section III.A.1.

**B.** **Basic Cable Commitments**

For the duration of the Commitment Period:

**1.** In negotiations between the Combined Entity and a Distributor concerning affiliation agreement terms for the Combined Entity's basic cable network portfolio, the Combined Entity shall separately negotiate affiliation agreement terms for the Paramount Basic Cable Channels and the Warner Bros. Basic Cable Channels. For the avoidance of doubt, this paragraph does not apply to other Combined Entity offerings (*e.g.*, premium cable channels, streaming services, or broadcast).

**2.** The Combined Entity will not alter the existing schedules for renegotiation of affiliate fee agreements covering basic cable channels, except at the written request of a Distributor, which the Combined Entity will not unreasonably reject or deny.

**3.** The Combined Entity shall not make any affiliation agreement or its terms for the Warner Bros. Basic Cable channels contingent on the Distributor's agreement to terms for the affiliation agreement for the Paramount Basic Cable Channels; or vice versa.

**4.** In separately negotiating affiliation agreement terms under this Section, the Combined Entity will not use confidential Paramount Basic Cable Channel affiliate fee data in any way to determine, influence, or impact negotiating Warner Bros. Basic Cable Channel affiliate fees, or vice versa.

**5.** Within 60 days after the Effective Date, the Combined Entity shall implement procedures and protections to ensure that the Combined Entity complies with the requirements of this Section III.B., and will provide those policies and protections to the Monitoring Trustee and the State Committee.

**6.** This commitment shall not apply where a Distributor affirmatively requests, in writing, that the Combined Entity negotiate basic cable affiliation agreement terms together for the Paramount Basic Cable Channels, Warner Bros. Basic Cable Channels, or any product or service offering from the Combined Entity; provided however, the Combined Entity may not solicit, encourage, or condition other terms on a Distributor making such a request.

**7.** **Divestiture Remedy for Breach.** In the event that the Combined Entity materially breaches the cable negotiation provisions in this section:

a. The Combined Entity shall have a cure period of six (6) months from the date the State Committee and the Monitoring Trustee notify the Court that they believe a material violation has occurred (the "Cable Cure Period") in which to re-negotiate and come into compliance with those provisions. The Combined Entity must make any revised agreements retroactive to the date of the violation and take any other steps necessary such that the Distributor is put in the same position as if the violation had not occurred.

b. If, upon the expiration of the Cable Cure Period, the Court has found that the Combined Entity has violated this Section III.B and has failed to cure said violation as determined by the Court in a final order, the Combined Entity shall, in addition to any remedies necessary to put the Distributor in the same position as if the violation had not occurred, divest its entire direct and indirect ownership interest in the Divestiture Channels.

1. The Combined Entity shall, within one hundred and twenty (120) days after the expiration of the Cable Cure Period, divest the Divestiture Channels to a bona fide divestiture buyer approved by the State Committee (such approval not to be unreasonably withheld or delayed) (a "**Divestiture Buyer**") in a manner consistent with this Consent Decree. The Combined Entity will use their best efforts to divest the Divestiture Channels as expeditiously as possible. In exercising the State Committee approval authority described in this paragraph, in the event that multiple bona fide entities bid to acquire the Divestiture Channels, the Combined Entity presumptively may

sell the Divestiture Channels to the highest bidder; however, the State Committee may direct the sale to a Divestiture Bidder that is within five percent (5%) of the highest bidder's bid price.

2. **Transition Services** (at Divestiture Buyer's Option). At the option of the Divestiture Buyer(s), on or before the closing date of any divestiture, the Combined Entity shall enter into one or more transition services agreements to provide any transition services reasonably necessary to operate any Divestiture Channels as viable, ongoing programming assets.

3. The Combined Entity may not reacquire any part of or interest in the Divestiture Channels during the Commitment Period.

**C. Entertainment Industry Investment Commitments**

**1.** **Lot Operations.** For the duration of the Commitment Period, the Combined Entity shall not sell or close the Paramount or Warner Bros. Lots and shall use commercially reasonable efforts to operate the Lots in a manner consistent with past practices, including leasing use to third parties and producing films and television shows.

**2.** **Committed Development Operations.** To the extent that either Paramount or Warner Bros. entered into contracts prior to the Effective Date to lease or develop studio facilities within a Plaintiff State ("**Development Agreements**"), and the development efforts described by those Development Agreements had not been completed prior to Closing, the Combined Entity shall honor the terms of those Development Agreements during the Commitment Period.

**3.** **Collective Bargaining.** During the Commitment Period, the Combined Entity shall honor existing collective bargaining agreements in the United States in accordance with their terms and shall bargain in good faith with applicable recognized labor organizations with respect to successor agreements, in each case subject to applicable law, the terms of those agreements, and commercially reasonable efforts. In furtherance of the foregoing:

a. The Combined Entity shall not unilaterally change any mandatory subject of bargaining affecting represented employees and covered by an existing collective bargaining agreement, except as permitted by such agreement or as otherwise agreed to in writing by the applicable labor organization.

b. The Combined Entity shall credit employees with all service, seniority, and accrued status recognized under applicable collective bargaining agreements for all purposes—including but not limited

to layoff, recall, promotion, benefits eligibility, and vacation accrual—subject to the terms of such agreements.

c. The Combined Entity shall not unlawfully interfere with employees in the exercise of rights to union representation and collective bargaining and shall respect the role of recognized labor organizations throughout the integration process.

4. **Employee Reapplication**. During the Commitment Period, Company employees who are displaced, laid off, or otherwise terminated as a result of the Transaction ("**Affected Employees**") shall have the right to apply for any open, vacant, and available positions within the Combined Entity's organization for which they are qualified, and the Combined Entity shall consider those applications in good faith.

5. **Community Investment.** The Combined Entity shall make an aggregate annual financial commitment of Nine and a Half Million Dollars ($9,500,000.00) each year for five (5) years following the Closing Date for investments in (1) workforce training and career development programs in film and television production communities at qualified educational institutions; and (2) film programs and community arts organizations.

6. **Independent Film Fund.** Within thirty (30) days of Closing, and for the duration of the Commitment Period, the Combined Entity will form and operate a fund for purchasing independent films (the "**Independent Film Fund**"). The Combined Entity will make an annual contribution to the Independent Film Fund of Five Million Dollars ($5 million) per annum for each Commitment Year.

**D. News Editorial Independence Board Commitments**

1. **Formation.** Within one hundred eighty (180) days following Closing, the Combined Entity shall establish the News Editorial Independence Board (the "**Editorial Independence Board**") and appoint Editorial Independence Board Members in manner that is consistent with this Section III.D.

2. **Composition.** The Editorial Independence Board shall be made up of five (5) established journalists (active or retired), each of whom shall have practiced journalism for a minimum of ten (10) years (including with credentials for at least three (3) years) ("**Journalist**"). ("**Editorial Independence Board Members**"). No more than two (2) Editorial Independence Board Members may be affiliated with the same political party.

3. **Appointment.** Editorial Independence Board Members shall be appointed by the Combined Entity's Board of Directors (the "**Combined Entity's Board**").

a. No member of any government or governmental entity may be appointed to the Editorial Independence Board.

b. No member of any government or governmental entity, including federal, state, and local governments, may approve or have approval rights over members appointed to the Editorial Independence Board.

c. No officer, director, shareholder or non-Journalist employee or contractor of the Combined Entity may be appointed to the Editorial Independence Board.

4. **Board Member Term.** Editorial Independence Board Members are expected to serve for three (3) years from the date of their appointment. The Combined Entity's Board can remove an Editorial Independence Board Member only for good cause, which for purposes of this paragraph shall mean fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary, or capricious, unrelated to business needs or goals, or pretextual. When an Editorial Independence Board is vacated, the Combined Entity's Board will fill that vacancy in a manner consistent with this Section III.D.

5. **Role.** The Editorial Independence Board will have the following responsibilities during the Commitment Period:

a. Establishing a set of guiding editorial principles based on CBS News and CNN's Standards & Practices policies and principles in effect as of the Effective Date of accuracy, independence, fairness, and journalistic integrity (collectively, "**News Editorial Principles**").

b. Resolving any disputes between CBS News employees, CNN employees, and management of the Combined Entity regarding alleged violations of the News Editorial Principles.

c. Resolving any disputes between CBS News employees, CNN employees, and management of the Combined Entity regarding alleged reporting bias or failure to meet agreed reporting fairness standards.

d. Establishing and monitoring adherence to ethical journalism as defined by journalism industry best practices and to editorial independence, including from the Combined Entity's ownership and shareholders.

6. **Reporting.** The Editorial Independence Board shall report to the Combined Entity's Board through the Combined Entity's Chief Compliance Officer.

7. **Scope.** The Editorial Independence Board's above-described responsibilities are limited to news and editorial content produced principally for distribution in the United States.

8. **Indemnification.** The Combined Entity shall indemnify and hold harmless Plaintiff States for any claims and litigation related to this section of the Consent Decree.

E. **Other Commitments**

1. **Pluto TV**. For the Commitment Period:

   a. The Combined Entity shall continue to maintain and make available a free, ad-supported streaming service under the Pluto TV brand or a successor or substantially equivalent replacement brand or service.

   b. The Combined Entity will, at a minimum, maintain this service with service and quality levels at or above the service and quality for the service as provided on the Effective Date, and shall make all product and content improvement and additions as contemplated on the Effective Date.

2. **Costs and Attorneys' Fees.** Defendants shall reimburse the Plaintiff States for reasonable attorneys' fees and reasonable economic expert fees (including reasonable expert firm support costs) incurred through the Effective Date, not to exceed Forty Million Dollars ($40,000,000), subject to review for reasonableness. The amount may be used for any one or more of the following purposes, by the Plaintiff States' Attorneys General as they, in their sole discretion, see fit and for any lawful purpose, including: antitrust or consumer protection law enforcement, including fees and expenses; for deposit into a state antitrust or consumer protection account (e.g., revolving account, trust account), for use in accordance with the state laws governing that account; for deposit into a fund exclusively dedicated to assisting state attorneys general to enforce the antitrust laws by defraying the costs of (a) experts, economists, and consultants in multistate antitrust investigations and litigation, (b) training or continuing education in antitrust for attorneys in state attorney general offices, or (c) information management systems used in multistate antitrust investigations and litigation; or for any other purpose as the attorneys general deem appropriate, consistent with, or required by, the various states' laws.

   a. Any payment the Companies make pursuant to this Consent Decree to the Colorado Department of Law is to be held, along with any interest thereon, in trust by the Attorney General to be used in the Attorney General's sole discretion for reimbursement of the State's actual costs and attorney's fees, the payment of restitution, if any,

and for future consumer fraud or antitrust enforcement, consumer education, or public welfare purposes.

3. **Anti-Retaliation.** The Combined Entity shall not take any adverse action against any exhibitor, distributor, employee, contractor, or other person in retaliation for reporting a compliance concern to the Monitoring Trustee or Plaintiff States, for cooperating with any investigation or inquiry related to compliance with this Consent Decree, or for cooperating with the investigation of or litigation challenging this Merger.

4. **Discharge.** The Plaintiff States affirm that this Consent Decree discharges as to the Defendants all competition claims, related consumer protection claims, and known related investigations by the Plaintiff States arising from the Merger and the related transactions. Related transactions include agreements that are ancillary to the Merger, for example equity commitments made in order to provide funding for the merger.

## IV. REPRESENTATIONS AND WARRANTIES

A. **Representations of the Plaintiff States.** The Plaintiff States represent and warrant that each of their respective Attorneys General has the authority to enter into this Consent Decree and to bind the applicable Plaintiff State to the terms hereof, provided, however, that the (1) State of Colorado does not join and does not bind its State to Section III.C.1 or III.D of this Consent Decree and (2) State of Washington does not join and does not bind its State to Section III.D of this Consent Decree.

B. **Representations of the Defendants**. Each Defendant represents and warrants that:

1. It is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware and is qualified to do business in the each of the Plaintiff States;

2. It has full corporate power and authority to execute, deliver, and perform this Consent Decree;

3. The execution, delivery, and performance of this Consent Decree have been duly authorized by all necessary corporate action; and

4. This Consent Decree constitutes a valid and binding obligation of the Defendants and the Combined Entity (as applicable), enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, and similar laws affecting creditors' rights generally and to general principles of equity.

## V. TERM AND DURATION

**A.** **Term.** This Consent Decree shall become effective on the Effective Date and shall remain in full force and effect for the Commitment Period, unless earlier terminated or extended by mutual written agreement of the Parties (the "**Term**"). Upon valid termination, this Consent Decree shall forthwith become null and void and there shall be no liability or obligation on the part of the Parties (other than as set forth in Section V.B. below). Notwithstanding the foregoing, at any time after the completion of the second full Commitment Year of the Commitment Period, the Combined Entity may, for good cause, petition the Court, by motion pursuant to Federal Rule of Civil Procedure 60(b) or as otherwise permitted by law, for relief from or modification to the requirements of this Consent Decree (a "**Petition**"). In such Petition, the Combined Entity bears the burden to show that, absent relief or modification, the Consent Decree impairs the Combined Entity's ability to successfully operate the business and to compete effectively, and that the requested relief or modification is not substantially likely to lessen competition. Prior to submitting a Petition, the Combined Entity will meet and confer with the State Committee in good faith to determine whether the Plaintiff States will consent to the requested relief or modification.

**B.** **Survival.** The representations, warranties, covenants and agreements in this Consent Decree shall not survive the termination of this Consent Decree, except that any obligations of the Combined Entity under this Consent Decree that by their nature are intended to survive termination, including completing the Miramax Divestiture (if required), any ongoing cure obligations, any accrued Contribution Fund contribution obligations, shall survive the termination of this Consent Decree until fully performed or discharged.

## VI. COMPLIANCE MONITORING AND REPORTING

**A.** **Internal Compliance Monitor.** Within twenty-one (21) days of Closing, Defendants shall: (i) appoint a "**Compliance Monitor**" who is an internal employee or officer of the Combined Entity and who reports directly to the Combined Entity's Chief Compliance Officer, and (ii) identify to the State Committee and the Monitoring Trustee the Compliance Monitor's name, business address, telephone number, and email address. Within forty-five (45) days of a vacancy in the Compliance Monitor position, the Combined Entity shall appoint a replacement, and shall identify to States Committee the replacement Compliance Monitor's name, business address, telephone number, and email address. During the Commitment Period, the Compliance Monitor shall:

**1.** Within one hundred twenty (120) days of the Closing, and annually thereafter for the duration of the Commitment Period, provide a report to the Combined Entity's Chief Compliance Officer describing the efforts the Combined Entity has made to comply with this Consent Decree.

**2.** Provide annual compliance training to employees of the Combined Entity whose day-to-day work responsibilities are directly affected by this Consent Decree ("**Relevant Personnel**") regarding the Combined Entity's obligations under this Consent Decree.

**3.** Provide supplemental compliance training to newly hired Relevant Personnel regarding the Combined Entity's obligations under this Consent Decree.

**4.** Semiannually communicate to Relevant Personnel that they may disclose to the Compliance Monitor or the Chief Compliance Officer, without reprisal or adverse consequence for such disclosure, information concerning any violation or potential violation of this Consent Decree by the Combined Entity.

**B. Monitoring Trustee.**

**1.** Within ninety (90) days of the Closing, the Combined Entity and the State Committee shall jointly select a mutually agreed-upon "**Monitoring Trustee**" to monitor the Combined Entity's compliance with this Consent Decree (excluding Article III.D) during the Commitment Period. The Combined Entity shall bear the reasonable costs of the Monitoring Trustee and any consultants reasonably retained by the Monitoring Trustee.

**2.** The Monitoring Trustee shall:

a. Have the powers and authority reasonably necessary to monitor the Combined Entity's compliance with the terms of this Consent Decree;

b. Serve as an independent third party and not as an employee or agent of either the State Committee or the Combined Entity;

c. Employ any reasonably necessary consultants, accountants, attorneys, and other representatives and assistants as are reasonably necessary to carry out the Monitor's duties and responsibilities (as mutually agreed with the State Committee and the Combined Entity, that agreement not to be unreasonably withheld);

d. Submit semiannual reports to the State Committee regarding the Combined Entity's compliance, as well as any ad hoc reports of its conclusions regarding the Combined Entity's alleged failure to meet any term of this Consent Decree, including the Annual Film Release Commitment in any Commitment Year. These reports shall receive a proper confidentiality designation, if any, consistent with the Modified Stipulated Protective Order in force in this case, and shall not disclose business secrets or documents marked business confidential of the Combined Entity.

e. The Monitoring Trustee and any reasonably necessary agents or consultants retained by the Monitoring Trustee shall, and upon reasonable notice to the Combined Entity, have full and complete access to the relevant personnel, records, and facilities that the Monitoring Trustee reasonably needs to ascertain the Combined Entity's compliance with this Consent Decree (provided, that this shall not imply that the Monitoring Trustee shall be permitted to access any document that would likely jeopardize legal privilege (including attorney-client privilege)).

**3.** The Combined Entity shall:

a. Cooperate with and assist the Monitoring Trustee in performing his or her duties for the purpose of reviewing compliance under this Consent Decree;

b. Not interfere with the ability of the Monitoring Trustee to perform any duties pursuant to this Consent Decree;

c. Not require the Monitoring Trustee to disclose to the Combined Entity the substance of the Monitor's communications with the State Committee or any other person, or the substance of any reports submitted pursuant to this Consent Decree provided, however, that the Monitoring Trustee shall keep the State Committee and the Combined Entity apprised of the scope and substance of the Monitoring Trustee's investigations or reviews, consistent with due process;

d. Indemnify and hold the Monitoring Trustee harmless against any loss, claim, damage, liability, and expense (including attorneys' fees and out of pocket costs) that arises out of, or is connect with, a claim concerning the performance of the Monitoring Trustee's duties pursuant to this Consent Decree, unless the loss, claim, damage, liability, or expense results from gross negligence or willful misconduct by the Monitoring Trustee.

**4.** The Combined Entity may require the Monitoring Trustee and each of its consultants, accountants, attorneys, and other representatives and assistants to enter into a customary confidentiality agreement, so long as the agreement does not restrict the Monitor's ability to access personnel, information, and facilities, to provide information to the State Committee, or to otherwise observe and report on the Combined Entity's compliance with this Consent Decree.

**5.** If the Monitoring Trustee resigns or the State Committee determines that the Monitor has ceased to act, has failed to act diligently, or is otherwise unable to continue serving as the Monitoring Trustee, the State Committee may require a new Monitoring Trustee be appointed in the same manner as

the initial appointment of the Monitoring Trustee. The substitute Monitoring Trustee shall be afforded all rights, powers, and authorities and shall be subject to all obligations of the Monitoring Trustee section of this Consent Decree. The Monitoring Trustee shall have no role or authority in day-to-day operations of the Combined Entity.

**6.** The Monitoring Trustee shall have no role or authority relating to the Combined Entity's news operations.

**7.** The Monitoring Trustee shall have no role or authority in the selection or production of content by the Combined Entity.

**C.** **Annual Certification.** The Combined Entity shall cause its Chief Executive Officer and General Counsel to certify to the State Committee, on an annual basis and within ninety (90) days of the end of each calendar year during the Term, that the Combined Entity is in compliance with all material terms of this Consent Decree, or shall identify any areas of non-compliance and the steps being taken to cure such non-compliance. On the same day the Combined Entity certifies compliance to the State Committee, the Combined Entity shall cause that certification to be filed on the docket in the United States District Court for the Northern District of California (the "**Court**") in Case No. 4:26-cv-7116.

## VII. ENFORCEMENT AND DISPUTE RESOLUTION

**A.** **Enforcement.** This Consent Decree shall be enforceable by any Plaintiff State, acting by and through its Attorney General, through any action or proceeding in the Court in Case No. 4:26-cv-7116. The Court shall retain jurisdiction to enforce this Consent Decree, and the Combined Entity consents to the jurisdiction of that Court for such purposes.

**B.** **Equitable Relief.** The Parties acknowledge that a breach of this Consent Decree may cause irreparable harm for which monetary damages would be an inadequate remedy. Accordingly, any Plaintiff State, acting by and through its Attorney General, shall be entitled to seek specific performance, injunctive relief, or any other equitable remedy available at law or in equity, in addition to any other remedies provided herein or available at law.

**C.** **Meet and Confer.** Prior to commencing any enforcement action, the complaining Party shall provide written notice to the other Party specifying the alleged breach or dispute in reasonable detail. The Parties shall meet and confer in good faith within thirty (30) days of receipt of such notice in an effort to resolve the dispute without resort to litigation.

**D.** **Mediation.** If the dispute is not resolved through the meet-and-confer process within thirty (30) days, either Party may submit the dispute to non-binding mediation before a mediator mutually agreed upon by the Parties. The costs of mediation shall be shared equally by the Parties.

**E.** **Reservation of Rights.** Nothing in this Article shall limit, waive, or otherwise affect the authority of any Plaintiff State, acting by and through its Attorney General, to enforce the Clayton Act, including Section 16, 15 U.S.C. § 26, or any applicable state antitrust, unfair competition, consumer-protection, or other statute, regulation, or common-law principle.

## VIII. GENERAL PROVISIONS

**A.** **Modification and Waiver.** No amendment, modification, or supplement to this Consent Decree shall be valid or binding unless (i) made in writing and signed by both Parties and (ii) approved by the Court. No waiver of any provision of this Consent Decree shall be effective unless in writing and signed by the Party granting such waiver. No failure or delay by either Party in exercising any right, power, or remedy under this Consent Decree shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or remedy.

**B.** **Severability.** If any provision of this Consent Decree is held to be invalid, illegal, or unenforceable by a court of competent jurisdiction, such provision shall be modified to the minimum extent necessary to make it valid, legal, and enforceable, and the remaining provisions shall continue in full force and effect. If such modification is not possible, the invalid provision shall be severed from this Consent Decree, and the remaining provisions shall remain in full force and effect, provided that the fundamental purposes of this Consent Decree can still be achieved.

**C.** **Force Majeure.** The Combined Entity shall not be considered in breach of this Consent Decree to the extent that performance of its obligations is prevented by force majeure events beyond the Parties' reasonable control, including but not limited to war, rebellion, hurricanes and other major storms, earthquakes, fires, terrorism, pandemics, strikes, labor disruptions, economic recessions, riots, insurrections, civil commotions, blockades, law or order of any federal government body exercising jurisdiction over the Parties, significant interference by or significant failures of state or local governmental authorities, significant interruptions in the supply chain, or acts of God. The Combined Entity shall promptly notify the Plaintiff States if this Force Majeure provision is invoked. For clarity, Plaintiffs States may petition the Court with respect the invocation of the Force Majeure provision.

**D.** **Governing Law.** This Consent Decree shall be governed by and construed in accordance with applicable federal law. To the extent federal law does not govern a procedural or other ancillary matter, the laws of the State of California shall apply, without regard to its conflict-of-laws principles.

**E.** **Conflicts.** If any statute or regulation pertaining to the subject matter of this Consent Decree is enacted, promulgated, or modified after the Effective Date and a court of competent jurisdiction holds that such statute or regulation is in conflict

with any provision of this Consent Decree, the Companies' compliance with such statute or regulation shall not be deemed a breach of this Consent Decree to the extent of the conflict.

F. **Jurisdiction and Venue.** The Parties consent to the exclusive jurisdiction and venue of the United States District Court for the Northern District of California for any action or proceeding arising out of or relating to this Consent Decree, including enforcement, and acknowledge that the Court shall retain jurisdiction for those purposes.

G. **Entire Agreement.** This Consent Decree, together with any exhibits, schedules, or attachments hereto, constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether oral or written, between the Parties relating to the subject matter hereof.

H. **Successors and Assigns.** This Consent Decree shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns. The Combined Entity may not assign its rights or delegate its obligations under this Consent Decree without the prior written consent of the Attorneys General, which consent shall not be unreasonably withheld. None of the Plaintiff States may assign its rights or delegate its obligations Consent Decree without the prior written consent of the Combined Entity, which consent shall not be unreasonably withheld.

I. **Counterparts.** This Consent Decree may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Execution and delivery of this Consent Decree by electronic means, including by facsimile, PDF, or other electronic signature, shall be valid and sufficient.

J. **No Third-Party Beneficiaries.** The Parties agree and acknowledge that this Consent Decree is solely for the benefit of the Parties, and that no person or entity is intended to be a third-party beneficiary of any provision of this Consent Decree for any reason, including for the purposes of any civil, criminal, or administrative action in any court or before any other authority. No other person or entity shall be permitted to assert any claim or right as a beneficiary or protected class under this Consent Decree, provided that nothing in this Consent Decree shall be construed to deprive any person, corporation, association, agency, or other entity of any right provided by law, regulation, or administrative pronouncement independent of this Consent Decree.

K. **Notices.** All notices or other communications under this Consent Decree shall be in writing (including but not limited to electronic communications) and shall be given to the recipients indicated below:

For Plaintiff States:

Each Plaintiff State can be contacted via the offices and personnel listed in the signature blocks.

For Paramount, Warner Bros. or the Combined Entity, as applicable:

Paramount Skydance Corporation
5555 Melrose Avenue
Los Angeles, CA 90038
Attention: Chief Legal Officer
Email: md@paramount.com

**L.** **No Admission of Liability.** This Consent Decree does not constitute an admission by the Combined Entity that it has violated any federal or state antitrust law, unfair competition law, or any other applicable law. The Combined Entity enters into this Consent Decree solely for the purpose of resolving the joint investigation conducted by the Attorneys General and avoiding the cost, delay, and uncertainty of litigation.

**M.** **Construction.** This Consent Decree shall be construed without regard to any presumption or rule requiring construction against the Party causing it to be drafted. The headings and captions of the Articles and Sections of this Consent Decree are inserted for convenience of reference only and shall not affect the interpretation or construction of this Consent Decree.

**N.** This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis. For purposes of this Consent Decree, a signature page that is transmitted electronically (*e.g.*, by DocuSign or emailed "PDF") shall have the same effect as an original.

**SO ORDERED.**

Dated: September 30, 2026



The Honorable Araceli Martínez-Olguín
United States District Judge

**IN WITNESS WHEREOF**, the Parties have caused this Consent Decree to be executed by their duly authorized representatives.

[Signatures follow]

FOR PLAINTIFF STATE OF CALIFORNIA:

ROB BONTA
Attorney General of California

*/s/ Ashley Kaplan*

PAULA L. BLIZZARD (SBN 207920)
Senior Assistant Attorney General
NATALIE S. MANZO (SBN 155655)
BRENT K. NAKAMURA (SBN 283572)
Supervising Deputy Attorneys General
WINSTON H. CHEN (SBN 166959)
MATTHEW E. DELGADO (SBN 306999)
NICOLE S. GORDON (SBN 224138)
JENNIFER K. HANE (SBN 275729)
ASHLEY KAPLAN (SBN 293443)
CASEY KOVARIK (SBN 348032)
ANDREW MCCREARY (SBN 338704)
DIVYA B. RAO (SBN 292853)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6000
Fax: (916) 731-3637
Email: Ashley.Kaplan@doj.ca.gov

RICHARD PARKER (SBN 62356)
JAMES WEINGARTEN (*pro hac vice*)
ADAM DI VINCENZO (*pro hac vice*)
GRANT BERMANN (*pro hac vice*)
ANASTASIA PASTAN (*pro hac vice*)
ALEXIS BROWN-REILLY (*pro hac vice*)
JULIA M. MAY (*pro hac vice*)
NATALIE NOGUEIRA (*pro hac vice*)
ALLISON CHESKY (*pro hac vice*)
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20005
Telephone: (202) 835-7525
Email: jweingarten@milbank.com

KELLY D. GARCIA (*pro hac vice*)
EMME TYLER (SBN 341797)
MILBANK LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5871
Email: kgarcia@milbank.com

*Attorneys for Plaintiff State of California*

FOR PLAINTIFF STATE OF ARIZONA:

KRISTIN K. MAYES
Attorney General of Arizona

/s/ Allison Weber

ROBERT A. BERNHEIM (*pro hac vice*)
Unit Chief Counsel
SARAH PELTON (*pro hac vice*)
ALLISON WEBER (*pro hac vice*)
Assistant Attorneys General
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Email: robert.bernheim@azag.gov
sarah.pelton@azag.gov
allison.weber@azag.gov

*Attorneys for Plaintiff State of Arizona*

FOR PLAINTIFF STATE OF COLORADO:

PHILIP J. WEISER
Attorney General of Colorado

*<u>/s/ Bryn A. Williams</u>*

BRYN A. WILLIAMS (SBN 301699)
First Assistant Attorney General
AMY BOWLES (*pro hac vice*)
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Bryn.Williams@coag.gov
Amy.Bowles@coag.gov

*Attorneys for Plaintiff State of Colorado*

FOR PLAINTIFF STATE OF CONNECTICUT:

WILLIAM TONG
Attorney General of Connecticut

NICOLE DEMERS (*pro hac vice*)
Deputy Associate Attorney General

*<u>/s/ Julián A. Quiñones Reyes</u>*

JULIÁN A. QUIÑONES REYES (*pro hac vice*)
FRANKLIN KANIN (*pro hac vice*)
Assistant Attorneys General
Office of the Connecticut Attorney General
165 Capitol Avenue
Hartford, CT 06106
Telephone: (860) 808-5030
Email: Julian.Quinones@ct.gov
Franklin.Kanin@ct.gov

*Attorneys for Plaintiff State of Connecticut*

FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS:

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

*/s/ Anthony W. Mariano*

ANTHONY W. MARIANO (*pro hac vice*)
Chief, Antitrust Division
WILLIAM L. TWOMEY (*pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (781) 835-7990
Email: Anthony.Mariano@mass.gov
William.Twomey@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

FOR PLAINTIFF STATE OF MINNESOTA:

KEITH ELLISON
Attorney General of Minnesota

*/s/ Jon M. Woodruff*

JAMES W. CANADAY (SBN 368825)
Deputy Attorney General
ELIZABETH ODETTE (*pro hac vice*)
Antitrust Division Manager
Assistant Attorney General
JON M. WOODRUFF (*pro hac vice*)
Assistant Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101-2130
Telephone: (651) 300-7425
Fax: (651) 296-9663
Email:
Jon.Woodruff@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General of Nevada

/s/ Samantha B. Feeley

SAMANTHA B. FEELEY (NV Bar No. 14034)
(*pro hac vice*)
Senior Deputy Attorney General
Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701
Tel: (775) 684-1100
Email: sfeeley@ag.nv.gov

*Attorney for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NEW JERSEY:

JENNIFER DAVENPORT
Attorney General of New Jersey

/s/ Ana Atta-Alla

ANA ATTA-ALLA (*pro hac vice*)
Deputy Attorney General
State of New Jersey
Office of the Attorney General
Division of Law
124 Halsey Street – 5th Floor
Newark, NJ 07102
Telephone: (973) 648-6835
Email: Ana.Atta-Alla@law.njoag.gov

*Attorney for Plaintiff State of New Jersey*

FOR PLAINTIFF STATE OF NEW MEXICO:

RAÚL TORREZ
Attorney General of New Mexico

/s/ Amanda Butler

AMANDA BUTLER (*pro hac vice*)
Senior Counsel
KALISTA M. WILSON (*pro hac vice*)
Assistant Attorney General
408 Galisteo St.
Santa Fe, NM 87501
Telephone: (505) 490-4060
Fax: (505) 318-1050
Email: KWilson@nmdoj.gov

*Attorneys for Plaintiff State of New Mexico*

FOR PLAINTIFF STATE OF NEW YORK:

LETITIA JAMES
Attorney General of New York

/s/ Elinor R. Hoffmann

ELINOR R. HOFFMANN (*pro hac vice*)
Chief, Antitrust Bureau
AMY MCFARLANE (*pro hac vice*)
Deputy Chief, Antitrust Bureau
PRATIK AGARWAL (*pro hac vice*)
MORGAN FEDER (*pro hac vice*)
C. WILLIAM MARGRABE (*pro hac vice*)
Assistant Attorneys General
JAYA MANTOVANI (*pro hac vice*)
Attorney General Fellow
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8269
Email: Elinor.Hoffmann@ag.ny.gov

*Attorneys for Plaintiff State of New York*

FOR PLAINTIFF STATE OF OREGON:

DAN RAYFIELD
Attorney General of Oregon

*/s/ Timothy D. Smith*

TIMOTHY D. SMITH (*pro hac vice*)
Attorney-in-Charge
IAN VAN LOH (SBN 280254)
ALEX DELORENZO (*pro hac vice*)
MIKAELA BOCK (SBN 335089)
Assistant Attorneys General
Economic Justice Section
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
Telephone: (503) 798-3297
Telephone: (971) 239-7457
Telephone: (503) 428-9482
Email: tim.smith@doj.oregon.gov
Email: ian.vanloh@doj.oregon.gov
Email: alex.delorenzo@doj.oregon.gov

*Attorneys for Plaintiff State of Oregon*

FOR PLAINTIFF STATE OF WASHINGTON:

NICHOLAS W. BROWN
Attorney General of Washington

*<u>/s/ Christina M. Black</u>*

JONATHAN A. MARK (*pro hac vice*)
Division Chief, Antitrust Division
CHRISTINA M. BLACK (SBN 300081)
BROOKE H. LOVROVICH (*pro hac vice*)
Assistant Attorneys General
800 Fifth Avenue, Suite 200
Seattle, WA 98104-3188
Telephone: (206) 464-7744
Fax: (206) 464-6451
Email: Jonathan.Mark@atg.wa.gov
Christina.Black@atg.wa.gov
Brooke.Lovrovich@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

FOR DEFENDANT PARAMOUNT SKYDANCE CORP.:


/s/ *Beth A. Wilkinson*
Beth A. Wilkinson (*pro hac vice*)
Rakesh Kilaru (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Fl.
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com

Marguerite M. Sullivan (*pro hac vice*)
Anna M. Rathbun (SBN 273787)
Christopher J. Brown (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
marguerite.sullivan@lw.com
anna.rathbun@lw.com
chris.brown@lw.com

Joshua N. Holian (SBN 211772)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
joshua.holian@lw.com

Jeffrey L. Kessler (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1469
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com

*Attorneys for Defendants Paramount Skydance Corporation*

FOR DEFENDANT WARNER BROS. DISCOVERY, INC.:

By: */s/ Daniel M. Petrocelli*
Daniel M. Petrocelli (SBN 97802)
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779
dpetrocelli@omm.com

Peter C. Herrick (*pro hac vice*)
**O'MELVENY & MYERS LLP**
1301 Avenue of the Americas, Suite 1700
New York, NY 10019-6022
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
pherrick@omm.com

Julia A. Schiller (*pro hac vice*)
**O'MELVENY & MYERS LLP**
1625 Eye Street NW
Washington, DC 20006-4061
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
jschiller@omm.com

Derek Ludwin (*pro hac vice)*
Henry Liu (*pro hac vice)*
Ross A. Demain (*pro hac vice)*
**COVINGTON & BURLING LLP**
One CityCenter
850 10th Street NW
Washington, DC 20001
Telephone: (202) 662-6000
dludwin@cov.com
hliu@cov.com
rdemain@cov.com

Bernard A. Nigro Jr. (*pro hac vice*)
Kathleen S. O'Neill (*pro hac vice*)
**FRIED FRANK HARRIS SHRIVER & JACOBSON LLP**
801 17th Street NW
Washington, DC 20006
Telephone: (202) 639-7000
Facsimile: (202) 639-7003
barry.nigro@friedfrank.com
kathy.oneill@friedfrank.com

*Attorneys for Defendant Warner Bros. Discovery, Inc.*

# EXHIBIT C

Paramount Skydance Corp., Current Report on Form 8-K (filed Sept. 25, 2026) (Items 3.01, 7.01, and 9.01 and signature page; Exhibit 99 omitted)

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): September 25, 2026**

# Paramount Skydance Corporation

**(Exact name of registrant as specified in its charter)**

| Delaware | 001-42791 | 99-3917985 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

| | |
|---|---|
| 1515 Broadway<br>New York, New York | 10036 |
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code: (212) 258-6000**

**Not Applicable**
**(Former name or former address, if changed since last report)**

Deadline

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class B Common Stock, $0.001 par value | PSKY | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 3.01. Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing.**

***(d) Transfer of Listing.***

***Transfer of Listing from Nasdaq to NYSE***

On September 25, 2026, Paramount Skydance Corporation, a Delaware corporation (the “Company”), acting pursuant to authorization from its Board of Directors (the “Board”), determined to voluntarily withdraw the listing of its Class B common stock, par value $0.001 per share (the “Class B Common Stock”), from The Nasdaq Global Select Market (“Nasdaq”) and transfer the listing to the New York Stock Exchange (the “NYSE”). The Company expects that the listing and trading of the Class B Common Stock on Nasdaq will end at market close on or about October 5, 2026, and that trading will begin on the NYSE at market open on or about October 6, 2026.

**Item 7.01. Regulation FD Disclosure.**

***Warrant Distribution Record Date***

The Board has set a record date of the close of business on October 5, 2026 (the “Record Date”) for the Company’s previously announced distribution of warrants (“Warrants”) to purchase shares of Class B Common Stock. The Company expects to distribute the Warrants on or about October 13, 2026 (the “Issue Date”). The distribution of the Warrants is contingent on the closing of the previously announced acquisition by the Company of Warner Bros. Discovery, Inc. (the “WBD Merger”); however, the WBD Merger is subject to further closing conditions, and the ultimate timing for the closing of the WBD Merger, if any, is not yet certain. As a result, the Company may, at its discretion, choose to cancel the Record Date and/or the Issue Date or postpone the Record Date and/or the Issue Date to a later date. If the Record Date and/or the Issue Date is cancelled or postponed, the Company will issue a public announcement of such change in a manner that complies with the rules of the exchange where the Company is then listed.

As previously disclosed on April 7, 2026, a special committee of the Board that was established in connection with the Company’s approval of the WBD Merger recommended to the Board the declaration of a distribution of Warrants to holders of Class B Common Stock as of the Record Date, excluding each of Lawrence J. Ellison, David F. Ellison, Gerald J. Cardinale, The Lawrence J. Ellison Revocable Trust, u/a/d 1/22/88, as amended, and RedBird Capital Partners Fund IV (Master), L.P. or any of their respective affiliates, successors or transferees (collectively, the “Restricted Holders”).

On the Issue Date, each share of Class B Common Stock held by a stockholder as of the Record Date, other than the Restricted Holders (including any of the Company’s wholly owned subsidiaries that own Class B Common Stock), the Paramount Global 401(k) Plan and the Paramount Global Master Trust, will receive one (1) Warrant, rounded down to the nearest whole Warrant. The Company expects to issue approximately 470 million Warrants on the Issue Date. Shares of Class B Common Stock held by the Paramount Global 401(k) Plan and the Paramount Global Master Trust will, in lieu of receiving Warrants in the warrant distribution, receive shares of Class B Common Stock.

If issued, each Warrant initially will entitle the holder thereof to purchase one (1) share of Class B Common Stock at an initial exercise price per share equal to the average of the daily volume-weighted average price of the Class B Common Stock for the twenty (20) trading days ending on (and including) the third (3rd) business day prior to the closing of the WBD Merger, subject to a maximum of $16.02 per share and a minimum of $12.00 per share. The exercise price of the Warrants will be subject to certain anti-dilution and other adjustments. The Company intends to apply to list the Warrants for trading on the NYSE, subject to applicable approvals, and the Warrants will trade separately from the Company’s Class B Common Stock.

Deadline

---

The Warrants will expire and cease to be exercisable at the earlier of (i) 5:00 p.m., New York City time, on the date that is the tenth (10th) anniversary of the Issue Date or (ii) an earlier expiration date that the Company may designate following the third (3rd) anniversary of the Issue Date, if within any period of thirty (30) consecutive trading days following such third (3rd) anniversary, there are at least twenty (20) trading days (whether or not consecutive), including the trading day immediately preceding the date on which the Company issues the early expiration notice, on which the closing sale price of the Class B Common Stock is at least equal to $30.00 initially, which price will be subject to certain anti-dilution adjustments.

This Current Report on Form 8-K does not constitute an offer to sell or the solicitation of an offer to buy any securities, including, without limitation, the Warrants or the shares of Class B Common Stock issuable upon exercise of the Warrants. Any offers, solicitations of offers to buy, or any sales of securities will be made in accordance with the registration requirements of the Securities Act of 1933, as amended (the “Securities Act”).

In connection with the declaration of the Record Date, the Company posted a document containing questions and answers (the “Warrant Distribution FAQ”) regarding the Warrant distribution on the Investor Relations section of the Company’s website.

The information furnished pursuant to this Item 7.01, including Exhibit 99, shall not be deemed “filed” for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the “Exchange Act”), or otherwise subject to the liabilities under that section and shall not be deemed to be incorporated by reference into any filing under the Securities Act or the Exchange Act, except as expressly set forth by reference in such filing.

**Cautionary Note Concerning Forward-Looking Statements**

This communication contains “forward-looking statements” regarding the timing and terms of any distribution of Warrants and the timing and expectations regarding the proposed listing on the NYSE of the Class B Common Stock and Warrants. The reader is cautioned not to rely on these forward-looking statements. These statements are based on current expectations of future events. If underlying assumptions prove inaccurate or known or unknown risks or uncertainties materialize, actual results could vary materially from the Company’s expectations and projections. Risks and uncertainties include, but are not limited to: the risk that the closing conditions for the WBD Merger will not be satisfied; the possibility that the WBD Merger will not be completed in the expected timeframe or at all; damage to the Company’s reputation or brands; volatility in the price of the Class B Common Stock and any Warrants; the effect the Company’s dual-class capital structure and the concentrated ownership may have on the price of its Class B Common Stock; risks associated with the Company’s status as a “controlled company” under Nasdaq rules and, following the transfer of listing described in Item 3.01 of this Current Report on Form 8-K, NYSE rules, including its exemption from certain corporate governance requirements; and risks associated with the lack of voting rights of the Class B Common Stock. A further list and description of these risks, uncertainties and other factors and the general risks associated with the Company can be found in the Company’s Annual Report on Form 10-K for the fiscal year ended December 31, 2025, filed with the U.S. Securities and Exchange Commission (the “SEC”) on February 25, 2026, and the Company’s Form 10-Q for the quarterly period ended June 30, 2026, filed with the SEC on August 4, 2026, including, in each case, in the sections captioned “Cautionary Note Concerning Forward-Looking Statements” and “Item 1A. Risk Factors,” and the Company’s subsequent filings with the SEC. Copies of these filings, as well as subsequent filings, are available online at www.sec.gov. The Company undertakes no obligation to update any forward-looking statement as a result of new information or future events or developments, except as required by law.

Deadline

**Item 9.01. Financial Statements and Exhibits.**

***(d) Exhibits.***

| **Exhibit Number** | **Description** |
|---|---|
| 99 | Warrant Distribution FAQ |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document). |

Deadline

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

PARAMOUNT SKYDANCE CORPORATION

By: /s/ Stephanie Kyoko McKinnon
Name: Stephanie Kyoko McKinnon
Title: General Counsel and Secretary

Date: September 25, 2026

Deadline

# EXHIBIT D

Paramount Skydance Corp., Quarterly Report on Form 10-Q for the quarter ended June 30, 2026 (filed Aug. 4, 2026), excerpts (cover page and p. 10)

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2026**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from ____________ to ____________**

**Commission File Number 001-42791**

# Paramount Skydance Corporation

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **99-3917985** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **1515 Broadway New York, New York** | **10036** |
| (Address of principal executive offices) | (Zip Code) |

**(212) 258-6000**

(Registrant's telephone number, including area code)

**Not Applicable**

(Former name, former address and former fiscal year, if changed since last report)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class B Common Stock, $0.001 par value | PSKY | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Number of shares of common stock outstanding at July 31, 2026:

Class A Common Stock, par value $.001 per share—31,500,087

Class B Common Stock, par value $.001 per share— 1,090,445,692

Ticking Consideration or certain other additional amounts as defined in the WBD Merger Agreement are required) from the Trust and $250 million from RedBird pursuant to the terms of the Subscription Agreements.

In April 2026, we announced that the Equity Investors had determined, as permitted under the Subscription Agreements, to assign their subscription rights thereunder (such assignments, the "Equity Syndication" and the assignees, the "Equity Syndication Parties") to the Equity Syndication Parties. The Equity Syndication Parties are composed of affiliates of the Ellison Parties and RedBird, as well as the following institutional investors: The Public Investment Fund, L'Imad 1st SPV 2 Exempt RSC LTD (an investment vehicle of L'Imad Holding, an Abu Dhabi sovereign wealth fund), QIA TMT Holding LLC (an investment vehicle of the Qatar Investment Authority), and LionTree Investment Fund, L.P. The aggregate allocations under the Equity Syndication total to the full amount of the commitments under the Subscription Agreements. At closing of the WBD Merger, Paramount will issue to each Equity Syndication Party a number of newly issued nonvoting shares of Paramount Skydance Corporation Class B Common Stock (or securities convertible into shares) equal to its allocated amount divided by the Syndication Purchase Price, defined as the 20-trading-day daily volume-weighted average price of Paramount Skydance Corporation Class B Common Stock determined as of the third business day prior to the closing of the WBD Merger, subject to a ceiling of $16.02 per share and a floor of $12.00 per share. The Equity Syndication does not relieve the Equity Investors of their contractual commitments made to the Company. To the extent that any Equity Syndication Party does not perform under its syndication assignment, the obligation of the Equity Investors to fund the related amount of the commitments would continue to be required under the Subscription Agreements. Following the closing, the Ellison Family (as defined below) and RedBird will remain the sole holders of Paramount Class A Common Stock, representing 100% of the voting shares of Paramount. For the purpose of determining the controlling ownership of Paramount, the Ellison family is comprised of Lawrence J. Ellison and David Ellison (the "Ellison Family"). David Ellison is the son of Lawrence J. Ellison, and Lawrence J. Ellison and David Ellison are accordingly considered immediate family members.

We have also secured commitments for debt financing totaling $54 billion, which include a $49 billion 364-day senior secured bridge loan facility, which we plan, subject to market conditions and other timing considerations, to reduce or replace with permanent financing (which may include issuance of debt securities) on or prior to the closing of the WBD Merger and, in connection with a credit agreement entered into in April 2026 (the "Pro Rata Credit Agreement"), $2.50 billion three-year senior secured term A loans and $2.50 billion five-year senior secured term A loans. The term A loans will be made in a single borrowing on the closing date of the WBD Merger. The Pro Rata Credit Agreement also provides for a $5.00 billion five-year senior secured revolving credit facility, which will be used for general corporate purposes, and will replace our existing revolving credit facility (see Note 7). The availability and initial funding of the facilities under the Pro Rata Credit Agreement and the bridge loan facility (if not replaced by permanent financing) are subject to the satisfaction or waiver of customary conditions set forth in the Pro Rata Credit Agreement and the bridge commitment papers, including the closing of the WBD Merger.

In addition, following the closing of the WBD Merger, each holder of Paramount Skydance Corporation Class B Common Stock (excluding any Equity Investor or affiliate thereof) as of a record date to be determined will receive, without payment of any consideration, one 10-year warrant (each, a "Warrant") for each share held, exercisable at an initial exercise price per share equal to the Syndication Purchase Price and subject to customary anti-dilution and fundamental change make-whole adjustments. Beginning on the third anniversary of issuance, we may call the Warrants if the closing price of our Class B Common Stock equals or exceeds $30.00 for at least 20 trading days during any 30 consecutive trading day period. We intend to apply to list the Warrants for trading on the Nasdaq Stock Market LLC ("Nasdaq") separate from our Class B Common Stock, subject to applicable approvals. The planned Warrant issuance is in lieu of a previously planned rights offering at $16.02 per share. In

# EXHIBIT E

Petition for Review, LiveVideo.AI Corp. v. FCC, No. 26-1257, Doc. #2195519 (D.C. Cir. filed Sept. 28, 2026) (petition, disclosure statement, and certificate; the Ruling attached to the petition is Exhibit A above)

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| LIVEVIDEO.AI CORP.,<br><br>Petitioner,<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,<br><br>Respondents. | No. 26-__________ |

**PETITION FOR REVIEW**

LiveVideo.AI Corp. ("LiveVideo") petitions for review of the Declaratory Ruling of the Federal Communications Commission's Media Bureau in *Paramount Global, Petition for Declaratory Ruling Under Section 310(b)(4)*, MB Docket No. 26-93, DA 26-1001 (Media Bur. rel. Sept. 17, 2026) (the "Ruling"). A copy of the Ruling is attached as Exhibit A.

This Court has jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1), and this petition is filed under 28 U.S.C. § 2344 and Federal Rule of Appellate Procedure 15(a). If the Court determines that review lies instead under 47 U.S.C. § 402(b), LiveVideo asks that this filing be treated as a notice of appeal under that provision. As 28 U.S.C. § 2344 requires, LiveVideo states:

**1. Nature of the proceedings.** Paramount Global petitioned for a declaratory ruling under 47 U.S.C. § 310(b)(4) on April 24, 2026. Acting on delegated authority, the Media Bureau granted that petition. The Ruling authorizes up to 100 percent

aggregate indirect foreign ownership of the parent of the Paramount broadcast licensees. It also gives specified foreign investors, including investment vehicles owned or controlled by the governments of Saudi Arabia, Abu Dhabi, and Qatar, advance authority to hold non-controlling interests of up to 20 percent. LiveVideo participated as a party, having filed a Petition to Deny, a written ex parte presentation, a disqualification petition on July 31, 2026, and an amended disqualification petition on September 11, 2026. The Ruling denied LiveVideo's opposition. Ruling ¶ 34 & App. A. LiveVideo is aggrieved by the Ruling as a competing bidder for Paramount with direct commercial interests in the affected video-distribution, digital-audience, and advertising markets. It will show its standing in its motion for stay and its opening brief. *See* D.C. Cir. R. 28(a)(7). On September 22, 2026, LiveVideo filed an Application for Review with the Commission under 47 U.S.C. § 155(c)(7) and 47 C.F.R. § 1.115, together with a request for an agency stay. The Commission has not acted on either filing.

**2. Facts on which venue is based.** Venue lies in this Court under 28 U.S.C. § 2343. This petition is timely because it is filed within 60 days after the Ruling was released on September 17, 2026. 28 U.S.C. § 2344.

**3. Grounds on which relief is sought.** The Ruling is arbitrary, capricious, and otherwise not in accordance with law, and it exceeds the Bureau's delegated authority. 5 U.S.C. § 706(2)(A), (C). In particular:

(a) The Bureau decided novel questions of law, fact, and policy that 47 C.F.R. § 0.283(c) requires be referred to the full Commission.

(b) The Ruling does not reasonably explain its public-interest determination under 47 U.S.C. § 310(b)(4). It does not explain why the safeguards it relies on are adequate for the foreign-government ownership approved at closing. Nor does it explain the legal basis, scope, limits, aggregation rules, monitoring, and enforcement of its advance authorization for future increases, including how a Letter of Assurance dated September 4, 2026, which defines covered investors by reference to the April 24, 2026 petition, applies to future holders.

(c) The Ruling does not explain the scope of the Executive Branch review and Letter of Assurance on which it relies. That includes whether the review considered Paramount's supplement filed June 23, 2026, and how the review informed the independent decision that 47 C.F.R. § 1.40001(b) requires.

(d) The Ruling issued while LiveVideo's requests to disqualify the Chairman remained unresolved. It did not reach them and did not explain how the independence required by 47 C.F.R. § 1.40001(b) was preserved. Ruling n.40.

(e) The Ruling does not consider whether the approved ownership structure triggers obligations under 22 U.S.C. § 611(d), 47 U.S.C. § 624, or 47 C.F.R. § 73.1212(j), or how any such obligations bear on the public interest.

LiveVideo will state the issues more fully in its statement of issues and briefs.

**4. Relief requested.** LiveVideo asks the Court to vacate the Ruling, or to remand it to the Commission, and to grant any other relief that is just. If the Court concludes that Commission action on the pending Application for Review must come before judicial review, LiveVideo asks the Court to hold this petition in abeyance until the Commission acts. LiveVideo will seek a stay by separate motion under Federal Rule of Appellate Procedure 18.

**Related case.** *LiveVideo.AI Corp. v. FCC*, No. 26-1176 (D.C. Cir.), is a related case. LiveVideo does not seek consolidation.

Dated: September 28, 2026

Respectfully submitted,

/s/ Alfred C. Constants III

Alfred C. Constants III
Constants Law Offices, LLC
115 Forest Avenue, Unit 331
Locust Valley, New York 11560
Tel: (516) 200-9660
Email: constantslaw49@gmail.com
*Counsel for Petitioner LiveVideo.AI Corp.*

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, LiveVideo.AI Corp. states that it has no parent corporation and that no publicly held corporation owns 10 percent or more of its stock. LiveVideo.AI Corp. is a corporation engaged in streaming, online video, search, and related media businesses.

Dated: September 28, 2026

Respectfully submitted,

/s/ Alfred C. Constants III

Alfred C. Constants III
Constants Law Offices, LLC
115 Forest Avenue, Unit 331
Locust Valley, New York 11560
Tel: (516) 200-9660
Email: constantslaw49@gmail.com
*Counsel for Petitioner LiveVideo.AI Corp.*

## CERTIFICATE OF SERVICE

I certify that on September 28, 2026, I filed this Petition for Review, with Exhibit A-C, through the Court's CM/ECF system. Under Federal Rule of Appellate Procedure 15(c)(3), the Clerk serves Respondents.

**Respondents**
General Counsel, Federal Communications Commission, 45 L Street NE, Washington, DC 20554
Attorney General of the United States, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530

/s/ Alfred C. Constants III
Alfred C. Constants III

EXHIBITS

Exhibit A—FCC Media Bureau DA 26-1001, MB Docket No. 26-93, released September 17, 2026.

Exhibit B—LiveVideo.AI Corp. Application for Review, filed September 22, 2026, Stay and Supplement To Application For Review