*LiveVideo.AI Corp. v. Federal Communications Commission*, No. 26-1176 (D.C. Cir.)

# EXHIBITS A THROUGH D TO EMERGENCY MOTION
# INDEX OF EXHIBITS


| Exhibit | Description | Pages |
|---|---|---|
| A | Verbatim Text Comparison: N.D. Cal. Case No. 4:26-cv-07116-AMO, ECF No. 170 ¶ 1 (Prohibition on Closing and Operational Integration) and Letter of Agreement TT 26-006 ¶¶ 1(b), 1(e), 2–4, 8, 17 (Post-Closing Data and Operational Obligations) (demonstrative; quotations only) | EM-003 – EM-005 |
| B | Paramount Global, Declaratory Ruling, MB Docket No. 26-93, DA 26-1001 (Media Bur. rel. Sept. 17, 2026) (complete, with Attachment and Appendix A) | EM-006 – EM-026 |
| C | Letter of Agreement, TT 26-006 (dated Sept. 4, 2026), executed for Paramount Global, as filed by NTIA in MB Docket No. 26-93 on Sept. 17, 2026 (ECFS No. 26110076883) (complete) | EM-027 – EM-032 |
| D | *California v. Paramount Skydance Corp.*, No. 4:26-cv-07116-AMO (N.D. Cal.): ECF No. 170, Stipulation and Order Not to Close (July 24, 2026) (complete, 11 pages, as reproduced in this Court at Doc. #2185379, pp. 10–20); and ECF No. 266, Order Granting Joint Motion to Enter Consent Decree and Dissolve Order Not to Close (Sept. 30, 2026) (complete) | EM-033 – EM-048 |

*LiveVideo.AI Corp. v. Federal Communications Commission*, No. 26-1176 (D.C. Cir.)

# NOTICE OF LODGING OF EXHIBITS

Petitioner LiveVideo.AI Corp. lodges Exhibits A through D in support of its Emergency Motion filed October 2, 2026. Exhibits B, C, and D are true copies of public agency and court records, reproduced in full. ECF No. 170 is reproduced from the copy previously filed in this Court at Doc. #2185379, pp. 10–20. Exhibit A is a demonstrative that reproduces, without commentary, the quoted text of the documents in Exhibits C and D; it is not evidence and contains no argument. Pages are numbered EM-001 through EM-048 at the lower right.

Dated: October 2, 2026

/s/ Alfred C. Constants III
Alfred C. Constants III
Constants Law Offices, LLC
115 Forest Avenue, Unit 331, Locust Valley, NY 11560
(516) 200-9660 · constantslaw49@gmail.com
*Counsel for Petitioner LiveVideo.AI Corp.*

# EXHIBIT A

Verbatim Text Comparison: N.D. Cal. Case No. 4:26-cv-07116-AMO, ECF No. 170 ¶ 1 (Prohibition on Closing and Operational Integration) and Letter of Agreement TT 26-006 ¶¶ 1(b), 1(e), 2–4, 8, 17 (Post-Closing Data and Operational Obligations) (demonstrative; quotations only)

# EXHIBIT A — VERBATIM TEXT COMPARISON

*Demonstrative. Quotations only, reproduced from Exhibits C and D. No characterization is intended.*

| N.D. Cal. No. 4:26-cv-07116-AMO, ECF No. 170 ¶ 1 — Prohibition on Closing and Operational Integration (stipulated order entered July 24, 2026; dissolved Sept. 30, 2026) | Letter of Agreement TT 26-006 ¶¶ 1(b), 1(e), 2–4, 8, 17 — Post-Closing Data and Operational Obligations (dated Sept. 4, 2026; filed Sept. 17, 2026) |
|---|---|
| ¶ 1: "The transaction at issue in State of California and Writers Guild shall not close, be consummated, or otherwise be completed and Defendants will not take any steps, directly or indirectly, to integrate or consolidate their operations pursuant to the Transaction until the earlier of (1) five days after the merits determination in these matters, or (2) June 1, 2027." (ECF No. 170 at 3; Ex. D) | ¶ 1(e): "'Paramount's U.S. Person Data' means the U.S. Person Personally Identifiable Information, Other Non-Anonymized Data, Anonymized Data, and Sensitive Personal Data Paramount collects, uses, processes, or maintains, either directly or through its subsidiaries (including but not limited to WBD), affiliates, or Service Providers. …"<br><br>¶ 1(b): "'Closing Date' refers to the closing date of the merger between Paramount Skydance and Warner Bros. Discovery, Inc. ('WBD')." |
| | ¶ 2: "Paramount shall notify the CMA(s) of the closing within two calendar days of the Closing Date."<br><br>¶ 3: "Paramount agrees to take all appropriate measures to prevent unauthorized Access to or unlawful use of Paramount's U.S. Person Data, and to prevent the unauthorized disclosure of information relating to Paramount's U.S. Person Data."<br><br>¶ 4: "Within 90 days of the Closing Date, Paramount agrees to provide copies of the security policies and plans ('Policies and Plans') that will be used to safeguard Paramount's U.S. Person Data after the Closing Date to the CMA(s) for objection or non-objection. …" |
| | ¶ 8: "Paramount agrees that this LOA is binding upon, and inures to the benefit of, Paramount and its respective successors and assigns. For purposes of this LOA, successors and assigns include any corporate name changes. …"<br><br>¶ 17: "This Agreement shall become effective for compliance purposes on the date of the FCC approval of the above-captioned Petition."<br><br>Signature block: "For Paramount Global: Makan Delrahim, Chief Legal Officer of Paramount Skydance Corporation, Paramount Global." (Ex. C) |

### Chronology (from the documents)

| Date | Event (source) |
|---|---|
| July 24, 2026 | Stipulation and Order Not to Close entered (ECF No. 170; Ex. D) |

| | |
|---|---|
| Sept. 4, 2026 | Letter of Agreement dated (Ex. C at 1) |
| Sept. 17, 2026 | Letter of Agreement filed by NTIA; DA 26-1001 released, effective upon release (Ex. B ¶ 35) |
| Sept. 30, 2026 | Order Not to Close dissolved (ECF No. 266; Ex. D) |

# EXHIBIT B

Paramount Global, Declaratory Ruling, MB Docket No. 26-93, DA 26-1001 (Media Bur. rel. Sept. 17, 2026) (complete, with Attachment and Appendix A)

**Before the
Federal Communications Commission
Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Paramount Global | ) | MB Docket No. 26-93 |
| | ) | |
| Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934, as Amended | ) ) ) | |

## DECLARATORY RULING

**Adopted: September 17, 2026** **Released: September 17, 2026**

By the Chief, Video Division, Media Bureau:

## I. INTRODUCTION

1. In this Declaratory Ruling (Declaratory Ruling), the Video Division, Media Bureau (Bureau), grants a petition for a declaratory ruling (Petition)[1] filed by Paramount Global (Paramount), on behalf of itself and its subsidiaries that operate broadcast television stations (Licensees).[2] The Petition asks the Commission to exercise its authority delegated to it by Congress to permit indirect foreign ownership in Paramount, the controlling U.S. parent of the Licensees, to exceed the 25% benchmarks established in section 310(b)(4) of the Communications Act of 1934, as amended (the Act),[3] and sections 1.5000 *et seq.* of the Commission's rules.[4] As discussed below, we grant Paramount's request for its

[1] Petition for Declaratory Ruling of Paramount Global (filed Apr. 24, 2026). Paramount filed a supplement (Supplement) on June 23, 2026, amending Exhibit B of the Petition to add the "direct equity and voting interests that each individual and entity will hold in the entity or entities immediately downstream" and include "clarifications in the accompanying notes regarding certain ownership interests." Supplement at 1.

[2] A complete list of Licensees is provided in the Attachment.

[3] Section 310(b)(4) of the Act states:

> No broadcast or common carrier or aeronautical en route or aeronautical fixed radio station license shall be granted to or held by . . . any corporation directly or indirectly controlled by any other corporation of which more than one-fourth of the capital stock is owned of record or voted by aliens, their representatives, or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country, if the Commission finds that the public interest will be served by the refusal or revocation of such license.

47 U.S.C. § 310(b)(4).

[4] 47 CFR § 1.5000 *et seq. See Review of Foreign Ownership Policies for Broadcast, Common Carrier and Aeronautical Radio Licensees under Section 310(b)(4) of the Communications Act of 1934, As Amended,* GN Docket No. 25-149, Report and Order, 41 FCC Rcd 831 (Jan. 30, 2026) (*2026 Foreign Ownership Order*) (codifying definitions, concepts, and practices underlying the foreign ownership rules to streamline the Commission's review processes); *Review of Foreign Ownership Policies for Broadcast, Common Carrier and Aeronautical Radio Licensees Under Section 310(b)(4) of the Communications Act of 1934, as Amended*, GN Docket No. 15-236, Report and Order, 31 FCC Rcd 11272 (2016) (*2016 Foreign Ownership Order*), *pet. for recon. dismissed*, 32 FCC Rcd 4780 (2017).

foreign investors, including certain prospective foreign investors (Foreign Investors),[5] to indirectly hold equity in excess of 25%, in the aggregate; specific approval[6] for the Foreign Investors to hold indirectly more than 5% each of the equity in Paramount through newly issued non-voting Class B shares;[7] and advance approval[8] for each of the Foreign Investors to hold up to 20% indirect equity in Paramount at some future time.[9] Further, as explained below, we conclude that in light of the commitments and undertakings set forth in the Letter of Agreement (LOA),[10] we do not grant the following requests made by Paramount, as they are now moot: foreign voting interests in excess of 25% in the aggregate; specific approval for each of the Foreign Investor's voting interests; and advance approval for each of the Foreign Investor's voting interests.[11]

2. Upon review of the Petition and consideration of the record of this proceeding, we find that the public interest would be served by granting the Petition, subject to compliance with the LOA's terms and the Commission's rules, as described below.[12] As discussed *infra*, Paramount must monitor foreign ownership to ensure continued compliance with the Commission's rules, including section 1.5004; Paramount must comply with the LOA, including, but not limited to, the commitment that "each of the Foreign Investor's interest in Paramount will consist entirely of non-voting stock without any governance or information rights, and the Foreign Investors will not have any influence, direction, or control over or provide any commentary or guidance on Paramount's content decisions, company management, or have any Access to Paramount's non-public U.S. Person Data" and "that in the event it proposes to change any voting, governance or information rights of the Foreign Investors, it will seek prior approval from the FCC through a new petition for declaratory ruling, and acknowledges that that [sic] such new petition

---

[5] The Foreign Investors include: (i) Public Investment Fund; (ii) L'Imad 1st SPV 2 Exempt RSC Ltd; (iii) L'imad 1st Holding 1 Exempt RSC Ltd; (4) L'imad 1st Capital Holding Ltd; (5) L'imad Holding Company – P.J.S.C; (6) QIA TMT Holding LLC; and (7) Qatar Investment Authority. *See infra* paras. 5-7.

[6] Under section 1.5001(i)(1) of the Commission's rules, petitions for a declaratory ruling are required to identify and seek specific approval for any foreign individual, entity, or group that holds or would hold, directly and/or indirectly, more than 5% of the equity and/or voting interests, or a controlling interest, in the licensee's controlling U.S. parent, subject to certain exemptions, including an exemption that increases the specific approval threshold to 10% for certain institutional investors. 47 CFR § 1.5001(i)(1), (i)(4).

[7] Petition; Reply Comments of Paramount Global at 1 (filed June 11, 2026) (Reply Comments).

[8] 47 CFR § 1.5001(k).

[9] Petition at 16-17. We note that after the Commission grants a declaratory ruling pursuant to section 310(b)(4) of the Act, petitioners have an affirmative duty under section 1.5004 to monitor and calculate their foreign equity and voting interests in a manner consistent with the principles enunciated by the Commission, including the standards and criteria set forth in sections 1.5002 and 1.5003 of the Commission's rules. 47 CFR §§ 1.5002-1.5004. *See infra* note 126. We also note that Paramount's specific approval, advance approval, and aggregate approval requests do not contemplate that actual voting interests will be held by any of the proposed Foreign Investors. *See infra* nn. 33 & 37.

[10] Letter of Agreement from Makan Delrahim, Chief Legal Officer of Paramount Skydance Corporation, Paramount Global to Chief, Foreign Investment Review Section (FIRS) and Deputy Chief, Compliance and Enforcement (FIRS), on behalf of the Assistant Attorney General for National Security, United States Department of Justice, National Security Division (dated Sept. 4, 2026) (LOA). As set forth in the LOA, "Foreign Investors" are "those foreign investors for which specific and advanced approval was requested in the Paramount Petition." *Id.* at 3 (citing Petition at 16-17). *See also* para. 1, note 5, *supra*.

[11] Under section 310(b)(4) of the Act, Commission approval is required only when the aggregate foreign ownership exceeds the statutory benchmarks. Accordingly, aggregate foreign equity and/or voting interests below the 25% benchmarks do not require a declaratory ruling from the Commission.

[12] For a discussion of the terms and conditions Paramount is subject to under this Declaratory Ruling, see *infra* para. 32.

could be subject to a referral to the Committee."[13] Paramount also must obtain Commission approval before its foreign ownership exceeds the terms and conditions of this Declaratory Ruling, including, but not limited to, seeking a new declaratory ruling if Paramount's foreign voting interests in the aggregate exceed 25%, or if it proposes to change the voting interests of any of the approved Foreign Investors under this Declaratory Ruling.

3. On April 27, 2026, the Bureau released a public notice[14] establishing a pleading cycle with comments due on May 27, 2026, and reply comments due on June 11, 2026, and designating the proceeding as "permit-but-disclose" in accordance with the Commission's *ex parte* rules.[15] We received several timely filed comments,[16] *ex parte* letters,[17] and other submissions to the Commission.[18] Also submitted into the record is a letter received from the National Telecommunications and Information Administration (NTIA) on behalf of the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector (Committee).[19] Consistent with the Committee's input, as discussed below, we find that it will serve the public interest to grant the Petition, subject to the conditions set forth in this Declaratory Ruling.

---

[13] LOA at 3-4.

[14] *Media Bureau Announces Filing of Petition for Declaratory Ruling by Paramount Global*, MB Docket No. 26-93, Public Notice, DA 26-411 (MB Apr. 27, 2026) (Public Notice).

[15] 47 CFR § 1.1206.

[16] *See, e.g.*, Comments of PRESSPAGE ENTERTAINMENT INC (filed Apr. 28, 2026) (PRESSPAGE Comments); Comments of Collin Hotchkiss (filed Apr. 28, 2026); Comments of Ron Beres (filed Apr. 29, 2026); Comments of Aidan Gordon (filed May 5, 2026); Comments of Patrick O. Ingle (filed May 7, 2026); Comments of W. Lee McVey, PE (Ret.) (filed May 7, 2026); Comments of Zachary Beaudoin (filed May 18, 2026); Comments of Chad Ray (filed May 20, 2026); Comments of Franklin Broadcasting LP (filed May 27, 2026) (Franklin Comments); Comments of Free Press (filed on May 27, 2026) (Free Press Comments). In addition, we received a number of late-filed comments. Between July 13 and July 14, 2026, LiveVideo.AI Corp. (LiveVideo.AI) submitted multiple filings, including a Motion for Leave to Accept Late-Filed Comments of LiveVideo.AI Corp. and Notice of Errata (together, LiveVideo.AI Comments); Written *Ex Parte* Presentation of LiveVideo.AI Corp. (LiveVideo.AI *Ex Parte*); and Exhibit; on July 31, 2026, LiveVideo.AI submitted a "Supplemental Petition to Disqualify Chairman Brendan Carr for Bias and Conflict of Interest." (LiveVideo.AI Supplement). We note that LiveVideo.AI raises claims such as alleged conflicts of interest, or submits documentation related to various pending litigations related to prior Commission transaction decisions. We decline to resolve LiveVideo.AI's conflict of interest claims because they fall outside the scope of this proceeding. The issue of whether the Commission's Chairman should disqualify himself, *see* LiveVideo.AI Supplement, is not properly raised at this stage of the proceeding because this Petition is being resolved under the Media Bureau's delegated authority. *See infra*, paras. 33-34 (citing 47 CFR §§ 0.61, 0.283). On July 22, 2026, Austin Olachea filed an Informal Objection and Supplemental Comments, both of which cite the incorrect docket number. On September 11, 2026, LiveVideo.AI filed an "Amended Petition to Deny, or in the Alternative Informal Objection; Motion for Leave to File Out of Time; Request for Targeted Supplementation; and Request to Withhold Action Pending a Complete Record)," which states that the filing supersedes its September 4, September 7, and September 8, 2026 submission filings.

[17] *See, e.g.*, *Ex Parte* Letter of PRESSPAGE ENTERTAINMENT INC (filed on May 5, 2026) (PRESSPAGE May 5, 2026 *Ex Parte* Letter); *Ex Parte* Letter of PRESSPAGE ENTERTAINMENT INC (filed on May 22, 2026) (PRESSPAGE May 22, 2026 *Ex Parte* Letter); and *Ex Parte* Letter of LiveVideo.AI Corp. (filed on July 14, 2026).

[18] A few congressional letters addressed to FCC Chairman Brendan Carr were filed in the docket. *See, e.g.*, Letter from Sen. Cory A. Booker, et al., United States Senate, to Hon. Brendan Carr, FCC (dated Mar. 23, 2026); Letter from Rep. Sam T. Liccardo, United States House of Representatives, to Hon. Brendan Carr, FCC (dated May 1, 2026); Letter from Sen. Maria Cantwell, et al., United States Senate, to Hon. Brendan Carr, FCC (dated May 20, 2026).

[19] Petition to Adopt Conditions to Authorization and License, NTIA, MB Docket No. 26-93 (filed Sept. 17, 2026) (Committee Petition); LOA.

## II. BACKGROUND

4. Paramount is a Delaware corporation that, through the Licensees (each a direct or indirect wholly owned subsidiary of Paramount), operates 28 broadcast television stations across the United States.[20] Paramount is a direct, wholly owned subsidiary of Paramount Skydance Corporation (Paramount Skydance), which, according to Paramount, is a "leading global media, streaming, and entertainment company that creates premium content and experiences for audiences worldwide."[21] Paramount Skydance has two classes of stock: Class A common stock, which has 100% of the voting interests in Paramount Skydance, and Class B common stock, which are non-voting shares.[22] The Ellison family indirectly holds 77.5% of the Class A shares as well as approximately 40% of the non-voting Class B shares; RedBird Capital Partners (RedBird) indirectly holds the remaining 22.5% of the Class A shares and approximately 9% of the non-voting Class B shares.[23]

### A. Proposed Investment

5. The Petition is filed in connection with a planned new investment (Proposed Investment) that would increase indirect foreign investment in Paramount.[24] As described in the Petition, in connection with the proposed merger of Paramount Skydance and Warner Bros. Discovery, Inc., on February 27, 2026, Lawrence Ellison, directly and indirectly, and a RedBird investment fund entered into subscription agreements to purchase up to approximately $47 billion of non-voting Paramount Skydance Class B shares.[25] Lawrence Ellison and RedBird then entered into agreements to assign those purchase rights to others, including, as is relevant here: (i) The Public Investment Fund, a sovereign wealth fund and instrumentality of Saudi Arabia (ii) L'Imad 1st SPV 2 Exempt RSC LTD, an investment vehicle of L'imad Holding, an Abu Dhabi government investment fund, and (iii) QIA TMT Holding LLC, an investment vehicle of the Qatar Investment Authority.[26]

6. As a result of the Proposed Investment, "the Ellison family and [RedBird Capital Partners] together will continue to hold the largest equity stake in Paramount Skydance and will continue to be the indirect owners of 100 percent of Paramount Skydance Class A Common Stock, representing 100 percent of the voting shares of, and thus control of, Paramount Skydance."[27] Paramount explains that the Proposed Investment will "not result in a transfer of control of Paramount" and that the "Ellison

---

[20] Petition at 3 (internal citations omitted).

[21] *Id*. Paramount Skydance's portfolio includes assets such as the "national CBS television network, Paramount Pictures, Nickelodeon, MTV, Comedy Central, and BET. The company also operates streaming platforms, including Paramount+ and Pluto TV." *Id*. Paramount Skydance also holds "extensive libraries of television and film titles, engages in content production and distribution, and provides advertising solutions." *Id*.

[22] *Id.* at 3.

[23] *Id.* at 3-5.

[24] *Id*. at 5-6.

[25] *Id*.

[26] *Id*.

[27] *Id*. The Petition notes that there are foreign investors in the RedBird funds. According to the Petition, however, "[t]he limited partners of RB Tentpole LP are insulated in accordance with Section 1.5003 of the Commission's rules. Therefore, the foreign insulated limited partners will be deemed to have voting interests in RB Tentpole LP equal to their equity interest." *Id*. at 15; *see also* 47 CFR § 1.5003 (providing insulation criteria for interests in limited partnerships) and 47 CFR § 1.5002(b)(2)(ii)(B) (explaining how to calculate indirect voting interests and stating that "[a] partner of a limited partnership (other than a general partner) or partner of a limited liability partnership that satisfies the insulation criteria specified in § 1.5003 shall be treated as an insulated partner and shall be deemed to hold a voting interest in the partnership that is equal to the partner's equity interest.")).

family will retain a majority of the voting interests and control of Paramount."[28] Therefore, Paramount notes that "no other application is being filed in connection with this Petition."[29] Paramount reiterates that "[a]ll voting rights and other decision-making functions in Paramount will be controlled by the Ellison family through U.S. entities."[30]

**B. Petition For Declaratory Ruling**

7. To effectuate the purchases described above, pursuant to section 1.5001(h) of the Commission's rules,[31] Paramount requests approval for its foreign investors, including the Foreign Investors, to indirectly hold equity in excess of 25% in Paramount, the controlling U.S. parent of the Licensees.[32] Paramount also requests specific approval for certain foreign entities that individually will hold, indirectly, more than 5% of the equity[33] of Paramount.[34] In particular, Paramount makes the following requests for specific approval: (1) Public Investment Fund (15.1% equity) (Kingdom of Saudi Arabia); (2) L'Imad 1st SPV 2 Exempt RSC Ltd (12.8% equity) (United Arab Emirates); (3) L'imad 1st Holding 1 Exempt RSC Ltd (12.8% equity) (United Arab Emirates); (4) L'imad 1st Capital Holding Ltd (12.8% equity) (United Arab Emirates); (5) L'imad Holding Company – P.J.S.C (12.8% equity) (United Arab Emirates); (6) QIA TMT Holding LLC (10.6% equity) (Qatar); and (7) Qatar Investment Authority

---

[28] Petition at 2. According to the Petition, David Ellison, a U.S. citizen, "is the sole manager of Hikouki, LLC, Furaito, LLC, and Aozora, LLC, which are the holding companies that each respectively own 100 percent of the Pinnacle Media entities. Sayonara, LLC ('Sayonara') is the sole member of Hikouki, LLC, Furaito, LLC, and Aozora, LLC. Sayonara is owned and controlled by The Lawrence J. Ellison Revocable Trust u/a/d 1/22/88, as amended (the 'Trust'), which is controlled by Lawerence J. Ellison. David Ellison has granted to Sayonara a voting interest equal to approximately 35.5 percent in each of Hikouki, LLC, Furaito, LLC, and Aozora, LLC, and David Ellison retains an approximately 64.5 percent interest. In addition, by voting proxy, the Pinnacle Media entities have each granted David Ellison 64.5 percent of their respective voting interests in [Harbor Lights Entertainment, Inc. (Harbor Lights)] (and indirectly in Paramount Skydance) and have granted Sayonara the remaining 35.5 percent. David Ellison and Sayonara have the right to designate the Ellison family directors of Harbor Lights and Paramount Skydance, each in accordance with these voting percentages. David Ellison also serves as the Chairman and CEO of Paramount Skydance. Sayonara does not have any veto rights, or any special or outsized voting rights, in Harbor Lights or Paramount Skydance as a result of its minority voting interests." *Id*. at 4-5, 10. We note that Harbor Lights was formerly named National Amusements, Inc. *Id*. at 3, n.5.

[29] *Id*. at 2.

[30] *Id*. at 14, 21. Reply Comments at 7. Paramount further states that "[it] has repeatedly committed, and reaffirms here, that no foreign investor will have the ability to control Paramount or the Licensees." *Id*.

[31] 47 CFR § 1.5001(h).

[32] Reply Comments at 1; Petition at 2, 14-16. According to the Petition, "[t]he foreign-owned interests through Class B shares is expected to be approximately 49.5 percent in the aggregate after the Proposed Investment." Petition at 15. Paramount further states that "[a]lthough Paramount expects that existing and prospective foreign investors will indirectly hold slightly less than 50 percent of Paramount's equity interests after consummating the Proposed Investment described below, Paramount seeks approval for foreign investors in the aggregate to indirectly hold up to 100 percent of its equity and/or voting interests in light of routine fluctuations in publicly held equity interests and to account for potential future investments (subject to any specific approval requirements in Section 1.5004(a))." *Id*. at 2.

[33] Paramount states that the "voting interest of investors holding only Class B shares will be zero" but "[o]ut of an abundance of caution, to the extent that the Commission deems holders of non-voting equity in a corporation to have a 'deemed' voting interest equal to their equity interest[.]" *Id*. at 16. Paramount further states that "foreign investors' equity interests will consist entirely of passive, non-voting stock." Reply Comments at 7. Paramount also states that it "will return to the Commission in the event Paramount proposes to effectuate any changes in governance rights in the company that would result in an attributable interest or active governance role being held by any foreign investor in the future," and that any changes that would accord foreign investors increased rights would be reviewed independently of this order. *Id*. at 8.

[34] 47 CFR § 1.5001(i); Petition at 16-17.

(10.6% equity) (Qatar).[35] Pursuant to section 1.5001(k) of the Commission's rules,[36] Paramount also requests advance approval for each of the foregoing foreign entities seeking specific approval to increase its indirect equity interests in Paramount up to a non-controlling 20% at some future time.[37]

### C. Public Interest Showing

#### 1. Paramount's Public Interest Showing

8. Paramount asserts that grant of the Petition will serve the public interest, as it would "afford Paramount and, in turn, the Licensees, greater access to capital, including from foreign sources," which would enable Paramount to "compete more effectively in the provision of television broadcast services and in the broader video programming marketplace."[38] Specifically, Paramount provides that it recently has been making "strategic investments to improve the Licensees' newsgathering and reporting operations, both nationally and at a local level."[39] For example, Paramount notes that efforts are under way to rejuvenate "the Licensees' online presence, allowing them to meet viewers where they are and ensuring their continued relevance to the communities that they serve, in turn enhancing the availability of reliable, high-quality, non-paywalled local and national news across the country."[40]

9. To this end, Paramount explains that "[r]educing barriers to further investment in Paramount, including by allowing the company to pursue additional capital from non-U.S. investors, will enable it to allocate additional resources to preserve and enhance the legacy and broad reach of the Licensees' television broadcast operations."[41] The Petition further states that "[i]n turn, Paramount's ability to compete in the television broadcast and broader video marketplaces will improve, thereby promoting the strength of the industry overall."[42] Paramount provides that the "new equity investment" will better position the company to "weather continuing challenges facing broadcasters and operators of linear pay-television networks."[43]

10. Finally, Paramount notes that "grant of this Petition will not present any national security, law enforcement, foreign policy, or trade policy concerns."[44] Specifically, Paramount explains, the

---

[35] Petition at 16-17.

[36] 47 CFR § 1.5001(k).

[37] Petition at 16-17. Under the Commission's foreign ownership rules, a petitioner may request advance approval in its petition for a foreign individual and/or entity seeking specific approval to increase its equity and/or voting interests at some future time. 47 CFR § 1.5001(k). With regard to voting rights, Paramount states that the new Class B shares will have no voting rights and that it "will return to the Commission in the event Paramount proposes to effectuate any changes in governance rights in the company that would result in an attributable interest or active governance role being held by any foreign investor in the future." Reply Comments at 8.

[38] Petition at 19.

[39] *Id*. at 20.

[40] *Id*. at 20-21. In Reply Comments, Paramount also states that its "broadcast stations provide a critical link to local communities, delivering lifesaving information during emergency situations (like tornadoes, hurricanes, blizzards, and wildfires)." Reply Comments at 5. Further, Paramount provides that "at a time when local news operations across the country are contracting and communities are losing access to trusted sources of local journalism, investment that will bolster Paramount's capacity to maintain robust news operations across its station group should be welcomed. And indeed, granting the Petition will support continued investment in reporters, producers, and technical staff at the Licensees' stations, as well as in the digital platforms and tools necessary to reach audiences where they increasingly consume news content." Reply Comments at 5-6.

[41] Petition at 21.

[42] *Id.*

[43] *Id.*

[44] *Id.*

"Ellison family (which includes only U.S. persons) will retain a majority of the voting interests and control of Paramount, and each of the entities through which the Ellison family holds its interests in the company is a U.S. entity."[45]

### 2. Comments and *Ex Parte* Submissions

11. *Foreign Ownership Concerns*. A few commenters raise public interest considerations pursuant to section 310(b)(4) of the Act.[46] For example, Free Press asserts that Paramount fails to demonstrate that the Proposed Investment would serve the public interest.[47] First, Free Press questions Paramount's public interest rationale that the Proposed Investment would afford Paramount and its Licensees greater access to capital to allow it to compete more effectively in the marketplace, arguing that there has "never been a U.S. broadcasting company with as much 'access to capital' as Paramount currently can find from its controlling shareholder."[48] Free Press further argues that Paramount, "does not need to acquire WBD in order to continue profitably operating the CBS network and its local broadcast stations," as "[n]one of the 28 stations are 'failing' or 'failed'. . . ."[49] Second, Free Press asserts that Paramount's "[g]eneric rhetoric" about the public interest benefits of permitting "foreign governments to control up to 100 percent of one of the Big 4 U.S. broadcasting networks and station owners" does not satisfy the Commission's section 310(b)(4) standard.[50] Third, according to Free Press, "[Paramount] has not demonstrated that there are no other lawful methods of financing the transaction other than obtaining a waiver so that three foreign governments can hold up to 100 percent of the equity interests in these domestic broadcasting operations."[51] Finally, Free Press argues that "Paramount will begin its ownership of WBD with nearly $80 billion in debt, which will require deep cuts to Paramount's pre-merger holdings and existing operations" and that "[t]hese cuts will negatively impact the public interest, particularly at Paramount's broadcast units."[52] Franklin Broadcasting LP (Franklin), similarly argues that the "Commission should examine whether the proposed foreign sovereign wealth fund, foreign government-related or other substantial foreign capital participation identified in the record is necessary to consummate the transaction or preserve broadcast and news operations."[53]

*12.* *National Security*. Other commenters raise national security concerns associated with the Proposed Investment and propose that the Commission coordinate with Executive Branch agencies for their views on national security.[54] Specifically, according to PRESSPAGE, even "when structured as non-controlling or non-voting equity, ownership by foreign state-linked entities raises material national-

---

[45] *Id.*

[46] *See, e.g.*, PRESSPAGE Comments at 1-2; Franklin Comments at 3, 7; and Free Press Comments at 3-10.

[47] Free Press Comments at 6.

[48] *Id*. at 7.

[49] *Id*. at 8.

[50] *Id*.

[51] *Id*.; Free Press asserts that the appropriate standard for reviewing Paramount's request is as a "waiver" under the Commission's rules. Specifically, "[t]o receive a waiver under the Commission's rules, petitioners must demonstrate that 'the underlying purpose of the rule(s) would not be served or would be frustrated by application to the instant case, and that a grant of the requested waiver would be in the public interest.' Or demonstrate that 'in view of unique or unusual factual circumstances of the instant case, application of the rule(s) would be inequitable, unduly burdensome or contrary to the public interest, or the applicant has no reasonable alternative.'" *Id*. at 5. As discussed in more detail *infra* para. 24, we note that waiver is not the applicable standard in the Commission's foreign ownership review under section 310(b)(4) of the Act.

[52] Free Press Comments at 9.

[53] Franklin Comments at 3.

[54] *See, e.g.*, PRESSPAGE Comments at 1-2; Franklin Comments at 10; LiveVideo.AI *Ex Parte* at 1-2.

security considerations."[55] PRESSPAGE presses the Commission to coordinate closely with the Executive Branch agencies for their views on any national security concerns and opines that the Commission "should not act until that review is complete and its recommendations are incorporated into the record."[56] Franklin similarly requests that the Commission consider whether approval of the Petition should be conditioned on, or accompanied by, further inquiry into certain matters, including coordination with "Team Telecom and other relevant national-security reviewers concerning foreign sovereign wealth fund participation, foreign-government-related investment and any other substantial foreign interests identified in the record."[57]

13. To mitigate potential national security concerns, PRESSPAGE and Franklin urge the Commission to consider implementing various safeguards.[58] For example, PRESSPAGE states that, even if the Commission finds that foreign ownership above 25% is permissible, it should evaluate whether "additional safeguards are necessary to preserve these core public-interest values."[59] To that end, PRESSPAGE suggests that post-transaction structural separation can fully resolve national security concerns. Specifically, PRESSPAGE proposes that "all U.S. news and broadcast functions would be placed in a **wholly U.S.-owned and U.S.-controlled public entity**, while all studio and entertainment operations would be placed in a **separate public entity** that may permissibly receive foreign investment under §310(b)(4)."[60] Similarly, Franklin states that the Commission should "preserve and examine the availability of structural safeguards if the record shows that formal voting-control protections are insufficient to address practical foreign influence, national-security concerns, editorial independence, localism, public-service obligations or capital-structure pressure affecting sensitive broadcast, news, linear and advertising-supported assets."[61]

14. *Control and Influence.* Several commenters also assert that, in addition to its consideration of "formal voting control" as part of its section 310(b)(4) review of the Petition, the Commission should address the "practical influence" that the Foreign Investors may have over Paramount.[62] In particular, Franklin "recognizes that Section 310(b)(4) proceedings often focus on formal ownership, voting control and attributable interests,"[63] and that "foreign investors, directly or indirectly, may receive governance, contractual, financial, informational or economic rights that could create practical influence over the parent company or its sensitive communications assets,"[64] but it asserts that "[w]here substantial foreign equity may participate economically in the parent of major U.S. broadcast,

---

[55] PRESSPAGE Comments at 1.

[56] *Id*. at 2.

[57] Franklin Comments at 9-10.

[58] *See* PRESSPAGE May 5, 2026 *Ex Parte* Letter at 2-4, Franklin Comments at 5-8.

[59] PRESSPAGE Comments at 2.

[60] PRESSPAGE May 5, 2026 *Ex Parte* Letter at 2 (emphasis in the original).

[61] Franklin Comments at 1. Franklin also suggests that if the Commission examines a structural separation or similar safeguard, it should consider commitments addressing: (1) "local-news continuity;" (2) "national-news availability;" (3) "editorial-independence protocols;" (4) "independent governance for sensitive news assets;" (5) "public reporting on local-news and public-service obligations;" (6) "preservation or expansion of free over-the-air and free ad-supported news distribution;" (7) "emergency and public-affairs information distribution;" (8) children's educational and informational programming, where applicable;" (9) protection of newsroom decision-making from improper foreign, parent-company or creditor influence; and (10) "compliance reporting sufficient to allow the Commission to monitor performance." *Id*. at 7.

[62] *See, e.g.*, Franklin Comments at 2; PRESSPAGE May 5, 2026 *Ex Parte* Letter at 2; Free Press Comments at 9-10; LiveVideo.AI *Ex Parte* at 3.

[63] Franklin Comments at 4.

[64] *Id*. at 5.

local news and national news assets, the Commission should examine not only formal voting control, but also practical influence."[65] Similarly, PRESSPAGE states that "foreign equity—particularly when concentrated or accompanied by governance rights—can create channels for influence over editorial judgment, newsroom priorities, or the flow of information to the American public."[66] Free Press also asserts that while Paramount "goes to great lengths to provide assurances that the foreign governments financing this deal will have no control or say over CBS Network and Paramount's 28 FCC licensed full-power TV stations, foreign governments don't write checks for tens of billions of dollars in exchange for a share of a business with declining revenues."[67] Free Press goes on to state that "[c]ontrol over for-profit, commercial domestic news media by any government is an extraordinary situation that would surely strike most Americans as unseemly, precisely because of the utility of the news media as a propaganda tool for those governments."[68]

### 3. Paramount's Reply

15. In reply comments, Paramount asserts that the commenters ignore the substantial public interest benefits of the Proposed Investment.[69] Paramount further asserts that Free Press's comments "appear grounded in a presumption that foreign investment in broadcast stations is contrary to the public interest, but Commission precedent holds the opposite."[70] Accordingly, "[s]ection 310(b)(4) provides that foreign ownership of broadcast licenses should be barred *only* "if the Commission finds that the public interest will be served by the refusal or revocation of such license," but "[n]o such finding could be made on the record of this proceeding."[71] Indeed, Paramount argues that the commenters ignore the Proposed Investment's substantial public interest benefits and states that the "Proposed Investment will yield precisely the kinds of public interest benefits that the Commission has identified as supporting approval of foreign investment in other broadcast licensees under Section 310(b)(4), and no commenter has articulated a credible basis for concluding otherwise."[72] Further, Paramount argues that Free Press mischaracterizes the applicable legal standard for the Commission's foreign ownership approval process. Specifically, Paramount provides that "[i]gnoring the Commission's well-established foreign ownership approval process, as codified in clearly defined rules, Free Press mischaracterizes the applicable legal standard by suggesting that there is a very high bar for 'waiv[ing]' the 25 percent indirect foreign ownership benchmark."[73]

---

[65] *Id*. at 2.

[66] PRESSPAGE May 5, 2026 *Ex Parte* Letter at 2.

[67] Free Press Comments at 9.

[68] *Id*. at 10.

[69] Reply Comments at 4.

[70] *Id.* at 2. Paramount further states that "[i]ndeed, the Commission has determined that foreign investment in broadcast stations is not only appropriate but beneficial given the challenges confronting the industry, and ample precedent supports permitting foreign investment in Paramount of up to and including 100 percent. Since 2016, the Commission has applied the same streamlined standard to approve indirect foreign ownership of broadcast licensees above the 25 percent threshold, with the aim of 'facilitat[ing] investment from new sources of capital at a time of growing need for investment in" U.S. broadcasters, an important sector of our nation's economy.' In adopting this framework, the Commission emphasized that foreign investment has provided much-needed capital to U.S. broadcasters, allowing them to upgrade their facilities and technology, invest in programming, and maintain the quality of their service to the public." *Id.* at 2-3.

[71] *Id.* at 3.

[72] *Id.* at 4-6.

[73] *Id.* at 4. Paramount further states "no waiver of the Commission's rules is required to grant the Petition, and no heightened showing of the sort demanded by Free Press is necessary (especially not under Section 1.925 of the Commission's rules, which does not apply to television broadcast services)." *Id.* Paramount explains that

*16.* In response to concerns raised regarding national security and the Foreign Investors' influence and control, Paramount states that commenters' concerns are speculative and unsupported by facts.[74] Paramount asserts that, as its Petition makes clear, its "new foreign investors, which will receive only non-voting equity, will not have any ability to influence the company's editorial decision-making or news or entertainment content or to access its viewers' personal data."[75] The commenters, Paramount argues, overlook the fact that "none of the foreign investors will be able to wield any influence, let alone control, over Paramount's programming or the operations of the Licensees more broadly by acquiring non-voting stock in Paramount."[76] Further, the "Ellison family will retain control over Paramount" and that "no foreign investor will have the ability to control Paramount or the Licensees; to the contrary, Paramount will ensure that there will be no interference with the editorial or decision-making policies of its broadcast stations (or CBS News or any other facets of Paramount news and entertainment programming)."[77] Paramount maintains that commenters "fail to explain how passive, non-voting shareholders will achieve such influence, and they also ignore that these precise issues are under review by Team Telecom, providing a further backstop to ensure that the national security and law enforcement agencies are satisfied with the company's controls."[78] Regarding the commenters' concerns about potential changes that may give the Foreign Investors increased rights, Paramount states that it will "return to the Commission in the event Paramount proposes to effectuate any changes in governance rights in the company that would result in an attributable interest or active governance role being held by any foreign investor in the future. Accordingly, there is no need to speculate about potential changes that could accord the foreign investors increased rights as any such changes would be reviewed independently."[79]

### D. National Security, Law Enforcement, Foreign Policy and Trade Policy Review

17. Pursuant to Commission practice,[80] the Commission referred the Petition to the relevant Executive Branch agencies for their views on any national security, law enforcement, foreign policy, or trade policy concerns related to the proposed foreign ownership of Paramount, as the controlling U.S. parent of Licensees.[81] On April 29, 2026, the Committee notified the Commission that it was reviewing the Petition for any national security and law enforcement concerns that may be raised by foreign

---

"[i]nstead, the statute and the Commission's rules establish a clear process for seeking approval for foreign ownership exceeding 25 percent, including approval to allow up to and including 100 percent aggregate foreign ownership, subject to the traditional public interest standard rather than any heightened standard of review. The Commission has explained that Section 310(b)(4) does not establish a general prohibition against foreign investment but rather creates a process for the Commission to evaluate the public interest implications of such investment on a case-by-case basis." *Id.*

[74] *Id*. at 6.

[75] *Id*. at 6-7.

[76] *Id*. at 7.

[77] *Id*.

[78] *Id.* at 7-8. Paramount further states that "[t]he Commission routinely 'accords deference' to the expertise of these agencies, whose scrutiny of the Proposed Investment will ensure that any of the foreign investors will not have any ability to compromise editorial decision-making, access the data of U.S. persons, or otherwise harm the public interest." *Id*. at 8, citing *2016 Foreign Ownership Order*, 31 FCC Rcd at 11277, para. 6.

[79] Reply Comments at 8.

[80] Consistent with the Commission's rules under section 1.40001(b), "the Commission will consider any recommendations from the executive branch on pending . . . petition(s) for foreign ownership ruling(s) pursuant to §§ 1.5000 through 1.5004 . . . that may affect national security, law enforcement, foreign policy, and/or trade policy as part of its public interest analysis. The Commission will evaluate concerns raised by the executive branch and will make an independent decision concerning the pending matter." 47 CFR § 1.40001(b).

[81] Public Notice at 4-5.

participation in the United States telecommunications services sector and requested that the Commission defer action on the Petition.[82] Subsequently, on June 16, 2026, the Department of Justice notified the Commission that the Committee had initiated its 120-day initial review of the Petition.[83] On September 17, 2026, NTIA submitted its Committee Petition to the Commission in which the Committee advised the Commission that "it has no objection to the Commission approving the above-captioned Petition for Declaratory Ruling, provided that the Commission conditions its approval on the assurance of Paramount Global to abide by the commitments and undertakings" set forth in the LOA.[84]

## III. DISCUSSION

18. *Standard of Review*. We review the Petition under section 310(b)(4) of the Act, which states that "[n]o broadcast . . . license shall be granted to or held by . . . any corporation directly or indirectly controlled by any other corporation of which more than one-fourth of the capital stock is owned of record or voted by aliens, their representatives, or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country, if the Commission finds that the public interest will be served by the refusal or revocation of such license."[85] This section of the Act grants the Commission discretion to allow foreign investment in a licensee's controlling U.S. parent above 25% unless the Commission finds that the public interest would be served by refusing to permit such foreign investment.[86] In evaluating petitions relating to foreign ownership, the Commission affords appropriate deference to the expertise of the Executive Branch agencies on issues related to national security, law enforcement, foreign policy, and trade policy.[87]

19. In the *2016 Foreign Ownership Order*, the Commission modified the broadcast licensee foreign ownership review process by extending the streamlined rules and procedures developed for review of foreign ownership of common carrier and certain aeronautical licensees under section 310(b)(4) to the broadcast context, with certain limited exceptions.[88] The *2016 Foreign Ownership Order* expressly provides for processing of petitions requesting approval for up to and including 100% aggregate foreign voting and/or equity investment by unnamed and future foreign investors in the controlling U.S. parent of a broadcast licensee.[89] To exercise in a meaningful way the discretion conferred by statute, the Commission must receive detailed information from the applicant sufficient for the Commission to make the public interest finding the statute requires.[90]

20. *Section 310(b)(4) Determination and Public Interest Analysis*. Pursuant to section 310(b)(4) of the Act,[91] as well as sections 1.5001 through 1.5004 of the Commission's rules,[92] we find that the public interest is served by permitting indirect foreign equity ownership of Paramount in excess

---

[82] Letter from Jessica Campbell, Attorney Advisor, Foreign Investment Review Section, National Security Division, Department of Justice, DOJ, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 26-93 (filed Apr. 29, 2026).

[83] Letter from Jessica Campbell, Attorney Advisor, Foreign Investment Review Section, National Security Division, DOJ, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 26-93 (filed June 16, 2026).

[84] Committee Petition at 1; LOA.

[85] 47 U.S.C. § 310(b)(4).

[86] *See id.*; *2016 Foreign Ownership Order*, 31 FCC Rcd at 11276, para. 5.

[87] *2016 Foreign Ownership Order,* 31 FCC Rcd at 11277, para. 6.

[88] *See generally id.*

[89] *Id.* at 11282, para. 15.

[90] *See, e.g.*, *id*. at 11282, 11283-84, paras. 15, 20 (noting that the requirements adopted in the streamlined foreign ownership rules ensure that the Commission has the information necessary to evaluate and understand a licensee's ownership structure and to fulfill its obligations under section 310(b) of the Act).

[91] 47 U.S.C. § 310(b)(4).

[92] *See* 47 CFR § 1.5000 *et seq.*

of the 25% benchmark in section 310(b)(4) of the Act, and, consequently, we grant Paramount's request, as described and conditioned below. We further find that it is in the public interest to grant specific approval and advance approval for the percentages set out to the entities specified in Section IV below. As discussed further below, we conclude that grant of the Petition is in the public interest because it, among other things, provides the Licensees with greater access to capital and thereby contributes to the strengthening of the broadcast industry.[93]

21. First, we disagree with the commenters that argue that Paramount has failed to demonstrate that grant of the Petition is in the public interest. In the Commission's review of foreign ownership pursuant to section 310(b)(4) of the Act,[94] it has long recognized that foreign investment in U.S. companies and networks, including broadcast, fosters technical innovation, supports job creation, and strengthens the U.S. economy.[95] The Commission remains committed to encouraging such investment while maintaining its ability to conduct comprehensive reviews of foreign ownership in its licensees to safeguard the United States from new and evolving national security threats.[96] When reviewing foreign investment under section 310(b)(4), the Commission's decisions carefully balance the dual public interest objectives of prohibiting potentially harmful foreign investment and promoting non-harmful foreign investment.[97]

22. Upon review of the entire record, we find that Paramount has sufficiently demonstrated that the public interest would be served by granting the Petition.[98] Specifically, Paramount states that grant of the Petition would provide it with greater access to capital, improve the Licensees' newsgathering and reporting operations, and better position the company to "weather continuing challenges facing broadcasters and operators of linear pay-television networks."[99] The commenters have not rebutted these statements. We also agree with Paramount that the concerns raised in the record to the contrary are speculative and unsupported. Several commenters assert that the Commission, as part of its section 310(b)(4) review of the Petition, should consider the "practical influence" that the Foreign Investors may have over Paramount and its Licensees in addition to "formal voting control."[100] We find this argument unconvincing. The Proposed Investment is not a loan, which must be repaid, but a purchase of stock that has no voting rights. We are persuaded by Paramount's argument[101] that the Foreign Investors therefore will not be able to wield any influence, let alone control, over decisions involving the Licensees.

---

[93] *See* Petition at 19-22 (describing public interest benefits arising from approval of this declaratory ruling and the related Proposed Investment).

[94] 47 U.S.C. § 310(b)(4).

[95] *Review of Foreign Ownership Policies for Common Carrier and Aeronautical Radio Licenses Under Section 310(b)(4) of the Communications Act of 1934, as Amended,* IB Docket No. 11-133, Second Report and Order, 28 FCC Rcd 5741, 5744, para. 3 (2013) (*2013 Foreign Ownership Second Report and Order*) ("foreign investment has been and will continue to be an important source of financing for U.S. telecommunications companies, fostering technical innovation, economic growth, and job creation."); *see also 2016 Foreign Ownership Order*, 31 FCC Rcd at 11280, para. 12 (stating that "applying the foreign ownership rules for common carrier licensees to broadcast licensees in the context of Section 310(b)(4) petitions will help improve access to capital from foreign investors and promote regulatory flexibility, while also preserving the Commission's statutory obligation, in consultation with the relevant Executive Branch agencies, to ensure that foreign ownership above the 25 percent benchmark serves the public interest.").

[96] *2026 Foreign Ownership Order* at 832, para. 1.

[97] *Id*. at 851-52, para. 39.

[98] *See supra* paras. 8-10.

[99] Petition at 19-22.

[100] *See, e.g.*, Franklin Comments at 2; PRESSPAGE May 5, 2026 *Ex Parte* Letter at 2; Free Press Comments at 9-10; LiveVideo.AI *Ex Parte* at 3.

[101] Reply Comments at 6-7.

Paramount has further demonstrated that David Ellison will retain control over Paramount and that the Ellison family will continue to own a majority of the voting stock, and we credit Paramount's statement that "Paramount will ensure that there will be no interference with the editorial or decision-making policies of its broadcast stations (or CBS News or any other facets of Paramount news and entertainment programming)."[102] Finally, we are persuaded by the commitments Paramount made in its LOA with the Committee, which explicitly states that the "Foreign Investor's interest in Paramount will consist entirely of non-voting stock without any governance or information rights, and the Foreign Investors will not have any influence, direction, or control over or provide any commentary or guidance on Paramount's content decisions, company management, or have any Access to Paramount's non-public U.S. Person Data" and that Paramount "affirms that in the event it proposes to change any voting, governance or information rights of the Foreign Investors, it will seek prior approval from the FCC through a new petition for declaratory ruling, and acknowledges that that [sic] such new petition could be subject to referral to the Committee."[103] We condition our approval of the Petition on Paramount's returning to the Commission for approval before giving the Foreign Investors additional rights, including but not limited to, any voting rights.[104]

23. We find that the Commission's review process, the Committee's review process, Paramount's Petition certification,[105] the Commission's continuing compliance obligations,[106] and the commitments and undertakings set out in the LOA adequately ensure that the proposed foreign ownership serves the public interest, and that the commenters have not provided any persuasive reasons for us to find that the public interest would not be served by granting the Petition. We therefore conclude that grant of the Petition is consistent with the Commission's longstanding goal of promoting foreign investment, including in the broadcast industry, and that it would not serve the public interest to deny it.

24. Second, we reject the commenters' attempts to set an alternative standard for the Commission's foreign ownership review pursuant to section 310(b)(4) of the Act. At the outset, we find that Free Press mischaracterizes the applicable legal standard for the Commission's section 310(b)(4) review. Free Press asserts that the Commission's waiver rule is the applicable legal framework to petitions for declaratory ruling under section 310(b) of the Act.[107] That is incorrect. Instead, petitions for declaratory ruling filed pursuant to section 310(b)(4) of the Act are reviewed under sections 1.5000–1.5004 of the Commission's rules.[108] We also disagree with the commenters' assertions that Paramount must demonstrate that acquisition of WBD is necessary to promote the public interest,[109] that there are no other lawful methods of financing the transaction than through foreign investment,[110] or that "substantial foreign capital participation identified in the record is necessary to consummate the transaction or preserve broadcast and news operations."[111] We find that there is no affirmative burden on petitioners to make these showings. The question is whether it would be in the public interest to refuse to allow this foreign investment, not whether the investment is "necessary" or the only alternative.

---

[102] *Id.*

[103] LOA at 3-4.

[104] *See infra* para. 32 describing the terms and conditions to which Paramount is subject.

[105] *See* Petition at Certification.

[106] 47 CFR § 1.5004.

[107] 47 CFR § 1.925(b)(3)(i).

[108] 47 CFR §§ 1.5000-1.5004.

[109] Free Press Comments at 8.

[110] *Id.*

[111] Franklin Comments at 3.

25. *National Security*. When evaluating petitions for declaratory ruling under section 310(b)(4) of the Act, we also consider public interest issues related to national security, law enforcement, foreign policy, and trade policy concerns.[112] To exercise in a meaningful way the discretion conferred by statute, the Commission must receive detailed information from the applicant sufficient for the Commission to make the public interest finding the statute requires.[113] The Commission also coordinates as necessary and appropriate with the relevant Executive Branch agencies and accords deference to their expertise in identifying and interpreting issues of concern related to these matters.[114] When the Commission refers a petition to the Executive Branch agencies, it does not act on the petition until the Committee completes its review and provides the Commission its recommendation.

26. As stated above, pursuant to our standard practice, the Commission coordinated with the Executive Branch agencies and referred the Petition for their views on any national security, law enforcement, and foreign policy, or trade policy concerns related to the proposed foreign ownership of Paramount, the controlling U.S. parent of the Licensees.[115] Here, the Executive Branch agencies have reviewed the Petition and do not object to the Commission granting the Petition, provided that the Commission conditions its approval on Paramount's compliance with the LOA.[116] The Committee Petition further states that "[a]fter discussions with representative [sic] of Paramount Global in connection with the above-captioned application, the Committee has concluded that the additional commitments set forth in the LOA will help ensure that those agencies with responsibility for enforcing the law, protecting the national security, and preserving public safety can proceed appropriately to satisfy those responsibilities."[117]

27. In accordance with the request of the Committee, we grant the Committee Petition, and condition the grant of the Petition, on compliance by Paramount with the commitments and undertakings

---

[112] *See Process Reform for Executive Branch Review of Certain FCC Applications and Petitions Involving Foreign Ownership*, IB Docket 16-155, Report and Order, 35 FCC Rcd 10927 (2020) (setting rules and procedures for referring applications for Executive Branch review consistent with Executive Order No. 13913) (*Executive Branch Review Order*); *Foreign Participation Order*, 12 FCC Rcd at 23918-21, paras. 59-66 (in opening the U.S. telecommunications market to foreign entry in 1997, the Commission affirmed that it would consider national security, law enforcement, foreign policy, and trade policy concerns related to reportable foreign ownership as part of its overall public interest review of applications for international section 214 authority, submarine cable landing licenses, and declaratory rulings to exceed the foreign ownership benchmarks of section 310(b) of the Act). *See also Applications of T-Mobile US, Inc., and Sprint Corporation*, 34 FCC Rcd 10578, 10732-33, para. 349 (2019) (*T-Mobile/Sprint Order*); *2016 Foreign Ownership Order*, 31 FCC Rcd at 11277, para. 6; 47 CFR § 1.40001(a).

[113] *See, e.g.*, *2016 Foreign Ownership Order* at 11282, 11283-84, paras. 15, 20 (noting that the requirements adopted in the streamlined foreign ownership rules ensure that the Commission has the information necessary to evaluate and understand a licensee's ownership structure and to fulfill its obligations under section 310(b) of the Act).

[114] *Id*. at 11277, para. 6, citing to *2013 Foreign Ownership Second Report and Order*, 28 FCC Rcd at 5751, 5762, paras. 13, 34; *Rules and Policies on Foreign Participation in the U.S. Telecommunications Market: Market Entry and Regulation of Foreign-Affiliated Entities*, IB Docket Nos. 97-142 and 95-22, Report and Order and Order on Reconsideration, 12 FCC Rcd 23891, 23920, para. 63 (1997) (*Foreign Participation Order*), Order on Reconsideration, FCC 00-339, 15 FCC Rcd 18158 (2000). *See also Executive Branch Review of FCC Applications and Petitions with Foreign Ownership for National Security, Law Enforcement, Foreign Policy and Trade Policy Concerns*, IB Docket No. 16-155, Notice of Proposed Rulemaking, 31 FCC Rcd 7456 (2016) (*2016 Executive Branch Review NPRM*)).

[115] We thus dismiss as moot the concerns raised by commenters suggesting we coordinate closely with the Executive Branch agencies for their views on any national security concerns and not act until that review is complete as those steps already have been taken in the instant proceeding. *See* PRESSPAGE Comments at 1-2; Franklin Comments at 10; LiveVideo.AI *Ex Parte* at 1-2. *See also 2016 Foreign Ownership Order*, 31 FCC Rcd at 11282, para. 15; *Executive Branch Review Order*, 35 FCC Rcd at 10934-36, paras. 17, 24.

[116] *See* Committee Petition at 1; LOA.

[117] Committee Petition at 2.

set forth in the LOA. A failure to comply and/or remain in compliance with any of these conditions shall constitute a failure to meet a condition of this Declaratory Ruling, which may also result in monetary sanctions or other enforcement action by the Commission.

28. Given the Executive Branch agencies' determination, we decline to adopt the safeguards or commitments proposed in the record.[118] The Commission grants a petition for declaratory ruling on the condition that the petitioner complies with the Commission's routine terms and conditions, including any mitigation measures or agreements negotiated with the Committee. After carefully and thoroughly reviewing the record, we find that the commenters did not raise any persuasive basis for the Commission to depart from this established practice.

## IV. DECLARATORY RULING

29. Upon review of the Petition, and consideration of the record of this proceeding, pursuant to section 310(b)(4) of the Act and sections 1.5001 through 1.5004 of the Commission's rules, we find that the public interest would be served by permitting indirect foreign equity ownership of Paramount, the controlling U.S. parent of the Licensees, to exceed the 25% benchmark in section 310(b)(4) of the Act, as amended.[119] We also find that it is in the public interest to permit up to 100% indirect foreign equity interest of Paramount, in the aggregate, subject to the terms and conditions set forth in the Commission's rules including section 1.5004 of the Commission's rules, and the commitments and undertakings set forth in the LOA.[120]

30. Pursuant to section 1.5001(i) of the Commission's rules,[121] this Declaratory Ruling grants specific approval for the following entities to hold, indirectly, greater than 5% of the equity interests in Paramount:

- Public Investment Fund (15.1% equity) (Kingdom of Saudi Arabia);
- L'Imad 1st SPV 2 Exempt RSC Ltd (12.8% equity) (United Arab Emirates);
- L'imad 1st Holding 1 Exempt RSC Ltd (12.8% equity) (United Arab Emirates);
- L'imad 1st Capital Holding Ltd (12.8% equity) (United Arab Emirates);
- L'imad Holding Company – P.J.S.C (12.8% equity) (United Arab Emirates);
- QIA TMT Holding LLC (10.6% equity) (Qatar); and
- Qatar Investment Authority (10.6% equity) (Qatar).

---

[118] PRESSPAGE Comments at 2; Franklin Comments at 2-3.

[119] In its comments, Free Press characterizes the Petition as a request that requires the Commission to ignore the statutory limits on foreign ownership. *See* Free Press Comments at 6. We disagree. As discussed *infra*, consistent with our precedent, we find that our actions herein, including authorizing up to 100% indirect foreign equity interest of Paramount, in the aggregate, are consistent with both the Act and the Commission's rules and precedent when doing so serves the public interest, provided that petitioners comply with the routine terms and conditions of their declaratory ruling. *See, e.g.*, *Searchlight II HMT, L.P., Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934, as Amended*, MB Docket No. 23-2, Declaratory Ruling, 38 FCC Rcd 7412 (MB 2023) ("[w]e also find that it is in the public interest to permit up to an aggregate 100% indirect foreign ownership of [the broadcast licensees' controlling U.S. parent]"); *Univision Holdings II, Inc., Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934, as Amended*, MB Docket No. 21-321, Declaratory Ruling, 37 FCC Rcd 449 (MB 2022) ("it is in the public interest to grant Univision's request to permit foreign investors to own up to 100% in the aggregate of Univision's equity and voting interests.").

[120] For a discussion of the mootness of Paramount's requests in light of its LOA for its indirect aggregate foreign voting interests to exceed 25%, specific approval for its proposed Foreign Investors' voting interests, and advance approval for such Foreign Investors' voting interests, see *supra* paras. 1-2.

[121] 47 CFR § 1.5001(i).

31. Pursuant to section 1.5001(k) of the Commission's rules,[122] this Declaratory Ruling also grants advance approval for each of the foreign entities above, seeking specific approval to increase their indirect equity interests in Paramount up to a non-controlling 20% at some future time.[123]

32. *Terms and Conditions.* Under this Declaratory Ruling, Paramount has an affirmative duty to monitor its foreign equity and voting interests, calculate those interests consistent with the principles enunciated by the Commission, including the standards and criteria set forth in sections 1.5002 through 1.5003 of the Commission's rules,[124] and otherwise ensure continuing compliance with the provisions of section 310(b) of the Act.[125] Grant of this Declaratory Ruling is conditioned on the terms and conditions set forth in section 1.5004 of the Commission's rules, including the requirement to obtain Commission approval before foreign ownership of Paramount exceeds the terms and conditions of this Declaratory Ruling.[126] Grant of the Declaratory Ruling, is further conditioned on compliance with the LOA.[127] Paramount is further subject to the Commission's requirement to obtain approval for any new or additional foreign individual, entity, or group of such individuals or entities to hold, directly and/or indirectly, more than 5% (or more than 10% for certain investors that fall under the narrow exceptions in section 1.5001(i) of the Commission's rules[128]) of the equity and/or voting interests, or for any foreign individual, entity, or group to hold a controlling interest, in the company.[129] If, at any time, Paramount knows, or has reason to know, that it is no longer in compliance with this Declaratory Ruling, section 310(b) of the Act, or the Commission's foreign ownership rules, Paramount shall file a statement with the Commission explaining the circumstances within 30 days of the date that it knew, or had reason to know,

---

[122] 47 CFR § 1.5001(k).

[123] *See supra* para. 1. We note that in its comments, LiveVideo.AI states that Paramount's "advance-approval request appears to exceed the ceiling applicable to non-controlling foreign interests." *See, e.g.*, LiveVideo.AI Comments at 3. However, the Commission's foreign ownership rules permit non-controlling foreign investors that request specific approval to request advance approval to increase their equity and/or voting interests up to a non-controlling 49.99% at some future time. Here, in relevant part, Paramount requested advance approval for each of the foreign entities seeking specific approval to increase their indirect equity interests in Paramount up to a non-controlling 20%, which falls below the maximum permissible percentage of 49.99% for non-controlling interests. 47 CFR § 1.5001(k)(2).

[124] 47 CFR §§ 1.5002-1.5003.

[125] 47 CFR § 1.5004, note to paragraph (a).

[126] 47 CFR § 1.5004. Section 1.5004, *inter alia*, specifies that licensees have an ongoing, proactive obligation to monitor their foreign ownership compliance and to take preemptive action to remain in compliance with the Commission's foreign ownership rules and any declaratory ruling they have received. 47 CFR § 1.5004(a). While all of the terms and conditions set forth in section 1.5004 of the Commission's rules apply, we highlight the following provisions: (1) where a previously unapproved foreign-organized entity is inserted into the vertical ownership chain of a licensee, or its controlling U.S.-organized parent, without prior Commission approval, the licensee shall file a letter to the attention of the Chief, Media Bureau, within 30 days after the insertion of the new, foreign-organized entity; (2) a licensee that has received a foreign ownership ruling, including a U.S.-organized successor-in-interest to such licensee as part of reorganization, or any subsidiary or affiliate relying on such licensee's ruling, shall file a new petition for declaratory ruling under § 1.5000 to obtain Commission approval before its foreign ownership exceeds the routine terms and conditions of this section, and/or any specific terms of conditions of its rulings; and (3) if at any time the licensee, including any successor-in interest and any subsidiary or affiliate knows, or has reason to know, that it is no longer in compliance with its foreign ownership rulings or the Commission's rules relating to foreign ownership, it shall file a statement with the Commission explaining the circumstances within 30 days of the date it knew, or had reason to know, that it was no longer in compliance.

[127] LOA; *see supra* para. 2.

[128] *See* 47 CFR § 1.5001(i)(4).

[129] 47 CFR § 1.5004(a)(1).

that it was no longer in compliance.[130] A failure to meet a condition of this Declaratory Ruling may result in monetary sanctions or other enforcement action by the Commission for such non-compliance, including an order requiring divestiture of the foreign investment.[131]

## V. ORDERING CLAUSES

33. Accordingly, **IT IS ORDERED** that, pursuant to section 310(b)(4) of the Communications Act of 1934, as amended, 47 U.S.C. § 310(b)(4), and sections 1.5001 through 1.5004 of the Commission's rules, 47 CFR §§ 1.5001-04, and pursuant to authority delegated to the Media Bureau in sections 0.61 and 0.283 of the Commission's rules, 47 CFR §§ 0.61, 0.283, the Petition for Declaratory Ruling filed by Paramount Global **IS GRANTED** as specified and subject to the conditions specified herein.

34. **IT IS FURTHER ORDERED**, pursuant to sections 4(i) and (j), and 310(b)(4) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i)(j), 310(b)(4), and sections 1.5001 through 1.5004 of the Commission's rules, 47 CFR §§ 1.5001-04, and pursuant to authority delegated to the Media Bureau in sections 0.61 and 0.283 of the Commission's rules, that the opposing comments filed by the commenters listed in Appendix A, **ARE DENIED**.

35. **IT IS FURTHER ORDERED** that this Declaratory Ruling **SHALL BE EFFECTIVE** upon release.

FEDERAL COMMUNICATIONS COMMISSION

David Brown
Chief, Video Division
Media Bureau

[130] *See* 47 CFR § 1.5004(f)(1). If, for example, a foreign individual or entity should directly or indirectly invest in Paramount above the percentages approved herein without Commission approval, Paramount is obligated to follow the steps set out in 47 CFR § 1.5004(f). Subsequent actions taken by or on behalf of Paramount to remedy non-compliance shall not relieve it of the obligation to notify the Commission of the circumstances (including duration) of non-compliance.

[131] 47 CFR § 1.5004(f).

**Attachment**

**Paramount Licensees**

| Call Sign | Facility ID No. | Community of License | Licensee |
|---|---|---|---|
| WUPA | 6900 | Atlanta, GA | Atlanta Television Station WUPA Inc. |
| KCBS-TV | 9628 | Los Angeles, CA | CBS Broadcasting Inc. |
| KDKA-TV | 25454 | Pittsburgh, PA | CBS Broadcasting Inc. |
| KPIX-TV | 25452 | San Francisco, CA | CBS Broadcasting Inc. |
| KYW-TV | 25453 | Philadelphia, PA | CBS Broadcasting Inc. |
| WBBM-TV | 9617 | Chicago, IL | CBS Broadcasting Inc. |
| WCBS-TV | 9610 | New York, NY | CBS Broadcasting Inc. |
| WCCO-TV | 9629 | Minneapolis, MN | CBS Broadcasting Inc. |
| KCCW-TV | 9640 | Walker, MN | CBS Broadcasting Inc. |
| WWJ-TV | 72123 | Detroit, MI | CBS Broadcasting Inc. |
| WLNY-TV | 73206 | Riverhead, NY | CBS LITV LLC |
| WBXI-CD | 70416 | Indianapolis, IN | CBS Mass Media Corporation |
| WTOG | 74112 | St. Petersburg, FL | CBS Operations Investments Inc. |
| W26DP-D | 74116 | Inverness, FL | CBS Operations Investments Inc. |
| W36FJ-D | 74113 | Sebring, FL | CBS Operations Investments Inc. |
| KTVT | 23422 | Fort Worth, TX | CBS Stations Group of Texas LLC |
| WBZ-TV | 25456 | Boston, MA | CBS Television Licenses LLC |
| WJZ-TV | 25455 | Baltimore, MD | CBS Television Licenses LLC |
| WSBK-TV | 73982 | Boston, MA | CBS Television Licenses LLC |
| WFOR-TV | 47902 | Miami, FL | CBS Television Licenses LLC |
| KCNC-TV | 47903 | Denver, CO | CBS Television Stations Inc. |
| WKBD-TV | 51570 | Detroit, MI | Detroit Television Station WKBD Inc. |
| KCAL-TV | 21422 | Los Angeles, CA | Los Angeles Television Station KCAL LLC |
| WBFS-TV | 12497 | Miami, FL | Miami Television Station WBFS Inc. |
| WPSG | 12499 | Philadelphia, PA | Philadelphia Television Station WPSG, Inc. |

| Call Sign | Facility ID No. | Community of License | Licensee |
|---|---|---|---|
| WPKD-TV | 69880 | Jeannette, PA | Pittsburgh Television Station WPCW Inc. |
| KMAX-TV | 51499 | Sacramento, CA | Sacramento Television Stations, Inc. |
| KOVR | 56550 | Stockton, CA | Sacramento Television Stations, Inc. |
| KPYX | 69619 | San Francisco, CA | San Francisco Television Station KBCW Inc. |
| KTXA | 51517 | Fort Worth, TX | Television Station KTXA Inc. |
| KSTW | 23428 | Tacoma, WA | The CW Television Stations Inc. |

**APPENDIX A**

**List of Commenters**

PRESSPAGE ENTERTAINMENT INC
Collin Hotchkiss
Ron Beres
Aidan Gordon
Patrick O. Ingle
W. Lee McVey, PE
Zachary Beaudoin
Chad Ray
Franklin Broadcasting LP
Free Press
LiveVideo.AI Corp.
Austin Olachea

# EXHIBIT C

Letter of Agreement, TT 26-006 (dated Sept. 4, 2026), executed for Paramount Global, as filed by NTIA in MB Docket No. 26-93 on Sept. 17, 2026 (ECFS No. 26110076883) (complete)

Paramount
A SKYDANCE CORPORATION

September 4, 2026

Chief, Foreign Investment Review Section ("FIRS")
Deputy Chief, Compliance and Enforcement (FIRS)
On Behalf of the Assistant Attorney General for National Security
United States Department of Justice
National Security Division
175 N Street NE
Washington, DC 20530
Compliance.Telecom@usdoj.gov

Subject: FCC MB Docket No. 26-93 (TT 26-006)
Petition for Declaratory Ruling by Paramount Global pursuant to
Section 310(b)(4) of the Communications Act of 1934, as amended

Dear Sir/Madam:

This Letter of Agreement ("LOA" or "Agreement") sets forth the commitments that Paramount Global ("Paramount") make to the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector (the "Committee") and the U.S. Department of Justice ("DOJ" or the "Compliance Monitoring Agency" or "CMA")[1] to address national security and law enforcement risks arising from the above-referenced Petition.[2] In this Petition, Paramount seeks a declaratory ruling from the Federal Communications Commission ("FCC" or "Commission") to allow Paramount to accept indirect foreign equity and voting interests in excess of the 25% benchmarks set forth in section 310(b)(4) of the Communications Act of 1934, as amended.[3] Paramount further requests that the Commission grant specific approval for certain foreign investors to indirectly hold equity and/or deemed voting interests of greater than 5% in Paramount, and grant advance approval for the non-

[1] DOJ includes the Federal Bureau of Investigation ("FBI").

[2] Petition for Declaratory Ruling of Paramount Global, MB Docket No. 26-93 (filed Apr. 24, 2026) ("Paramount Petition").

[3] 47 U.S.C. § 310(b)(4).

controlling prospective foreign investors to increase their indirect equity and/or voting interests up to 20% in Paramount.[4]

Paramount certifies as true and correct, under penalties outlined in 18 U.S.C. § 1001, all statements Paramount or its representatives have made to the Committee, DOJ, U.S. Department of Homeland Security, Department of War, and the FCC in the course of the review of the above-referenced petition that was conducted pursuant to Executive Order 13913,[5] and it hereby adopts those statements as the basis for this LOA. Paramount acknowledges that nothing in this LOA obviates or otherwise modifies any other legal obligation or requirement that Paramount may have to any governmental or regulatory agency, including but in not limited to, obligations to comply with the Foreign Agents Registration Act, 22 U.S.C. § 611 et seq., and implementing regulations.

**<u>Definitions</u>**

1) For purposes of this LOA, the following definitions apply:

   a. "Access" means: (1) to enter a location; or (2) to obtain, read, copy, edit, divert, release, affect, alter the state of, or otherwise view data or systems in any form, including through information technology ("IT") systems, cloud computing platforms, networks, security systems, and equipment (software and hardware). For the avoidance of doubt, Access shall be construed broadly to include rather than exclude considered conduct.

   b. "Closing Date" refers to the closing date of the merger between Paramount Skydance and Warner Bros. Discovery, Inc. ("WBD").

   c. "Foreign Investors" are those foreign investors for which specific and advanced approval was requested in the Paramount Petition.[6]

   d. "Other Non-Anonymized Data" means other information that is collected, stored and/or used by Paramount or a Service Provider when linked to specific individuals, including registered user data, device-level data, race, gender, religion, age, political party, marital status, affinities, geolocation data, geographical indicators, social media account information, employment information, financial information, usage information, and payment information of such specific individuals.

---

[4] *Paramount Global Seeks Foreign Ownership Declaratory Ruling Pursuant to Section 310(b)(4) of the Communications Act of 1934, as amended*, MB Docket No. 26-93, Public Notice, DA 26-411 (MB Apr. 27, 2026) ("*Paramount Public Notice*") *citing* Paramount Petition at 16-17.

[5] Exec. Order No. 13913, 85 Fed. Reg. 19643 (Apr. 4, 2020). The Media Bureau of the FCC referred the Paramount Petition to the Committee for its reviews on any national security, law enforcement, foreign policy, or trade policy concerns related to the foreign ownership of Paramount. *Paramount Public Notice* at 4-5.

[6] *See* Paramount Petition at 16-17.

e. "Paramount's U.S. Person Data" means the U.S. Person Personally Identifiable Information, Other Non-Anonymized Data, Anonymized Data, and Sensitive Personal Data Paramount collects, uses, processes, or maintains, either directly or through its subsidiaries (including but not limited to WBD), affiliates, or Service Providers. For the avoidance of doubt, any device-level data associated with the account of the U.S. Person logged in on that device is considered U.S. Person Data.

f. "Personally Identifiable Information" or "PII" means any information that uniquely identifies and correlates to a natural person or can be used to distinguish or trace a natural person's identity, alone, including a natural person's name, social security number, or biometric records, or when combined with other personal or identifying information that is linked or linkable to a specific individual, including date and place of birth, or parent's surname.

g. "Sensitive Personal Data" means sensitive personal data as set forth in 31 CFR § 800.241.

h. "Service Provider" means any unaffiliated company that collects, uses, processes, secures, or maintains Paramount's U.S. Person Data at the direction of Paramount.

**<u>Specific Commitments</u>**

2) Paramount shall notify the CMA(s) of the closing within **two calendar days** of the Closing Date.

3) Paramount agrees to take all appropriate measures to prevent unauthorized Access to or unlawful use of Paramount's U.S. Person Data, and to prevent the unauthorized disclosure of information relating to Paramount's U.S. Person Data.

4) Within **90 days** of the Closing Date, Paramount agrees to provide copies of the security policies and plans ("Policies and Plans") that will be used to safeguard Paramount's U.S. Person Data after the Closing Date to the CMA(s) for objection or non-objection. The CMA(s) will object or non-object within **60 days** of receipt of Paramount's submission.

5) Paramount agrees to make modifications to the Policies and Plans if necessary to address the CMA(s) concerns and resolve an objection.

6) Paramount agrees that it will update the Policies and Plans when appropriate to conform with evolving security best practices.

7) Paramount affirms each of the Foreign Investor's interest in Paramount will consist entirely of non-voting stock without any governance or information rights, and the

Foreign Investors will not have any influence, direction, or control over or provide any commentary or guidance on Paramount's content decisions, company management, or have any Access to Paramount's non-public U.S. Person Data. Paramount further affirms that in the event it proposes to change any voting, governance or information rights of the Foreign Investors, it will seek prior approval from the FCC through a new petition for declaratory ruling, and acknowledges that that such new petition could be subject to a referral to the Committee.

**General Provisions**

8) Paramount agrees that this LOA is binding upon, and inures to the benefit of, Paramount and its respective successors and assigns. For purposes of this LOA, successors and assigns include any corporate name changes. Paramount may not assign any obligation under this LOA without the prior written consent of the CMA(s).

9) Paramount agrees that the Committee, at its sole discretion, may make non-substantive administrative updates to the LOA to add, modify, or remove the compliance monitoring agencies monitoring this LOA.

10) Paramount also agrees that the Committee may decide in its sole discretion to make non-substantive administrative updates to the LOA, to account for changes in 1) corporate ownership, mergers and acquisitions, structure, names, and license numbers; and 2) Committee structure.

11) If the CMA(s) finds that the terms of this LOA are inadequate to resolve any national security or law enforcement risks, Paramount agrees to resolve those concerns, according deference to the CMA(s)'s views on the need for modification. If new or additional national security or law enforcement risks develop with respect to the policies that have received the CMA(s)'s prior non-objection under this LOA, Paramount similarly agrees to resolve the CMA(s)'s concerns to the CMA(s)'s satisfaction. Rejection of a proposed modification shall not alone be dispositive, but failure to resolve national security or law enforcement concerns may result in a request that the FCC modify, condition, revoke, cancel, terminate, or render null and void any relevant license, permit, or other authorization granted by the FCC to Paramount or its successors-in-interest, or any other appropriate enforcement action required to address the concern.

12) Paramount agrees that in the event that Paramount breaches the commitments set forth in this LOA, to include conduct contrary to timely CMA objection to any notice submitted pursuant to this LOA, a recommendation may be made that the FCC modify, condition, revoke, cancel, enter other declaratory relief, or render null and void any relevant license, permit, or other authorization granted by the FCC to Paramount or its successors-in-interest, in addition to pursuing any other remedy available by law or equity.

13) For purposes of counting days in this LOA, the day of the event that triggers the period is excluded, but every day thereafter is counted, including intermediate Saturdays, Sundays,

and legal holidays. If the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.

14) The time period dictated in any non-objection, consent, or approval provision applicable to the CMA(s) pursuant to this LOA shall be tolled during a lapse in appropriations or any time when the Federal government in the greater Washington, D.C. area is closed.

15) Paramount agrees to permit disclosure of information submitted to the FCC in confidence pursuant to 47 CFR § 0.442 to Federal government departments, agencies, and offices whose principals are listed in Section 3 of Executive Order 13913.

16) Paramount understands that if the CMA(s), with non-objection from the Committee, finds the national security and law enforcement risks associated with this Petition have decreased such that they no longer warrant mitigation, the Committee may terminate this LOA by notice to the FCC. Paramount further understands that even after such a termination, under Section 6 of Executive Order 13913, the Committee may conduct a license review for additional or new risks to U.S. national security and law enforcement interests at any time. Termination of a mitigation agreement does not relieve Paramount from liability for any breach of this LOA occurring while it was in effect.

17) This Agreement shall become effective for compliance purposes on the date of the FCC approval of the above-captioned Petition.

*For Paramount Global:*

Signed by:
Makan Delrahim
B7A7BC211B3E49C...

Makan Delrahim
Chief Legal Officer of Paramount Skydance Corporation
Paramount Global

# EXHIBIT D

*California v. Paramount Skydance Corp.*, No. 4:26-cv-07116-AMO (N.D. Cal.): ECF No. 170, Stipulation and Order Not to Close (July 24, 2026) (complete, 11 pages, as reproduced in this Court at Doc. #2185379, pp. 10–20); and ECF No. 266, Order Granting Joint Motion to Enter Consent Decree and Dissolve Order Not to Close (Sept. 30, 2026) (complete)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| THE STATE OF CALIFORNIA, *et al.*,<br>*Plaintiffs*,<br>v.<br>PARAMOUNT SKYDANCE CORP. *et. al.*,<br>*Defendants*. | Case No. 4:26-cv-7116-AMO<br>Case No. 4:26-cv-7212-AMO<br><br>**STIPULATION AND [~~PROPOSED~~] ORDER NOT TO CLOSE** |
| WRITERS GUILD OF AMERICA, WEST., INC., *et al.*,<br>*Plaintiffs*,<br>v.<br>PARAMOUNT SKYDANCE CORP., *et. al.*,<br>*Defendants*. | |



EM-034

WHEREAS, on July 13, 2026, Plaintiffs the State of California, the State of Arizona, the State of Colorado, the State of Connecticut, the Commonwealth of Massachusetts, the State of Minnesota, the State of Nevada, the State of New Jersey, the State of New Mexico, the State of New York, the State of Oregon, and the State of Washington (collectively, the "Plaintiff States") filed the action, *The State of California v. Paramount Skydance Corp.*, 4:26-cv-7116-AMO (*State of California)*, seeking to permanently enjoin Defendant Paramount Skydance Corporation's ("Paramount") acquisition of Defendant Warner Bros. Discovery Inc. ("Warner Bros.") (the "Transaction"), as a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. Plaintiff States further moved for a temporary restraining order to temporarily enjoin the transaction. (Dkt. No. 27).

WHEREAS, on July 14, 2026, Plaintiffs Writers Guild of America, West, Inc., and Writers Guild of America, East, Inc., (collectively, the "WGA Plaintiffs") filed the action, *Writers Guild of America, West, Inc. v. Paramount Skydance Corp.*, 4:26-cv-7212-AMO (*Writers Guild*), also seeking to permanently enjoin the Transaction as a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

WHEREAS, on July 20, 2026, the Court granted Plaintiff States' motion for a temporary restraining order in the *State of California* matter, issued the operative temporary restraining order temporarily enjoining the Transaction, and set a briefing schedule on a motion for preliminary injunction to be heard on August 3, 2026. (Dkt. No. 141).

WHEREAS, on July 22, 2026, the WGA Plaintiffs filed a motion for preliminary injunction (Dkt. No. 58), as well as a motion to shorten time on the motion for preliminary injunction seeking to align the motion for preliminary injunction briefing in *Writers Guild* with the motion for preliminary injunction briefing in *State of California*. (Dkt. No. 60).

WHEREAS, on July 23, 2026, the Court issued an Order re Scheduling and Extending Temporary Restraining Order in *State of California* (Dkt. No. 166) and Order re Scheduling in *Writers Guild* (Dkt. No. 63), aligning the briefing schedule on the motions for preliminary injunction in both matters, finding good cause to extend the temporary restraining order to August 17, 2026, and ordering the parties to meet and confer to reach consensus on the path forward in resolving the two motions for preliminary injunction.

WHEREAS, on July 23, 2026, and July 24, 2026, the parties met and conferred to discuss the scheduling of these matters.

THEREFORE, IT IS HEREBY STIPULATED by the parties through their respective counsel, that:

1. The transaction at issue in *State of California* and *Writers Guild* shall not close, be consummated, or otherwise be completed and Defendants will not take any steps, directly or indirectly, to integrate or consolidate their operations pursuant to the Transaction until the earlier of (1) five days after the merits determination in these matters, or (2) June 1, 2027. This stipulation and order extends to Defendants' agents, officers, servants, employees, attorneys, and other persons who are in active concert or participation with Defendants.

2. The briefing deadlines and August 3, 2026 hearing date for Plaintiff States' motion for preliminary injunction are cancelled. The WGA Plaintiffs' motion for preliminary injunction is withdrawn. Plaintiff States and WGA Plaintiffs will be permitted to file motions for preliminary injunction orders, if necessary, at a later date.

3. This stipulation shall not waive or modify any rights, schedules, or deadlines of any party relating to any post-judgment appeal, including any injunctive relief pending appeal.

4. This stipulation is without prejudice to any party's claims, defenses, arguments, or positions in this action.

5. The parties will submit a joint statement in each of their respective cases regarding the scheduling of the trial in each matter by Friday, July 31, 2026.

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

By: /s/ Jeffrey L. Kessler
Jeffrey L. Kessler (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
Matthew R. DalSanto (SBN 282458)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1469
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com
matthew.dalsanto@winstontaylor.com

Conor A. Reidy (*pro hac vice*)
Kevin B. Goldstein (*pro hac vice*)
**WINSTON TAYLOR LLP**
300 N. LaSalle Drive
Chicago, IL 60654-3406
Telephone: (312) 558-7542
Facsimile: (312) 558-5700
conor.reidy@winstontaylor.com
kevin.goldstein@winstontaylor.com

Matthew R. Huppert (*pro hac vice*)
**WINSTON TAYLOR LLP**
1901 L Street NW
Washington, DC 20036-3506
Telephone: (202) 282-5004
Facsimile: (202) 282-5100
matt.huppert@winstontaylor.com

Marguerite Sullivan (*pro hac vice pending*)
Christopher J. Brown (*pro hac vice pending*)
**LATHAM & WATKINS LLP**
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
marguerite.sullivan@lw.com
christopher.brown@lw.com

*Attorneys for Defendant Paramount Skydance Corporation.*

By: /s/ Daniel M. Petrocelli
Daniel M. Petrocelli (SBN 97802)

FOR PLAINTIFF STATE OF CALIFORNIA:

ROB BONTA
Attorney General of California

By: /s/ Ashley Kaplan

PAULA L. BLIZZARD (SBN 207920)
**Senior Assistant Attorney General**
NATALIE S. MANZO (SBN 155655)
BRENT K. NAKAMURA (SBN 283572)
**Supervising Deputy Attorneys General**
DANIEL D. AMBAR (SBN 278853)
WINSTON H. CHEN (SBN 166959)
MATTHEW E. DELGADO (SBN 306999)
NICOLE S. GORDON (SBN 224138)
JENNIFER K. HANE (SBN 275729)
ASHLEY KAPLAN (SBN 293443)
CASEY KOVARIK (SBN 348032)
DIVYA B. RAO (SBN 292853)
**Deputy Attorneys General**
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6153
Fax: (916) 731-3637
Email: Daniel.Ambar@doj.ca.gov

RICHARD PARKER (SBN 62356)
JAMES WEINGARTEN (*pro hac vice*)
ADAM DI VINCENZO (*pro hac vice*)
GRANT BERMANN (*pro hac vice*)
ANASTASIA PASTAN (*pro hac vice*)
JULIA MAY (*pro hac vice*)
NATALIE NOGUEIRA (*pro hac vice*)
ALLISON CHESKY (*pro hac vice*)
**MILBANK LLP**
1101 New York Ave. NW
Washington, DC 20005
Telephone: (202) 835-7525
Email: jweingarten@milbank.com

KELLY D. GARCIA (*pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5871
Email: kgarcia@milbank.com

*Attorneys for Plaintiff State of California.*

FOR PLAINTIFF STATE OF ARIZONA:

KRISTIN K. MAYES

**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779
dpetrocelli@omm.com

Peter C. Herrick (*pro hac vice*)
**O'MELVENY & MYERS LLP**
1301 Avenue of the Americas, Suite 1700
New York, NY 10019-6022
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
pherrick@omm.com

Julia A. Schiller (*pro hac vice*)
**O'MELVENY & MYERS LLP**
1625 Eye Street NW
Washington, DC 20006-4061
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
jschiller@omm.com

Derek Ludwin (*pro hac vice)*
Henry Liu (*pro hac vice)*
Ross A. Demain (*pro hac vice)*
**COVINGTON & BURLING LLP**
One CityCenter
850 10th Street NW
Washington, DC 20001
Telephone: (202) 662-6000
dludwin@cov.com
hliu@cov.com
rdemain@cov.com

Bernard A. Nigro Jr. (*pro hac vice*)
Kathleen S. O'Neill (*pro hac vice*)
**FRIED FRANK HARRIS SHRIVER & JACOBSON LLP**
801 17th Street NW
Washington, DC 20006
Telephone: (202) 639-7000
Facsimile: (202) 639-7003
barry.nigro@friedfrank.com
kathy.oneill@friedfrank.com

*Attorneys for Defendant Warner Bros. Discovery, Inc.*

Attorney General of Arizona

*/s/ Allison Weber*

ROBERT A. BERNHEIM (*pro hac vice*)
Unit Chief Counsel
SARAH PELTON (*pro hac vice*)
ALLISON WEBER (*pro hac vice*)
Assistant Attorneys General
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Email: consumer@azag.gov

*Attorneys for Plaintiff State of Arizona*

FOR PLAINTIFF STATE OF COLORADO:

PHILIP J. WEISER
Attorney General of Colorado

*/s/ Bryn A. Williams*

BRYN A. WILLIAMS (SBN 301699)
First Assistant Attorney General
AMY BOWLES (*pro hac vice*)
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Bryn.Williams@coag.gov
Amy.Bowles@coag.gov

*Attorneys for Plaintiff State of Colorado*

FOR PLAINTIFF STATE OF CONNECTICUT:

WILLIAM TONG
Attorney General of Connecticut

NICOLE DEMERS (*pro hac vice* forthcoming)
Deputy Associate Attorney General

*/s/ Julián A. Quiñones Reyes*

JULIÁN A. QUIÑONES REYES (*pro hac vice*)
FRANKLIN KANIN (*pro hac vice* forthcoming)
Assistant Attorneys General
Office of the Connecticut Attorney General
165 Capitol Avenue
Hartford, CT 06106
Telephone: (860) 808-5030
Email: Franklin.Kanin@ct.gov

*Attorneys for Plaintiff State of Connecticut*

FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS:

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

*<u>/s/ Anthony W. Mariano</u>*

ANTHONY W. MARIANO (*pro hac vice*)
Chief, Antitrust Division
WILLIAM L. TWOMEY (*pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (781) 835-7990
Email: Anthony.Mariano@mass.gov
William.Twomey@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

FOR PLAINTIFF STATE OF MINNESOTA:

KEITH ELLISON
Attorney General of Minnesota

*<u>/s/ Jon M. Woodruff</u>*

JAMES W. CANADAY (SBN 368825)
Deputy Attorney General
ELIZABETH ODETTE (*pro hac vice* forthcoming)
Antitrust Division Manager
Assistant Attorney General
JON M. WOODRUFF (*pro hac vice*)
Assistant Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101-2130
Telephone: (651) 300-7425
Fax: (651) 296-9663
Email: Jon.Woodruff@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General of Nevada

ERNEST D. FIGUEROA

Consumer Advocate

*/s/ Samantha B. Feeley*

SAMANTHA B. FEELEY (NV Bar No. 14034)
(*pro hac vice*)
Senior Deputy Attorney General
Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701
Tel: (775) 684-1100
Email: sfeeley@ag.nv.gov

*Attorney for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NEW JERSEY:

JENNIFER DAVENPORT
Attorney General of New Jersey

*/s/ Ana Atta-Alla*

ANA ATTA-ALLA (*pro hac vice*)
Deputy Attorney General
State of New Jersey
Office of the Attorney General
Division of Law
124 Halsey Street – 5th Floor
Newark, NJ 07102
Telephone: (973) 648-6835
Email: Ana.Atta-Alla@law.njoag.gov

*Attorneys for Plaintiff State of New Jersey*

FOR PLAINTIFF STATE OF NEW MEXICO:

RAÚL TORREZ
Attorney General of New Mexico

*/s/ Amanda Butler*

AMANDA BUTLER (*pro hac vice*)
Senior Counsel
KALISTA M. WILSON (*pro hac vice* forthcoming)
Assistant Attorney General
408 Galisteo St.
Santa Fe, NM 87501
Telephone: (505) 490-4060
Fax: (505) 318-1050
Email: KWilson@nmdoj.gov

*Attorneys for Plaintiff State of New Mexico*

FOR PLAINTIFF STATE OF NEW YORK:

LETITIA JAMES
Attorney General of New York

/s/ Elinor R. Hoffmann

ELINOR R. HOFFMANN (*pro hac vice*)
Chief, Antitrust Bureau
AMY MCFARLANE (*pro hac vice*)
Deputy Chief, Antitrust Bureau
PRATIK AGARWAL (*pro hac vice*)
MORGAN FEDER (*pro hac vice*)
C. WILLIAM MARGRABE (*pro hac vice*)
Assistant Attorneys General
JAYA MANTOVANI (*pro hac vice*)
Attorney General Fellow
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8269
Email: Elinor.Hoffman@ag.ny.gov

*Attorneys for Plaintiff State of New York*

FOR PLAINTIFF STATE OF OREGON:

DAN RAYFIELD
Attorney General of Oregon

/s/ Ian Van Loh

TIMOTHY D. SMITH (*pro hac vice*)
Attorney-in-Charge
IAN VAN LOH (SBN 280254)
ALEX DELORENZO (*pro hac vice*)
Senior Assistant Attorneys General
Economic Justice Section
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
Telephone: (503) 798-3297
Telephone: (971) 239-7457
Telephone: (503) 428-9482
Email: tim.smith@doj.oregon.gov
Email: ian.vanloh@doj.oregon.gov
Email: alex.delorenzo@doj.oregon.gov

*Attorneys for Plaintiff State of Oregon*

FOR PLAINTIFF STATE OF WASHINGTON:

NICHOLAS W. BROWN
Attorney General of Washington

*/s/ Christina M. Black*

JONATHAN A. MARK (*pro hac vice*)
Division Chief, Antitrust Division
CHRISTINA M. BLACK (SBN 300081)
BROOKE H. LOVROVICH (*pro hac vice*)
Assistant Attorneys General
800 Fifth Avenue, Suite 200
Seattle, WA 98104-3188
Telephone: (206) 464-7744
Fax: (206) 464-6451
Email: Jonathan.Mark@atg.wa.gov
Christina.Black@atg.wa.gov
Brooke.Lovrovich@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

By: */s/ Kellie Lerner*
KELLIE LERNER (*pro hac vice*)
ELLISON A. SNIDER (*pro hac vice*)
BENJAMIN B. ALLEN (*pro hac vice*)
**SHINDER CANTOR LERNER LLP**
14 Penn Plaza, Suite 1900
New York, NY 10122
Telephone: (646) 960-8601
kellie@scl-llp.com
esnider@scl-llp.com
ballen@scl-llp.com

J. WYATT FORE (*pro hac vice*)
**SHINDER CANTOR LERNER LLP**
600 14th Street, NW
Washington, D.C. 20005
Telephone: (646) 960-8632
wyatt@scl-llp.com

DAVID C. BROWNSTEIN (SBN: 141929)
DAVID M. GOLDSTEIN (SBN: 142334)
**FARMER BROWNSTEIN JAEGER GOLDSTEIN SIEGEL & SHEPARD LLP**
155 Montgomery Street, Suite 301 San Francisco, CA 94104-2733
Telephone: (415) 962-2873
dbrownstein@fbjgss.com
dgoldstein@fbjgss.com

CHARLES J. LADUCA (*pro hac vice*)
N. SLADE BOND II (*pro hac vice*)
**CUNEO GILBERT FLANNERY & LADUCA, LLP**
2445 M Street, NW Suite 740
Washington, D.C. 20037

Telephone: (202) 789-3960
sbond@cuneolaw.com

SARAH ROONEY (*pro hac vice*)
**CUNEO GILBERT FLANNERY & LADUCA, LLP**
8705 Colesville Road
B. 133
Silver Spring, MD 20910
Telephone: (301) 518-7428
srooney@cuneolaw.com

MICHAEL J. FLANNERY (SBN: 196266)
**CUNEO GILBERT FLANNERY & LADUCA, LLP**
Two CityPlace Drive
St. Louis, MO 63141
Telephone: (314) 226-1015
mflannery@cuneolaw.com

MATTHEW J. PLATKIN (*pro hac vice*)
AARON HAIER (*pro hac vice*)
**PLATKIN LLP**
413 Washington Avenue, Unit 174
Belleville, NJ 07109
Telephone: (973) 561-1951
mplatkin@platkinllp.com
ahaier@platkinllp.com
*Attorneys for Plaintiffs the Writers Guild of America, West, Inc., and the Writers Guild of America East Inc.*

**PURSUANT TO STIPULATION,** the transaction at issue in State of California and Writers Guild shall not close, be consummated, or otherwise be completed and Defendants will not take any steps, directly or indirectly, to integrate or consolidate their operations pursuant to the transaction until the earlier of (1) five days after the merits determination in these matters, or (2) June 1, 2027. This stipulation and order extend to Defendants' agents, officers, servants, employees, attorneys, and other persons who are in active concert or participation with Defendants.

**IT IS SO ORDERED.**

Dated: July 24, 2026

ARACELI MARTÍNEZ-OLGUÍN
**United States District Judge**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE STATE OF CALIFORNIA, et al.,<br>Plaintiffs,<br>v.<br>PARAMOUNT SKYDANCE CORPORATION, et al.,<br>Defendants. | Case No. 26-cv-07116-AMO<br>**ORDER GRANTING JOINT MOTION TO ENTER CONSENT DECREE**<br>Re: Dkt. No. 243 |

This Order assumes familiarity with the facts and procedural history of this antitrust case brought by twelve state Attorneys General challenging the proposed merger between two major media corporations. Before the Court is a joint motion to enter a consent decree. The motion additionally requests that the Court dissolve the stipulation and order not to close. The Court **GRANTS** the joint motion for the following reasons.

It is well-settled that the Court may approve a consent decree if it determines that "it is fair, reasonable and equitable and does not violate the law or public policy." *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 672 F.3d 1160, 1165 (9th Cir. 2012). The Court must independently scrutinize the proposed consent decree's terms, and "eschew any rubber stamp approval." *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 747 (9th Cir. 1995). Indeed, "a federal court is more than a recorder of contracts from whom parties can purchase injunctions; it is an organ of government constituted to make judicial decisions." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986). "However, a consent decree need not impose all the obligations authorized by law." *United States v. State of Oregon*, 913 F.2d 576, 581 (9th Cir. 1990) (citing *Local 93*, 478 U.S. at 522-23). "Rather, the court's approval is nothing more than an amalgam of delicate balancing, gross approximations and rough

United States District Court
Northern District of California

justice. The court need only be satisfied that the decree represents a reasonable factual and legal determination." *Oregon*, 913 F.2d at 581 (internal quotation marks & citations omitted).

Here, the Court finds the proposed consent decree represents a reasonable factual and legal resolution of the dispute. The parties' proposed consent decree falls within the scope of the case made by the pleadings. Plaintiffs advance three U.S. markets for antitrust purposes: (1) distribution of wide-release theatrical films, (2) distribution of top-grossing theatrical films, and (3) licensing of basic cable channels to distributors. *See* Compl. ¶ 36. The parties' proposed production, distribution, and funding of films, including particular provisions for "tentpole" and "independent" films, ostensibly addresses potential harms to the first two markets by requiring certain minimum thresholds of investment and release of domestic films. And the parties' proposed requirements for continued, separate negotiations of distribution for the two entities' basic cable holdings addresses concerns related to the third market. The proposed consent decree imposes these requirements and includes important backstops requiring divestment of studios and/or cable channels in case of the combined entity's failure to comply with the proposed consent decree's terms. Further, the proposed consent decree imposes these requirements on film distribution and basic cable negotiations in the midst of a rapidly-changing marketplace. The Court therefore finds that the proposed consent decree reflects a settlement between the parties that is a fair, reasonable, and good faith approach to address the competitive harms alleged in the Complaint, and does not violate the law or public policy.[1]

Further, the Court finds the proposed settlement agreement reflects a procedurally sound resolution. The parties reached their agreement following highly contested, however brief, litigation, and they reached their agreement following what they report to have been several rounds of in-depth negotiations. Importantly, the participation of twelve state attorneys general

---

[1] Though amici aver that the "News Editorial Independence Board" risks violating the First Amendment by embroiling the Plaintiff States and/or the Court in enforcement of press standards, Dkt. Nos. 259 & 60, the Court disagrees. The proposed consent decree governs the News Editorial Independence Board's creation and structure, not its speech, which is substantively different than several of the cases regarding compelled speech cited by amici. *See* Dkt. No. 260 at 8 (citing *NRA of Am. v. Vullo*, 602 U.S. 175, 189 (2024); *Moody v. NetChoice, LLC*, 603 U.S. 707, 727 (2024)). Accordingly, the Court does not find that the News Editorial Independence Board provision renders the proposed consent decree contrary to law.

supports a finding of fairness. *See Moreno v. San Francisco Bay Area Rapid Transit Dist.*, Case No. 17-cv-02911-JSC, 2019 WL 343472, at *5 (N.D. Cal. Jan. 28, 2019) (recognizing that a government agency's participation in seeking a consent decree "weighs in favor of approving the settlement"); *S.E.C. v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984) ("[C]ourts should pay deference to the judgment of the government agency which has negotiated and submitted the proposed judgment."). Particularly recognizing that these government officials assent to the consent decree and recognizing, as Defendants have repeated throughout the case, that antitrust regulators across the globe have cleared the transaction before now, the Court concludes the proposed consent decree was the product of procedural fairness.

Amici express dismay at many of the proposed consent decree's provisions. *See* Dkt. Nos. 259 & 260.[2] However, a proposed consent decree like this one represents a negotiated settlement that does not fully remediate an alleged violation or even necessarily resolve the ultimate factual and legal issues of a case. As the Supreme Court has described,

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with litigation . . . . [T]he parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve.

*United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971); *see also Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982) (quoting same).

Here, the Court recognizes that this proposed consent decree reflects a compromise of the claims short of full adjudication – compromise that may leave some dissatisfaction for both sides and the public but a compromise that saves the risk, time, and expense of litigating through trial. The potential for greater investment in "documentaries and other nonfiction works, films by and

[2] The Court GRANTS the motion to amend/correct the amicus brief. Dkt. No. 261.

about Black and Latino communities, or other distinctive projects that might have been greenlit by one of two independently competing studios," Dkt. No. 259 at 5, and the concerns regarding news editorial independence, Dkt. No. 260 at 7-9, represent just some of the meaningful grounds for disappointment with the proposed consent decree. *See also* Dkt. No. 255 at 5 (letter from Sen. Cory A. Booker quoting a state Attorney General's statement that they were "deeply disappointed" they did not secure certain remedies in the proposed consent decree). But these hopes and desires for the proposed consent decree to reach farther – to achieve more – do not rise to the level of legal violations upon which the Court can reject the parties' negotiated resolution. "Unless a consent decree is unfair, inadequate, or unreasonable, it ought to be approved." *Randolph*, 736 F.2d at 529.

For the foregoing reasons, the Court **GRANTS** the parties' joint motion. The Court **DISSOLVES** the parties' stipulation and the Court's Order Not to Close, Dkt. No. 170, effective upon entry of this Order. In accordance with the parties' joint request, the Court will issue the consent decree as judgment and as a standalone docket entry.

**IT IS SO ORDERED.**

Dated: September 30, 2026

ARACELI MARTÍNEZ-OLGUÍN
**United States District Judge**