**Nos. 26-1257, 26-1176**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

LIVEVIDEO.AI CORP.,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

---

On Petition for Review of an Order of
the Federal Communications Commission's Media Bureau Video Division

---

**RESPONDENT FEDERAL COMMUNICATIONS COMMISSION'S OPPOSITION TO EMERGENCY MOTION FOR STAY AND MOTION TO DISMISS PETITION FOR REVIEW**

---

## INTRODUCTION

Petitioner LiveVideo.AI Corp. has filed a petition for review challenging a Sept. 17, 2026 declaratory ruling of the Federal Communications Commission's Media Bureau Video Division permitting foreign investors in Paramount to hold an indirect ownership interest in FCC licenses exceeding the 25% benchmarks established in section

310(b)(4) of the Communications Act. LiveVideo now asks for an administrative stay, a stay pending review, and expedited consideration. *LiveVideo v. FCC*, D.C. Cir. No. 26-1257 (*LiveVideo II*), ECF No. 2195868 at 1-2.[1] LiveVideo's emergency motions and its petition for review are baseless. This Court plainly lacks jurisdiction over a bureau-level order subject to an application for review before the agency. The stay motions should be denied, and the petition for review dismissed.

## BACKGROUND

### A. Statutory And Regulatory Background

"The Federal Communications Commission possesses broad statutory authority to regulate broadcast media 'as public convenience, interest, or necessity requires.'" *FCC v. Prometheus Radio Project*, 592 U.S. 414, 418 (2021) (quoting 47 U.S.C. § 303).

As relevant here, the Communications Act provides that "[n]o broadcast * * * license shall be granted to or held by * * * any corporation directly or indirectly controlled by any other corporation of which more than one-fourth of the capital stock is owned of record or voted by aliens,

---

1 LiveVideo has also filed an emergency stay motion in *LiveVideo.AI Corp. v. FCC*, D.C. Cir. No. 26-1176 (*LiveVideo I*). *See* ECF No. 2196191. As directed by this Court's Oct. 6 order in *LiveVideo I* (ECF No. 2196631), this opposition addresses both stay motions.

their representatives, or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country, if the Commission finds that the public interest will be served by the refusal or revocation of such license." 47 U.S.C. § 310(b)(4). In other words, the Act "bars possession of [broadcast] licenses where aliens hold more than twenty-five percent interest in a U.S.-organized entity * * *, but only if the Commission determines that refusing ownership would serve the public interest." *NTCH, Inc. v. FCC*, 841 F.3d 497, 500 (D.C. Cir. 2016).

Under the Commission's implementing rules, "[a] broadcast * * * licensee * * * shall file a petition for declaratory ruling to obtain Commission approval under section 310(b)(4) of the Act, and obtain such approval, before the aggregate foreign ownership of any controlling U.S. parent exceeds, directly and/or indirectly, 25 percent of the controlling U.S. parent's equity interests and/or 25 percent of its voting interests." 47 C.F.R. § 1.5000(a)(1).

## B. Factual and Procedural Background

### 1. LiveVideo's Serial Paramount Objections

LiveVideo has attempted to insert itself into several different Paramount transactions and regulatory proceedings in recent years.

In August 2024, claiming to be a "long time business partner" of Paramount Global, LiveVideo sued various Paramount stakeholders in the U.S. District Court for the Southern District of New York, seeking billions of dollars in damages for "tortious interference, unfair competition, Dodd Frank, and U.S.C. § 1030 violations." *See Livevideo.AI Corp v. Redstone et al.*, No. 1:24-cv-06290 (S.D.N.Y.) ECF No. 35. The district court determined that the claims were "frivolous," awarded sanctions "for the filing of dozens of baseless and procedurally improper motions," enjoined LiveVideo from further filing, and repeatedly referred its counsel, Alfred Camillo Constants III, to the court's grievance committee. *Id.*, Opinion and Order, ECF No. 211 at 1–3 (June 9, 2026). Undeterred, LiveVideo's vexatious filings continued, and the Southern District ultimately awarded sanctions and attorneys' fees to defendants and terminated the case. *Id.* at 9–10.

Meanwhile, claiming to be "a former business partner of Paramount and a competitor to Skydance and Paramount," LiveVideo opposed a broadcast license transfer between Paramount Global and Skydance Media that the FCC ultimately approved in July 2025. *In re Applications for Consent to the Transfer of Control of Paramount Glob.*, 2025 WL 3526328, at *4 (July 24, 2025) (Skydance Order). Despite articulating no

stake in the outcome of that proceeding, LiveVideo showered the agency with some 50 filings, including various petitions to deny transfer, for declaratory rulings; motions for document production, to enlarge the issues, and to re-open the record; along with numerous letters, correspondence, and other miscellaneous documents.[2] The Commission found that LiveVideo's submissions "fail[ed] from a lack of factual specificity and redressability," but nonetheless considered its objections and rejected them. Skydance Order ¶ 43. Even then, LiveVideo continued to make numerous filings in the license transfer proceeding, ultimately filing a petition for review and multiple motions for emergency relief that remain pending in this Court. *See LiveVideo I*, ECF Nos. 2180709, 2180914, 2196191.

As the Commission explained in its motion to dismiss *LiveVideo I*, this Court plainly lacks jurisdiction over that case because LiveVideo filed petitions for reconsideration challenging the license transfer approval that remain pending before the agency. *See id.*, ECF No. 2186123. And as the Commission repeatedly explained in opposition to LiveVideo's various motions in that matter, LiveVideo continues to

---

[2] https://www.fcc.gov/ecfs/search/search-filings/results?q=(proceedings.name:(%2224-275%22)).

conflate unrelated agency proceedings and distinct corporate transactions in its numerous filings. *See id.*, ECF No. 2182487 (opposition to emergency stay), 2190509 (opposition to motion to relate).

### 2. The Paramount Foreign Ownership Declaratory Ruling Proceeding

On April 27, 2026, Paramount asked the Commission to "find that it would serve the public interest to allow Paramount * * * to accept indirect foreign equity and voting interests in excess of the 25% benchmarks set forth in section 310(b)(4) of the [Communications] Act." *Paramount Glob. Seeks Foreign Ownership Declaratory Ruling Pursuant to Section 310(b)(4) of the Commc'ns Act of 1934*, *As Amended*, DA 26-411, 2026 WL 1284539, at *1 (Apr. 27, 2026).

"Pursuant to Commission practice," the FCC referred Paramount's request "to relevant Executive Branch agencies for their views on any national security, law enforcement, foreign policy, or trade policy concerns related to the foreign ownership of Paramount." *Id.* at *3 (citing *Process Reform for Executive Branch Review of Certain FCC Applications and Petitions Involving Foreign Ownership*, IB Docket 16-155, Report and Order, 35 FCC Rcd. 10927 (2020)). And it invited any "[i]nterested

persons" to "file comments no later than May 27, 2026," with replies due "no later than June 11, 2026." *Id.*

In July 2026—shortly after counsel for the Commission pointed out in *LiveVideo I* that LiveVideo was not a participant in Paramount's foreign ownership proceeding, *see* D.C. Cir. No. 26-1176, ECF No. 2182487 at 13, 16—LiveVideo began filing numerous pleadings in the agency's foreign ownership docket. *See* FCC Dkt. No. 26-93.[3] As before, LiveVideo quickly became by far the proceeding's most prolific participant, claiming conclusorily that it was a Paramount competitor, shareholder, and "public-interest commenter." *Motion for Leave to Accept Late-Filed Comments of LiveVideo.AI Corp.* at 10.[4] Among other things, LiveVideo filed hundreds of pages of untimely comments, *id.*, "ex parte presentation[s],"[5] exhibits that included photocopies of envelopes and

---

[3] https://www.fcc.gov/ecfs/search/search-filings/results?q=(proceedings.name:(%2226-93%22)).

[4] https://www.fcc.gov/ecfs/document/26110014680/1.

[5] https://www.fcc.gov/ecfs/document/26110016775/1.

screenshots of dockets[6], a motion to disqualify FCC Chairman Carr[7], "informal objections,"[8] and a "petition to deny."[9]

On September 17, 2026, the National Telecommunications and Information Administration, acting on behalf of the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector (Team Telecom), advised the FCC that it had no objection to the proposed foreign ownership agreement so long as the Commission conditioned its approval on Paramount's agreement to various conditions laid out in an accompanying letter of agreement. NTIA, *Petition to Adopt Conditions to Authorization and License* (Sept. 17, 2026);[10] *see also Team Telecom and Paramount Letter of Agreement* (Sept. 4, 2026).[11] The Video Division of the FCC's Media Bureau then issued a declaratory ruling permitting the proposed indirect foreign ownership in Paramount, subject to the "commitments and undertakings set forth in the Letter of Agreement" between Paramount

---

[6] https://www.fcc.gov/ecfs/document/26110016984/1.

[7] https://www.fcc.gov/ecfs/document/26110069211/1.

[8] https://www.fcc.gov/ecfs/document/26110075756/1.

[9] https://www.fcc.gov/ecfs/document/26110075885/1.

[10] https://www.fcc.gov/ecfs/document/26110076883/2.

[11] https://www.fcc.gov/ecfs/document/26110076883/1.

and Team Telecom. *In re Paramount Glob. Petition for Declaratory Ruling Under Section 310(b)(4) of the Commc'ns Act*, DA 26-1001, 2026 WL 2836949, at *1 (Sept. 17, 2026) (Declaratory Ruling).

The Media Bureau's Video Division found "that it will serve the public interest to grant the Petition, subject to [certain] conditions." Declaratory Ruling ¶3. It noted that that the Commission "has long recognized that foreign investment in U.S. companies and networks, including broadcast, fosters technical innovation, supports job creation, and strengthens the U.S. economy." Declaratory Ruling ¶21. It credited Paramount's assertions that foreign investment "would provide it with greater access to capital, improve the Licensees' newsgathering and reporting operations, and better position the company to 'weather continuing challenges facing broadcasters and operators of linear pay-television networks.'" Declaratory Ruling ¶22. Addressing commenters' concerns about foreign influence, the Video Division noted that the investment "is not a loan, which must be repaid, but a purchase of stock that has no voting rights," and credited Paramount's assertion that it would both retain domestic control of voting interests, and ensure non-interference with editorial decision-making. *Id.* Moreover, the Video Division noted Paramount's commitments in its letter of agreement with

Team Telecom, and expressly conditioned "approval of the Petition on Paramount's returning to the Commission for approval before giving the Foreign Investors additional rights, including but not limited to, any voting rights." *Id.* It warned of "monetary sanctions or other enforcement action by the Commission" if Paramount failed to remain in compliance with these conditions. Declaratory Ruling ¶27.

Lastly, the Video Division "decline[d] to resolve LiveVideo.AI's conflict of interest claims because they fall outside the scope of this proceeding." Declaratory Ruling n.16. It explained that because Paramount's "[p]etition is being resolved under the Media Bureau's delegated authority"—and thus not before the full Commission or any individual commissioners—disqualification of Chairman Carr "is not properly raised at this stage of the proceeding." *Id.* (citing 47 C.F.R. §§ 0.61, 0.283).

### 3. Paramount's Acquisition of Warner Bros.

On February 27, 2026, Paramount Skydance and Warner Bros. Discovery, Inc. entered into a preliminary merger agreement under which Paramount Skydance would acquire Warner Bros. sometime in the third quarter of 2026, subject to sufficient financing, shareholder approval, and various regulatory hurdles. Alex Weprin, *It's a Deal:*

*Paramount and Warner Bros. Discovery Unveil $111 Billion Megamerger*, THE HOLLYWOOD REPORTER (February 27, 2026).[12] Because Warner Bros. holds no television station broadcast licenses, the merger did not require FCC approval under the Communications Act's license transfer provisions.

The Paramount Skydance-Warner Bros. merger closed on Oct. 6, 2026. Benjamin Mullin, *Paramount Closes Deal for Warner Bros. Discovery, Creating New Media Behemoth*, NEW YORK TIMES (Oct. 6, 2026).[13]

### 4. LiveVideo's Petition for Review and Emergency Stay Motions

Meanwhile, on September 29, 2026, LiveVideo filed a petition for review in this Court challenging the foreign ownership declaratory ruling. *LiveVideo II*, ECF No. 2195519 at 1. The petition acknowledges that it seeks review of a decision issued by "the Media Bureau" "[a]cting

---

[12] https://www.hollywoodreporter.com/business/business-news/paramount-warner-bros-discovery-mega-deal-official-1236517004/.

[13] https://www.nytimes.com/2026/10/06/business/media/paramount-warner-bros-discovery-skydance.html.

on delegated authority," but nonetheless asserts that "[t]his Court has jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1)." *Id.*

On October 1, 2026, LiveVideo filed an emergency motion "for an immediate administrative stay, a * * * stay pending review, and expedited consideration" of its challenge to the Media Bureau's foreign ownership declaratory ruling. *LiveVideo II*, ECF No. 2195868 at 1-2.

On October 2, 2026, LiveVideo filed an emergency motion for leave to supplement its previous emergency stay motion in *LiveVideo I*, and for "an immediate administrative stay" of the foreign ownership declaratory ruling it had challenged in *LiveVideo II*. *LiveVideo I*, ECF No. 2196191 at 16-17.

Despite failing to explain how the events are related, both emergency motions are premised on the (now-consummated) Oct. 6 closing of Paramount-Skydance's acquisition of Warner Bros. *See LiveVideo II*, ECF No. 2195868 at 5; *LiveVideo I*, ECF No. 2196191 at 2. And despite the Commission's repeated attempts to explain to LiveVideo that it has been conflating distinct agency proceedings and corporate transactions (*LiveVideo I*, ECF Nos. 2182487 at 14-15, 2190509 at 9-13), LiveVideo's latest filings persist in treating Skydance's merger with Paramount, and the combined entity's subsequent acquisition of Warner

Bros., interchangeably with the different issue of foreign investment in Paramount. To briefly recap the key distinctions:

(1) As a statutory precondition of its acquisition by Skydance, Paramount in 2025 secured FCC approval to transfer control of its television station broadcast licenses to Skydance. The Paramount-Skydance merger closed in 2025, but the license transfer approval is the basis of LiveVideo's petition for review in *LiveVideo I*.

(2) As required by the Communications Act, Paramount-Skydance later petitioned for an FCC declaratory ruling permitting Paramount to accept foreign investment exceeding certain statutory thresholds. The bureau-level approval of that foreign investment is the basis for LiveVideo's petition for review in *LiveVideo II*.

(3) Paramount-Skydance acquired Warner Bros. in a merger that closed on Oct. 6, 2026. The FCC had no occasion to approve or disapprove that merger, nor were there any FCC proceedings directly governing that transaction.

## ARGUMENT

A stay pending appeal is "extraordinary relief." *Citizens for Responsibility and Ethics in Washington v. FEC*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam). It should not be granted unless the movant

can show that (1) it is likely to succeed on the merits, (2) it will suffer irreparable harm absent a stay, (3) a stay will not harm other parties, and (4) a stay is in the public interest. *Marin Audubon Soc'y v. FAA*, 129 F.4th 869, 871 (D.C. Cir. 2025). Even then, a stay pending appeal "is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 427 (2009).

LiveVideo's stay motions fail at every step.

## I. LIVEVIDEO IS UNLIKELY TO PREVAIL ON THE MERITS

This Court lacks jurisdiction over LiveVideo's petition for review in *LiveVideo II* because it challenges a bureau-level order, not a "final order[] of the Federal Communications Commission." 28 U.S.C. § 2342(1). "Ongoing agency review renders an order nonfinal for purposes of judicial review." *Int'l Telecard Ass'n v. FCC*, 166 F.3d 387, 388 (D.C. Cir. 1999). And because the Communications Act makes "[t]he filing of an application for review * * * a condition precedent to judicial review of any order" issued on delegated authority, 47 U.S.C. § 155(c)(7), it is "well established that 'a petition for review filed after a bureau decision but before resolution by the full Commission is subject to

dismissal as incurably premature." *NTCH, Inc. v. FCC*, 877 F.3d 408, 412 (D.C. Cir. 2017) (collecting cases).[14]

So too here. By its own account, LiveVideo seeks review of a decision issued by "the Media Bureau" "[a]cting on delegated authority." *LiveVideo II*, ECF No. 2195519 at 1; *see also* Declaratory Ruling ¶33 (invoking "authority delegated to the Media Bureau"). And LiveVideo has filed an application for Commission review of that bureau ruling. *See* FCC MB No. 26-93, LiveVideo.AI Corp.'s Application for Review of DA 26-1001 (Sept. 22, 2026).[15] Because that "[o]ngoing agency review renders [the challenged] order nonfinal," the "petition for review of the order is incurably premature," and must be dismissed. *Int'l Telecard Ass'n*, 166 F.3d at 388.

LiveVideo is well aware of these precedents and cites them in its emergency motion. *See LiveVideo II*, ECF No. 2195868 at 6-7.

---

[14] The Supreme Court endorsed this jurisdictional limitation in a recent stay proceeding. *See Nat'l Republican Congressional Comm. v. Brown*, No. 26A274, 2026 WL 2618462 (U.S. Sept. 4, 2026) (per curiam) (holding that because "the Communications Act makes clear that an aggrieved party must wait for the Commission to resolve its application for review by order before filing a petition for judicial review," a court of appeals "likely lacked statutory jurisdiction" to review bureau-level guidance).

[15] https://www.fcc.gov/ecfs/document/26110077749/1.

Nonetheless, it urges the Court to ignore this jurisdictional rule in favor of an All Writs Act stay "to prevent action that would frustrate future review." *Id.* While the Court may contemplate such extraordinary action in appropriate circumstances, *see Reynolds Metals Co. v. FERC*, 777 F.2d 760, 762-63 (D.C. Cir. 1985), no such circumstances exist here. For one thing, LiveVideo makes no effort to explain why proceeding in the ordinary course would "frustrate future review." And in any event, LiveVideo does not otherwise satisfy the criteria for a stay.

## II. LIVEVIDEO CANNOT ESTABLISH IRREPARABLE HARM FROM THE DECLARATORY RULING

In seeking a stay, "speculative and hypothetical" allegations of harm are insufficient, and a movant's failure "to provide any substantiation is a clear abuse of this court's time and resources." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 675 (D.C. Cir. 1985) (per curiam). That is the case here.

In its *LiveVideo II* petition, LiveVideo asserts that it "is aggrieved by the Ruling as a competing bidder for Paramount with direct commercial interests in the affected video-distribution, digital-audience, and advertising markets." ECF No. 2195519 at 2. But no one is "bidd[ing] for Paramount" in the foreign ownership proceeding. To the

extent that LiveVideo is suggesting that it was a "competing bidder for Paramount" when Skydance acquired Paramount in a 2025 deal worth $28 billion, that suggestion is both hard to believe and entirely beside the point—the declaratory ruling challenged here has nothing to do with that long-since-closed transaction.

To the extent LiveVideo is trying to assert that it is a competitor to Paramount-Skydance in "video-distribution, digital-audience, and advertising markets," that too is insufficient to establish irreparable harm. It would not even be enough for Article III standing. While this Court has recognized that "parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition," *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998), "a plaintiff must show that the challenged government action results in 'an actual or imminent increase in competition,'" and "must also show that it is in fact 'a *direct* and *current* competitor' in that market." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 279 (D.C. Cir. 2023) (emphasis in original). LiveVideo's vague assertions of competition satisfy none of those requirements.

In its renewed emergency stay motion in *LiveVideo I*, LiveVideo also claims that it "has continuously held Class B common stock in

Paramount since January 2025" and "faces immediate equity dilution and the alteration of statutory governance protections under Section 310(b)(4) through the unlawful introduction of foreign sovereign equity into Petitioner's specific equity tier." ECF No. 2196191 at 15. But equity dilution claims typically belong to the corporation, not to an individual shareholder (unless they hold a controlling interest), and depend on the corporation receiving inadequate compensation. *See F5 Cap. v. Pappas*, 856 F.3d 61, 72 (2d Cir. 2017). LiveVideo makes no such allegations here. And Section 310(b)(4) does not provide "statutory governance protections" to LiveVideo or any other shareholder.

In any event, LiveVideo offers no explanation for why any hypothetical pocketbook harms would be irreparable. "Harm that is 'merely economic' in character is typically not sufficiently grave under the irreparable injury standard." *Allina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61, 67 (D.D.C. 2010). And even if LiveVideo could demonstrate that it would ultimately suffer some cognizable harm from the declaratory ruling, it nonetheless fails to show that a stay is necessary to prevent such harm in the interim. Foreign ownership stakes can be (and not infrequently are) divested, voluntarily, by agreement, or by Commission order. *See, e.g.*, *In the Matter of Truphone, Inc.*, 37 FCC Rcd

12051 (2022) (consent decree with regulated party providing for divesture of foreign investment to comply with section 310(b)(4)'s ownership limits). In the unlikely event LiveVideo were to prevail on appeal, it could obtain complete relief from vacatur of the Commission order approving the challenged foreign investment.

## III. THE EQUITIES AND PUBLIC INTEREST DO NOT FAVOR A STAY

Finally, "to obtain preliminary relief," a movant must also show "that 'the balance of equities tips in [their] favor' and that 'an injunction is in the public interest.'" *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20–21 (2008). "These factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

Significant reliance interests of the companies involved, their investors, and their customers weigh against a stay here. On the other side of the scale, LiveVideo articulates no public interest or theory of harm in its favor. Instead, it recites numerous consequences it claims its proposed stay would *not* have. *See LiveVideo II*, ECF No. 2195868 at 18-20. It is the movant's burden, however, to show affirmative reasons for granting relief. *Marin Audubon Soc'y*, 129 F.4th at 871. LiveVideo fails to do so here.

In its *LiveVideo I* motion, LiveVideo also argues that "[t]he public interest strongly favors compliance with Section 310(b)(4), adherence to Commission delegation rules, and preservation of meaningful judicial review." *LiveVideo I*, ECF No. 2196191 at 16. True enough. But the Commission is entitled to the presumption that it has complied with Section 310(b)(4) and adhered to agency rules. "A presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *People for the Ethical Treatment of Animals v. United States Dep't of Agric. & Animal & Plant Health Inspection Serv.*, 918 F.3d 151, 157 (D.C. Cir. 2019) (citation omitted). Accordingly, there is no reason to think the equities favor a stay over judicial review in the ordinary course.

## CONCLUSION

Both stay motions should be denied and the petition for review in No. 26-1257 must be dismissed.

Dated: October 13, 2026

Respectfully submitted,

/s/ *Adam Sorensen*

Christopher S. Santini
*Acting General Counsel*

Jacob M. Lewis
*Associate General Counsel*

Adam L. Sorensen
*Counsel*

FEDERAL COMMUNICATIONS COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal Communications Commission*

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1):

   ☒ this document contains 3,548 words, *or*

   ☐ this document uses a monospaced typeface and contains ____ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☒ this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook, *or*

   ☐ this document has been prepared in a monospaced spaced typeface using ________________ with ___________________.

/s/ *Adam Sorensen*
Adam Sorensen
*Counsel for Respondent*
*Federal Communications Commission*